FILED

MC

10/1/2020

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

WEC 98C-4 LLC,

        Plaintiff,

v.

SAKS, INCORPORATED,

        Defendant

and

TOCU II LLC,

        Plaintiff-Intervenor,

        v.

SAKS, INCORPORATED,

        Defendant.

Case No.  20-04363

**COMPLAINT IN INTERVENTION**

TOCU II LLC, a Delaware limited liability company ("TOCU II" or "Plaintiff-Intervenor"), by and through Midland Loan Services, a division of PNC Bank, National Association ("Midland"), solely in its capacity as servicer, and through its undersigned counsel, for its Complaint in Intervention against Saks, Incorporated ("Saks" or "Defendant") hereby alleges as follows:

**PARTIES**

1.      Plaintiff-Intervenor TOCU II is a Delaware limited liability company with all of its members being domiciled and its principal place of business in California, and is the lender under the Loan,[1] the holder of the A Note, and the assignee of the Lease Guaranty.

---

[1] Capitalized terms in the Parties section of this Verified Complaint are defined below in the Introduction section.

2.      Plaintiff WEC 98C-4 LLC is a Texas limited liability company with its principal place of business and its members in New Jersey.

3.      Midland is the master servicer for Plaintiff-Intervenor for the Loan and has the power and authority to administer the Loan for Plaintiff-Intervenor and to enforce the terms of the Loan Documents.

4.      Saks is a Tennessee corporation with its principal place of business in New York and is the successor-in-interest to Profitts, Inc., guarantor under the Lease Guaranty.

## VENUE AND JURISDICTION

5.      Personal jurisdiction exists over Defendant because Defendant has made or performed a contract or promise substantially connected with Illinois.

6.      Subject matter jurisdiction exists through diversity of citizenship among all parties pursuant to 28 U.S.C. § 1332(a), and  the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claim occurred in this District.

## INTRODUCTION

*A.      The Former Department Store and Lease*

8.      WEC 98C-4 LLC ("Borrower" or "Landlord") is the current title-holder to certain real property commonly known as 7501 W. Cermak Road, North Riverside, Cook County, Illinois (as hereinafter defined, the "Premises").

9.      The Premises was subject to the terms of that certain Lease Agreement dated October 31, 1985 (the "Lease") among Chicago Title & Trust Company, as trustee under a Trust Agreement dated June 15, 1985 and known as Trust No. 1085900 and Six Anchors Limited Partnership as landlord and CPS Realty Partnership as tenant ("Tenant").  Attached as Exhibit A

and incorporated by reference is a true and complete copy of the Lease and amendments thereto.

10. The Premises is located within the North Riverside Park Mall and for many years the Tenant operated a department store known as Carson Pirie Scott.

**B.     *Secured Debt Encumbering the Premises***

11. On August 5, 1998, Red Mountain Funding, L.L.C. ("Original Lender") made a loan (the "Original Loan") to Landlord in the original principal amount of $14,012,500.00, as evidenced by certain agreements dated August 5, 1998 including, without limitation, a (i) Promissory Note (the "Original Note"), (ii) Mortgage, Security Agreement and Assignment of Leases and Rents (the "Mortgage") recorded in the Office of the Recorder of Deeds of Cook County, Illinois (the "Recorder of Deeds") on August 10, 1998 as Document Number 98700245, and (iii) Assignment of Lease and Rents (the "ALR").  Attached as Exhibit B and incorporated by reference is a true and complete copy of the ALR.

12. Also on August 5, 1998, Proffitt's Inc., a Tennessee corporation and predecessor-in-interest to Saks, signed a certain Corporate Guaranty in favor of Borrower (the "Lease Guaranty") as it relates to Tenant's obligations under the Lease.  Attached as Exhibit C and incorporated by reference is a true and complete copy of the Lease Guaranty.

13. Pursuant to the ALR the Borrower assigned to the Original Lender "all of Borrower's estate, right, title and interest in, to and under the Lease and the Lease Guaranty[.]" (Ex. B at 1.)  Specifically the ALR designated the Original Lender to receive rents due under the Lease, and the right to enforce the Lease Guaranty, which guarantees the prompt payment and performance of all obligations under the Lease.  (Ex. B at 2, 4.)

14. On June 18, 2004, Borrower and Original Lender split the Original Note into two loans as evidenced by (a) that certain Promissory Note A in the original principal amount of

$8,372,716.00 (as amended, modified or restated, hereinafter the "A Note") and (b) that certain Promissory Note B in the original principal amount of $4,924,759.00 (as amended, modified or restated, hereinafter the "B Note") (the A Note and B Note are collectively referred to herein as the "Notes" and evidence the "Loan").[2]

15.     Original Lender later endorsed the A Note and assigned the Mortgage and ALR to TOCU II.

**C.     Events of Default Under the Loan and Lease Guaranty**

16.     On February 4, 2018, Tenant's parent company sought bankruptcy protection in a proceeding styled *In re: The Bon-Ton Stores, Inc*., Case No. 18-10248 in the United States Bankruptcy Court for the District of Delaware (the "Tenant Bankruptcy Case").

17.     Borrower failed to make the scheduled payment on the Loan in February 2018 as required by the terms of the Notes.

18.     Borrower's failure to pay the amounts due under the Notes constituted an Event of Default under each agreement and under the Mortgage.

19.     A "Lease Default" exists pursuant to Section 21(p) of the Mortgage because the Tenant filed for bankruptcy protection and failed to remit required lease payments.

20.     On August 31, 2018, the Lease was rejected in the Tenant Bankruptcy Case.

21.     The Tenant's rejection of the Lease triggered Saks' obligations under the Lease Guaranty, including, *inter alia*, prompt payment of minimum and additional rents due and performance under the Lease. Saks' obligations under the Lease Guaranty are owed to TOCU II by virtue of the ALR.

---

[2] The Notes, the Mortgage, and all other documents evidencing, securing or relating to the Loan are sometimes referred to collectively as the "Loan Documents."

22.     Borrower's demands to Saks for payment under the Lease Guaranty went altogether unfulfilled.

**D.      The Mortgage Foreclosure Proceeding**

23.     On September 14, 2018 TOCU II commenced in the Circuit Court of Cook County, Illinois ("State Court") a mortgage foreclosure action to foreclose on the Mortgage and any junior liens and encumbrances on the Mortgaged Property (the "Mortgage Foreclosure Proceeding").

24.     On October 2, 2018, the State Court entered an order appointing John Suzuki of Collateral Trustee, Inc. (the "Receiver") as the receiver of the Premises.

25.     The Receiver immediately engaged CBRE as broker for the purpose of conducting a nationwide search to re-let the Premises.  CBRE's listing and active marketing has continued nationally since the Receiver was appointed but the Premises remain vacant.

26.     On November 12, 2019, the State Court judge entered summary judgment of mortgage foreclosure and other relief in favor of TOCU II (the "Foreclosure Judgment") which, among other things, (i) permitted a judicial sale of the Mortgaged Property; and (ii) entered judgment against Borrower in the amount of $10,548,701.86 (the "Judgment").  Attached as Exhibit D and incorporated by reference is a true and complete copy of the Judgment.

27.     On January 10, 2020, a judicial sale of the Mortgaged Property took place and TOCU II was the winning bidder having credit bid $2,250,000.

28.     During the pendency of the Mortgage Foreclosure Proceeding, TOCU II has reimbursed the Receiver for his fees plus certain expenses including, without limitation, property taxes, common area maintenance costs, utilities, and property maintenance (collectively, the "Carry Costs").  The 2019 Carry Costs were $938,415 and the 2020 Carry Costs projection is

approximately $880,000 exclusive of attorneys' fees and costs. Moreover, deferred maintenance exceeds $1 million.

29.     Pursuant to the terms of the ALR, Borrower has irrevocably assigned to TOCU II all of Borrower's interest in the Lease Guaranty together with all rights, powers, privileges, options and other benefits.

<div align="center">

**COUNT I**
**BREACH OF CONTRACT**

</div>

30.     Plaintiff adopts and realleges paragraphs 1 through 29 above as though fully set forth and incorporated herein as this paragraph 30.

31.     As additional security for the payment and performance of Borrower's obligations under the Loan, Borrower granted the ALR.

32.     The ALR evidences Borrower's irrevocable assignment to Plaintiff of all interest in the Lease Guaranty together with all rights, powers, privileges, options and other benefits.

33.     Plaintiff has a valid and enforceable judgment against Borrower in the amount of no less than $10 million.

34.     Plaintiff and the Receiver through CBRE have attempted to re-let the Premises since the Lease was rejected in the Tenant Bankruptcy Case.

35.     The Lease requires monthly payment of minimum rent during the lease term.

36.     The Lease also requires prompt payment of additional rent—including the Carry Costs—as incurred during the lease term.

37.     Saks guaranteed the "full, faithful and prompt performance of all the covenants, terms, conditions, and agreements" of the Tenant under the Lease.

38.     Saks' obligations under the Lease Guaranty are absolute and unconditional and "[n]o termination of the Lease or taking or recovering of the premises demised thereby shall

deprive Landlord of any of its rights and remedies against Guarantor under this Guaranty." Ex. C at 4.

39.     The Lease Guaranty "shall apply to the Obligations arising on or before January 31, 2024[.]" Ex. C at 4.

40.     As a direct and proximate cause of Saks' failure to pay the monthly minimum rent and additional rent including, without limitation, the Carry Costs, deferred maintenance, and attorneys' fees and costs, Plaintiff has been damaged in an amount currently exceeding $5,000,000 and the damages will continue to accrue monthly during the Lease term.

WHEREFORE, Plaintiff requests:

(A)     A judgment against Saks, Incorporated in an amount to be established at trial; and

(B)     Such other and further relief as the Court deems just and proper, including, but not limited to, declaratory and injunctive relief.

TOCU II LLC, a Delaware limited liability company

By: */s/ Thomas B. Fullerton*
One of its attorneys

Mark S. Bernstein (6198568)
Thomas B. Fullerton (6296539)
Jordan D. Mobley (6313519)
Akerman LLP
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
(312) 634-5700
mark.bernstein@akerman.com
thomas.fullerton@akerman.com
jordan.mobley@akerman.com

# Exhibit A

.DFF/10-29-85
0723R
North Riverside

<u>LEASE</u>

by and between

CHICAGO TITLE & TRUST COMPANY, as trustee
under a Trust Agreement dated June 15, 1985
and known as Trust No. 1085900,

and

SIX ANCHORS LIMITED PARTNERSHIP,
a Maryland limited partnership, as Landlord

and

CPS REALTY PARTNERSHIP, an Illinois general partnership,
as Tenant

This instrument prepared by

Sidley & Austin
One First National Plaza
Chicago, Illinois 60603

Date:   October 31, 1985

DFF/10-29-85
0723R

## TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| 1. | Lease of Demised Premises; Fixed Term . . . . . . | 1 |
| 2. | Certain Definitions . . . . . . . . . . . . . . . | 2 |
| 3. | Basic Rent and Percentage Rent . . . . . . . . . | 6 |
| 4. | Additional Rent . . . . . . . . . . . . . . . . . | 14 |
| 5. | No Counterclaim, Abatement, etc. . . . . . . . . . | 14 |
| 6. | Extension of Demised Term . . . . . . . . . . . | 14 |
| 7. | Payment of Impositions, etc. . . . . . . . . . . . | 15 |
| 8. | Compliance with Legal and Insurance Requirements, Instruments, etc. . . . . . . . . . | 16 |
| 9. | Liens, etc. . . . . . . . . . . . . . . . . . . . | 16 |
| 10. | Permitted Contests . . . . . . . . . . . . . . . | 17 |
| 11. | Use of Demised Premises, etc. . . . . . . . . . . | 18 |
| 12. | Utility Services . . . . . . . . . . . . . . . . | 20 |
| 13. | Indemnification by Tenant . . . . . . . . . . . . | 20 |
| 14. | Maintenance and Repair, etc. . . . . . . . . . . . | 21 |
| 15. | Improvements, Alterations and Changes . . . . . . | 21 |
| 16. | Improvements; Tenant's Equipment . . . . . . . . . | 23 |
| 17. | No Claims Against Landlord, etc. . . . . . . . . . | 24 |
| 18. | Insurance . . . . . . . . . . . . . . . . . . . . | 24 |
| 19. | Damage, Destruction or Taking; Exchange . . . . . | 26 |
| 20. | Events of Default; Termination . . . . . . . . . . | 35 |
| 21. | Repossession, etc., by Landlord . . . . . . . . . | 37 |
| 22. | Reletting . . . . . . . . . . . . . . . . . . . . | 37 |

- i -

DFF/10-29-85
0723R

| Section | | Page |
|---------|---|------|
| 23. | [Deleted] . . . . . . . . . . . . . . . . . . . | 37 |
| 24. | Survival of Tenant's Obligations; Damages. . . . . | 37 |
| 25. | Tenant's Waiver of Statutory Rights . . . . . . . | 39 |
| 26. | Assignment of Landlord's Interest . . . . . . . . | 39 |
| 27. | Surrender of Demised Premises, etc. . . . . . . . | 40 |
| 28. | No Merger of Title . . . . . . . . . . . . . . . | 40 |
| 29. | Assignment and Subletting. . . . . . . . . . . . | 40 |
| 30. | Consents and Approvals . . . . . . . . . . . . . | 42 |
| 31. | Right of Landlord to Perform, etc. . . . . . . . | 42 |
| 32. | Estoppel Certificate . . . . . . . . . . . . . . | 43 |
| 33. | No Waiver, etc., by Landlord . . . . . . . . . . | 43 |
| 34. | Right to Enjoin . . . . . . . . . . . . . . . . | 43 |
| 35. | Remedies, etc., Cumulative . . . . . . . . . . . | 43 |
| 36. | Condition of Title and the Demised Premises. . . . | 44 |
| 37. | Exhibition . . . . . . . . . . . . . . . . . . . | 44 |
| 38. | Inspection . . . . . . . . . . . . . . . . . . . | 44 |
| 39. | Subordination, Attornment and Nondisturbance . . . | 44 |
| 40. | Tenant's Purchase Options. . . . . . . . . . . . | 45 |
| 41. | Liability of Beneficiary . . . . . . . . . . . . | 50 |
| 42. | Notices, etc. . . . . . . . . . . . . . . . . . | 51 |
| 43. | Exculpation of Land Trustee. . . . . . . . . . . | 51 |
| 44. | Miscellaneous . . . . . . . . . . . . . . . . . | 51 |
| Exhibit A - Description of Land. . . . . . . . . . . . | | |
| Exhibit B - Rental Terms . . . . . . . . . . . . . . | | |

- ii -

DFF/10-29-85
0723R

Section                                                              Page

Exhibit C – Schedule of Leases . . . . . . . . . . . . . . .

Exhibit D – [Deleted]. . . . . . . . . . . . . . . . . . .

Exhibit E – Schedule of Lease Years. . . . . . . . . . . .

Exhibit F – Schedule of Instruments Constituting Operating
            Agreement. . . . . . . . . . . . . . . . . . .

Exhibit G – [Deleted]. . . . . . . . . . . . . . . . . . .

Exhibit H – Schedule of Existing Mortgages . . . . . . . .

DFF/10-29-85
0723R

<u>LEASE</u>

THIS LEASE, made October 31, 1985, between CHICAGO
TITLE & TRUST COMPANY, as trustee under a Trust Agreement dated
June 15, 1985 and known as Trust No. 1085900 (hereinafter
referred to as the "Land Trustee"), and SIX ANCHORS LIMITED
PARTNERSHIP, a Maryland limited partnership having an office
and place of business at Suite 650, 502 Washington Avenue,
Towson, Maryland 21204 (hereinafter referred to as the
"Beneficiary" and hereinafter collectively with the Land
Trustee  referred to as "Landlord"), and CPS REALTY
PARTNERSHIP, an Illinois general partnership having its office
and principal place of business at One South Street, Chicago,
Illinois 60603 (hereinafter referred to as "Tenant"),

W I T N E S S E T H:

1.  <u>Lease of Demised Premises; Fixed Term</u>.  Landlord,
for and in consideration of the covenants and conditions herein
contained, does hereby lease to Tenant and Tenant does hereby
hire and take from Landlord, upon and subject to the covenants
and conditions herein contained, the following property:

(a)  the 11.55 $\pm$ acre parcel of land situate and
lying in North Riverside, Illinois and more fully described in
Exhibit A attached hereto (the "Land");

(b)  a department store building containing
180,550 $\pm$ square feet of gross floor area located on the Land
and all fixtures (excluding trade fixtures), machinery, and
equipment affixed thereto and constituting a part thereof,
including, without limitation, all furnaces, boilers, heaters,
electrical equipment, heating, plumbing, refrigerating,
ventilating, waste disposal, air-cooling and air-conditioning
apparatus and sprinkler systems (the "Improvements");

TOGETHER WITH all rights-of-way or uses, privi-
leges, franchises, servitudes, licenses, easements, tenements,
hereditaments and appurtenances now or hereafter belonging or
appertaining to any of the foregoing, including those with
respect to lands adjacent to the lands referred to in paragraph
(a) above (but in no case including such adjacent lands or
improvements or other property, whether real, personal or
mixed, thereon);

the Land, Improvements, and all such rights-of-way or use,
privileges, franchises, servitudes, licenses, easements,

DFF/10-29-85
0723R

tenements, hereditaments and appurtenances, being hereinafter collectively referred to as the "Demised Premises" or "North Riverside";

SUBJECT, HOWEVER, to the Mortgage and the Permitted Exceptions;

To Have and To Hold for a term commencing on the date hereof and continuing through 11:59 p.m. on February 3, 2001 (herein referred to as the "Fixed Term"), and, at Tenant's option as provided in section 6, for one or more extended periods, unless this Lease is sooner terminated as hereinafter provided (said term, including the extended portion or portions thereof if so extended, or as shortened by any earlier termination of this Lease, being hereinafter referred to as the "Demised Term").

2. <u>Certain Definitions</u>. As used in this Lease the following terms have the following respective meanings unless the context otherwise requires:

<u>Aggregate Basic Rent</u>: means the total of the Basic Rent under all of the Leases as shown on Exhibit B hereto and labelled as such.

<u>Aggregate Demised Premises</u>: as defined in section 3.

<u>Aggregate Maximum Rent</u>: means the maximum total Basic Rent and Percentage Rent as shown on Exhibit B hereto and labelled as such.

<u>Approved Independent Auditor</u>: means (a) an independent certified public accounting firm which, at the time in question, is considered to be a "Big Eight" accounting firm, or (b) such other independent public accounting firm as may be selected by the party charged with its employment and approved by the other party hereto.

<u>Basic Rent</u>: as defined in section 3.

<u>CPS</u>: means Carson Pirie Scott & Company, its permitted successors and assigns.

<u>Default</u>: any condition or event which constitutes an Event of Default or which, after notice or lapse of time or both, constitutes an Event of Default.

<u>Default Rate</u>: shall be a rate of interest equal to the lesser of: (a) the maximum amount of interest permitted under applicable state law, or (b) the greater of (i) four percent (4%) in excess of the

- 2 -

DFF/10-29-85
0723R

yield, from time to time, as quoted daily in the Wall
Street Journal (or if the same is not then published,
another similar national journal selected by Landlord),
of U.S. Treasury Bonds having an maturity closest to
that date which is ten (10) years after the date of
the Event of Default, or (ii) sixteen percent (16%)
per annum.

Demised Premises:  as defined in section 1.

Demised Term:  as defined in section 1.

Event of Default:  as defined in section 20.

Exchange Property:  as defined in section 19.4.

Existing Mortgages:  means the mortgages, deeds of
trust, financing statements and other security
instruments encumbering all or any portion of the
Demised Premises described on Exhibit H hereto.

Fixed Term:  as defined in section 1.

Gross Sales:  as defined in section 3.

Impositions:  all taxes, assessments (including, with-
out limitation, all assessments for public improvements
or benefits, whether or not commenced or completed
prior to the date hereof and whether or not to be com-
pleted within the term hereof), water, sewer or other
rents, rates and charges, excises, levies, license
fees, permit fees, inspection fees and other authori-
zation fees and other charges (other than any income,
excess profits, franchise taxes or similar taxes of
Landlord, unless and only to the extent that such tax
is levied on Landlord in lieu of real estate taxes on
·the Demised Premises), in each case whether general or
special, ordinary or extraordinary, or foreseen or
unforeseen, of every character (including all penalties
or interest thereon), which at any time before, during
or in respect of the Demised Term hereof may be
assessed, levied, confirmed or imposed on or in respect
of or be a lien upon (a) the Demised Premises or any
part thereof or any rent therefrom or any estate, right
or interest therein, or (b) any occupancy, use or pos-
session of the Demised Premises or any part thereof.
Impositions shall also include all charges or assess-
ments on account of or due under the Operating
Agreement at any time before, during or in respect of
the Demised Term.

- 3 -

DFF/10-29-85
0723R

Insurance Requirements: all terms and provisions of any insurance policy covering or applicable to the Demised Premises or any part thereof and all orders, rules, regulations and other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) applicable to or affecting the Demised Premises or any part thereof or any use or condition of the Demised Premises or any part thereof.

Lease Year: as defined in section 3.

Leases: (a) this Lease, (b) any leases for the Exchange Property, and (c) those five (5) other leases of even date herewith between Landlord and Tenant for the premises listed on Exhibit C attached hereto, or for any other property exchanged for such premises pursuant to the terms of such leases.

Legal Requirements: all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions and requirements of all governments, departments, commissions, boards, courts, authorities, agencies, officials and officers, foreseen or unforeseen, ordinary or extraordinary, which now or at any time hereafter may be applicable to the Demised Premises or any part thereof, or any of the adjoining sidewalks, curbs, vaults and vault space, if any, streets or ways, or any use or condition of the Demised Premises or any part thereof, including without limitation requirements regarding the removal or other disposition of asbestos, lead-based paints or other hazardous materials.

Maximum Rent: means the Maximum Rent allocable to the Demised Premises as set forth on Exhibit B hereto and labelled as such.

Mortgage: means only those mortgages or deeds of trust created or assumed by Landlord and at any time encumbering the fee simple estate in any or all of the Demised Premises, and any other security interest created or assumed by Landlord therein and existing at any time under any other form of security instrument or arrangement used from time to time in the locality of the Demised Premises (including, by way of example rather than of limitation, any such other form of security arrangement arising under any deed of trust,

- 4 -

DFF/10-29-85
0723R

sale-and-leaseback documents, lease-and-leaseback
documents, security deed or conditional deed, or any
financing statement, security agreement or other docu-
mentation used pursuant to the provisions of the
Uniform Commercial Code or any successor or similar
statute), provided that such mortgage, deed of trust
or other form of security instrument, and an instrument
evidencing any such other form of security arrangement,
has been recorded among the Land Records or in such
other place as is, under applicable law, required for
such instrument to give constructive notice of the
matters set forth therein.

Mortgagee:  any holder of or beneficiary under a
Mortgage.

Operating Agreement:  the covenants, easements and
restrictions affecting the Demised Premises and relat-
ing to the construction and operation of the retail
shopping center of which the Demised Premises are a
part, a schedule of which is attached hereto as Exhibit
F, as such may be modified from time to time pursuant
to Section 11.3.

Partial Taking:  a Taking which is not a Total Taking.

Percentage Rent:  as defined in section 3.

Permitted Exceptions:  all encumbrances, liens and
other matters affecting title to or the use of the
Demised Premises whether or not of record existing
before the acquisition of the Demised Premises by
Landlord (except the Existing Mortgages) and any other
such matters created by or the creation of which is
consented to by Tenant (except the Mortgage).

Restoration:  the replacement, repair or restoration
of the Demised Premises as nearly as practicable (in
the case of a Taking, after giving effect to any
reduction in area caused thereby) to the value and
general utility thereof immediately prior to such
damage, destruction or Taking, together with any
necessary temporary repairs and property protection
pending completion of the work, and such alterations
and additions as may be made at Tenant's election
pursuant to and subject to the conditions of section
15.

- 5 -

DFF/10-29-85
0723R

Taking: a transfer during the term hereof of all or
any part of the Demised Premises or any interest
therein or right accruing thereto, as the result of or
in lieu of or in anticipation of the exercise of the
right of appropriation, confiscation, condemnation or
eminent domain, or a change of grade during the term
hereof affecting the Demised Premises or any part
thereof.

Tenant's Equipment: all merchandise counters and
cabinets, cash registers and point of sale machines,
accounting machines, and office equipment and all
trade fixtures and other furniture, furnishings and
equipment (including alterations, replacements, sub-
stitutions or additions thereto) not owned by Landlord
which (a) are removable without damage to the Demised
Premises which damage is not subject to being
repaired, (b) which were not intended by Tenant to
remain permanently in place when installed and (c) are
used principally in connection with the business being
conducted by Tenant or by others holding under Tenant
and may also be used in connection with the operation,
maintenance or protection of the Demised Premises or
any part thereof.

Total Taking: a Taking of all or substantially all of
the Demised Premises.

Unavoidable Delays: delays due to strikes, labor
disputes (including lock-outs arising out of labor
disputes), acts of God, inability to obtain labor or
materials, laws, ordinances, rules, regulations or
orders of governmental authorities, enemy or hostile
action, civil commotion, fire or casualty or any other
conditions or causes beyond the reasonable control of
Tenant; provided that, for the purposes of this
definition, lack of funds or lack of sales shall not
be deemed a cause beyond the reasonable control of
Tenant.

3.   Basic Rent and Percentage Rent.

    3.1.  Basic Rent.  Tenant covenants and agrees to pay
as net rental (over and above any additional payments to be made
by Tenant as hereinafter provided) to Landlord for the Demised
Premises for each Lease Year of the Demised Term the amounts of
Basic Rent for the Demised Premises set forth in Exhibit B
attached hereto (hereinafter referred to as the "Basic Rent").
The Basic Rent shall be payable, in equal monthly installments

DFF/10-29-85
0723R

in advance on the first day of each full calendar month during
the Demised Term, with a payment of prorated Basic Rent for the
period from the date hereof to the first day of the first full
calendar month in the Demised Term being payable on the com-
mencement date hereof.   The Basic Rent and all other amounts
due to Landlord from Tenant under the terms of this Lease shall
be payable to the Beneficiary at the office of the Beneficiary
set forth above, or to such agent or at such other place as
Beneficiary may from time to time designate by notice to Tenant.
The Basic Rent shall be absolutely net to Landlord, so that this
Lease shall yield net, to Landlord, such Basic Rent throughout
the Demised Term of this Lease.   Notwithstanding the foregoing,
Tenant shall not be obligated to pay any income, excess profits,
franchise tax or similar tax of Landlord, unless and only to the
extent that such tax is levied on Landlord in lieu of an Impo-
sition for real estate taxes on the Demised Premises.   All
amounts payable under this section 3, as well as all other
amounts payable by Tenant to Landlord under the terms of this
Lease, shall be paid to Beneficiary at the office of Beneficiary
in lawful money of the United States of America which shall be
legal tender for payment of all debts and dues, public and
private, at the time of payment.

        3.2.   Percentage Rent.

            3.2.1.   Defined.   Commencing with the eleventh
Lease Year and for each Lease Year thereafter during the Demised
Term hereof, in addition to the Basic Rent and all other sums
required to be paid by Tenant to Landlord hereunder, Tenant
shall pay to Landlord in the manner and to the extent set forth
in Section 3.2.2 a sum (hereinafter referred to as "Percentage
Rent") equal to the product obtained by multiplying (a) a
fraction, the numerator of which is the Basic Rent hereunder
for each such Lease Year and the denominator of which is the
Aggregate Basic Rent for such Lease Year, times (b) the amount
by which (1) the lesser of (x) the product obtained by multi-
plying the Applicable Percentage specified on Exhibit B hereto
for such Lease Year times the Gross Sales for such Lease Year
and (y) the Aggregate Maximum Rent specified in Exhibit B for
such Lease Year, exceeds (2) the Aggregate Basic Rent for such
Lease Year.

            3.2.2.   Payment of Percentage Rent.   For the
eleventh Lease Year the total amount of Percentage Rent due, if
any, shall be payable within five (5) days following the receipt
of the annual statement of Gross Sales required by section 3.2.6
hereof.   Beginning with the twelfth Lease Year, and for each
Lease Year thereafter, there shall be due and payable monthly,
in advance, at the same time, form and manner of payment as

- 7 -

DFF/10-29-85
0723R

Basic Rent, an estimated amount of Percentage Rent which shall
be equal to one-twelfth (1/12) of the amount by which the total
Basic Rent and Percentage Rent payable for the immediately
preceding Lease Year exceeds the monthly payment of Basic Rent
due for the current Lease Year. It is recognized that the total
amount of Percentage Rent for each Lease Year will not be
determinable until the annual statement of Gross Sales for such
Lease Year has been delivered following the end of such Lease
Year. Thus, the estimated monthly payments of Percentage Rent
coming due in each Lease Year, prior to the delivery of the
annual statement of Gross Sales for the immediately preceding
Lease Year, shall be equal to the amount by which the total
monthly payment of Basic Rent and estimated Percentage Rent, if
then payable, due for the last month of the preceding Lease
Year exceeds the monthly payment of Basic Rent for such current
Lease Year. Following delivery of the annual statement of
Gross Sales for the previous Lease Year and the computation of
the Percentage Rent, if any, due for such Lease Year, the
monthly payment of estimated Percentage Rent shall be adjusted
to reflect the actual total rent payable for the preceding
Lease Year. Tenant's obligation to pay accrued but unpaid
Percentage Rent for any Lease Year shall survive any termination
of this Lease or any expiration of the Demised Term.

3.2.3. Adjustments. Within five (5) days follow-
ing the delivery of the annual Statement of Gross Sales for
each Lease pursuant to section 3.2.6 hereof, the Percentage
Rent payable for such Lease Year shall be determined and each
party hereby agrees to pay to the other, on demand, the amount
of any excess or deficiency in estimated Percentage Rent paid
by Tenant to Landlord during the preceding Lease Year. Each
party further agrees to pay to the other within (5) days from
receipt of the annual statement of Gross Sales for the preceding
Lease Year any excess or deficiency in the monthly payments of
estimated Percentage Rent made during the current Lease Year
prior to the receipt of such annual statement of Gross Sales so
that the total estimated payments of Percentage Rent received
(as adjusted) under the Leases shall equal the amount due had
the sum of the Basic Rent and Percentage Rent payable for the
prior Lease Year under the Leases been known at the commencement
of the current Lease Year. The obligation of the parties to so
adjust shall survive any termination of this Lease or any
expiration of the Demised Term.

3.2.4. "Lease Year" Defined. The first Lease
Year shall commence on the first day of the Demised Term and
shall end at the close of the twelfth full calendar month fol-
lowing the commencement of the Demised Term. Thereafter for
the next eight (8) years of the Demised Term each Lease Year

- 8 -

DFF/10-29-85
0723R

shall consist of successive periods of twelve (12) calendar months. The tenth Lease Year shall commence on the day following the last day of the ninth Lease Year and shall end on February 3, 1996. Thereafter each Lease Year of the Demised Term shall be as shown on Exhibit E hereto, it being the intent of the parties hereto that each Lease Year beginning with the eleventh Lease Year shall correspond with Tenant's fiscal year.

3.2.5. "Gross Sales" Defined. For the purpose of calculating Percentage Rent, "Gross Sales" means the gross amount received or to be received from all sales, both cash and on credit, made on or from the Demised Premises and all of the other premises demised by Landlord to Tenant under the Leases (hereinafter referred to as the "Aggregate Demised Premises"), whether received or to be received by Tenant or CPS, or any affiliate, assignee, sublessee, licensee or concessionaire of either, and shall include the gross amounts so received or to be received for orders taken on the Aggregate Demised Premises though filled elsewhere, and, in cases of sales on credit, whether or not payment be actually made therefor, together with all charges for services made in or upon the Aggregate Demised Premises. Notwithstanding the foregoing, the following shall not be included in and, if previously included, shall be deducted from Gross Sales:

(i) all credits and refunds made to customers for merchandise returned or exchanged;

(ii) all sales of merchandise and services sold to employees of Tenant or CPS or any affiliate of CPS at a discount;

(iii) all payments made to third party credit or bank card companies as a discount rate on purchases charged at the Aggregate Demised Premises but not to exceed 2% of Gross Sales for each Lease Year;

(iv) receipts from public telephones, stamp machines and vending machines (other than from vending machine sales of merchandise made to customers of Tenant or CPS or any affiliate, assignee, sublessee, licensee or consessionaire of either), public toilets or public lockers;

(v) charges for parcel post or other delivery charges, gift boxes for purchases, gift wrapping, alteration service and workroom operations, shoe repair, hat repair, engraving, monogramming, pressing, cleaning, mending, and similar minor auxiliary services not usually or customarily considered as merchandise or rendition of services for profit;

- 9 -

DFF/10-29-85
0723R

(vi)   sales by licensees or concessionaires
(excluding CPS and any affiliate of Tenant or CPS) of Tenant but
not in excess of 10% of Gross Sales for each Lease Year, provi-
ded there shall be included in Gross Sales all payments received
by Tenant or CPS from such licensees or concessionaires;

(vii)   all sums and credits received in settle-
ment of claims for loss or damage to merchandise, or for mer-
chandise transferred to other stores not part of the Aggregate
Demised Premises or returned to manufacturers or jobbers for
refund;

(viii)   all sums received by or paid to Tenant
or CPS on account of any sales tax or other similar tax col-
lected by Tenant or CPS from its customers on merchandise or
services which Tenant or CPS collects and pays, pursuant to any
law or laws now or hereafter in force;

(ix)   sales of fixtures, equipment or property
which is not stock in trade;

(x)   interest, service, finance or sales
carrying charges or other charges paid by customers or others
to Tenant for the extension of credit on sales, including
revolving credit insurance and health and accident insurance
issued in connection with customer credit;

(xi)   merchandise purchased with gift certifi-
cates, provided that the sale of such gift certificates shall
be included in Gross Sales;

(xii)   sales on orders where (a) the order is
not received at or filled from the Aggregate Demised Premises
and Tenant does not receive payment at the Aggregate Demised
Premises in connection therewith or (b) the order is placed at
the Aggregate Demised Premises (but not filled from the Aggre-
gate Demised Premises) for items sold by Tenant only through
mail orders where such items are neither physically sold nor
displayed on the Aggregate Demised Premises,

(xiii) the retail price allowed on all merchan-
dise traded in by customers for credit or the amount of credit
for discounts and allowances made in lieu of acceptance thereof,
provided such amounts were previously included in Gross Sales.

There shall not be deducted from such Gross Sales any
income, excess profits, capital stock, franchise or other taxes
based upon or measured by Tenant's income or profit.

- 10 -

DFF/10-29-85
0723R

3.2.6. <u>Statements of Gross Sales</u>. Tenant shall deliver to Landlord at the office of Beneficiary: (a) beginning with the first month of the eleventh Lease Year and within thirty (30) days after the close of each fiscal period of Tenant (approximately thirty (30) days) of the Demised Term thereafter, a written report signed by Tenant or by an authorized officer or agent of CPS, showing the Gross Sales made in the preceding fiscal period unless the Tenant has paid one twelfth of the Maximum Rent for such year for any such fiscal period, (b) for the first nine Lease Years, within ninety (90) days after the close of each fiscal year of Tenant all or part of which is included in any such Lease Year, a statement of Gross Sales for such fiscal year which shall be computed on a consistent basis for each fiscal year, in the manner used by CPS in generating its audited annual statements and in accordance with section 3.2.5 hereof and (c) commencing with the tenth Lease Year, within ninety (90) days after the close of each Lease Year, a statement of Gross Sales for the preceding Lease Year which shall be computed on a consistent basis for each Lease Year, in the manner used by CPS in generating its audited annual statements and in accordance with section 3.2.5 hereof. The annual statement shall be accompanied by the signed certificate of CPS's chief financial officer certifying specifically that (i) he has examined the report of Gross Sales for the preceding Lease Year, (ii) his examination included such tests of Tenant's and CPS's books and records as he considered necessary or appropriate under the circumstances, (iii) such report presents fairly the Gross Sales of the preceding Lease Year, and (iv) the reported Gross Sales conform with and are computed in compliance with the definition of Gross Sales contained in section 3.2.5 hereof.

Unless excused under the provisions of section 3.2.9, if Tenant shall fail to deliver such annual statement and certificate to Landlord within said ninety (90) day period, Landlord shall have the right, unless such failure is cured within fifteen (15) days following notice by Landlord to Tenant of such failure, thereafter to employ an Approved Independent Auditor to examine such books and records, as may be necessary to certify the amount of Tenant's Gross Sales for such Lease Year, and Tenant shall pay to Landlord the cost thereof as additional rent. If such audit shall disclose that Tenant's records, in such Approved Independent Auditor's reasonable determination, are inadequate to disclose such Gross Sales, Landlord shall be entitled to receive for such Lease Year the Maximum Rent, and the difference between such Maximum Rent and the amounts actually paid by Tenant as Basic Rent and Percentage Rent shall be payable by Tenant to Landlord at the office of Beneficiary on written demand. In addition, if there is an intentional misrepresentation in the annual statements prepared

- 11 -

DFF/10-29-85
0723R

by CPS's chief financial officer, then the Landlord may require
the certification of all such annual statements thereafter by
an Approved Independent Auditor employed by and at Tenant's
expense.

       3.2.7. _Tenant's Records_. Tenant may use a com-
puter recordkeeping system, or any other recordkeeping system
so long as such system records sales accurately and reasonably
permits the Landlord to verify the Tenant's statements of Gross
Sales.

       For the purpose of permitting verification by
Landlord of any amounts due as rent, Tenant will keep and pre-
serve or will cause CPS to keep and preserve for at least three
(3) years, and during the Demised Term shall keep at the Demised
Premises or at the offices of CPS's chief financial officer,
ordinary books, records, ledgers, and journals, as well as
records kept for income and sales tax purposes which shall dis-
close in reasonable detail all information required to permit
Landlord to verify Tenant's Gross Sales. At any reasonable
time beginning with the eleventh (11th) Lease Year after ten
(10) days advance notice to Tenant, Landlord or any Mortgagee,
their agents and accountants, shall have the right, at their
expense, during business hours to make any examination or audit
of such books and records which Landlord or such Mortgagee may
desire. If such audit shall disclose a liability in any Lease
Year for Basic Rent and Percentage Rent in excess of the Basic
Rent and Percentage Rent theretofore paid by Tenant for such
period, Tenant shall promptly pay such liability. In addition,
if such audit shall disclose that Tenant has underpaid by three
percent (3%) or more any Percentage Rent for such Lease Year,
then in such event, Tenant shall promptly pay the cost of such
audit and interest at the Default Rate on all additional Per-
centage Rent then payable, for such Lease Year accruing from
the date such additional Percentage Rent and estimated Per-
centage Rent based on such revised Percentage Rent was due and
payable. If Tenant disagrees with the results of such audit
and if such audit was not performed by an Approved Independent
Auditor employed by Landlord at Landlord's expense, Tenant,
within fifteen (15) days after receipt thereof may elect, at
its expense, by notice to Landlord, to employ an Approved
Independent Auditor to conduct a second audit and Landlord and
Tenant agree to be bound by the results thereof if the results
thereof are delivered to Landlord within one hundred eighty
(180) days of Tenant's notice to Landlord. If such audit dis-
closes a rent liability for underpayment Tenant shall promptly
pay such liability and, in addition, if such audit discloses a
rent liability of three percent (3%) or more, Tenant shall also
pay interest at the Default Rate on all additional Percentage

- 12 -

DFF/10-29-85
0723R

Rent then payable for such Lease Year accruing from the date
such additional Percentage Rent and estimated Percentage Rent
based on such revised Percentage Rent was due and payable.

3.2.8.  Adjustments to Aggregate Basic Rent and
Aggregate Maximum Rent.  In the event of (a) termination of any
of the Leases other than this Lease pursuant to the provisions
contained in any of the other Leases similar to those contained
in Sections 19 and 20 hereof, or (b) a reduction in Basic Rent
and Maximum Rent under any of the other Leases pursuant to a
Partial Taking with respect to the portion of the Aggregate
Demised Premises covered thereby, or (c) a cessation of oper-
ations under any other Lease pursuant to the provisions similar
to those contained in section 11.1 hereof, or (d) an assignment
of any of the other Leases permitted only because the Tenant
has agreed to pay Maximum Rent as provided in provisions of any
other Lease similar to those contained in section 29(a), then
(i) the Aggregate Basic Rent shall be deemed to be reduced by
(A) the amount of the Basic Rent payable under any Lease so
terminated or any Lease where operations have ceased as
described above or any Lease assigned or sublet as described
above and by (B) the amount of the reduction in Basic Rent under
such Leases as a result of a partial Taking, (ii) the Aggregate
Maximum Rent shall be reduced by (A) the amount of the Maximum
Rent payable under any Lease so terminated as specified on
Exhibit B and by (B) the amount of any reduction in Maximum
Rent resulting from a Partial Taking, and (iii) the Aggregate
Demised Premises shall no longer include any premises covered
by a Lease so terminated, by a Lease where operations have
ceased as described above, or by any Lease assigned or sublet
as described above.

3.2.9.  Limitation on Obligation to Provide
Statements.  If on or before the first day of any Lease Year
during the Demised Term, Tenant by notice to Landlord elects to
pay Maximum Rent after the tenth (10th) Lease Year for the
remainder of the Demised Term and makes the same election under
all of the other Leases, then, beginning with such Lease Year,
Tenant shall not be obligated to provide the statements required
pursuant to Sections 3.2.6 and 3.2.7 of this Lease; provided,
however, Tenant's election shall not relieve Tenant from pro-
viding any such statements for any periods of time arising
before the commencement date of the Lease Year for which such
election takes effect.  Such election shall obligate Tenant to
pay Maximum Rent for the remainder of the Demised Term commen-
cing with such Lease Year and Tenant may not thereafter revoke
such election, but Tenant shall no longer be obligated to pay
Percentage Rent under this section 3.2.

- 13 -

DFF/10-29-85
0723R

4.  <u>Additional Rent</u>.  Tenant will also pay, as addi-
tional rent, all other amounts, liabilities and obligations
which Tenant herein assumes or agrees to pay, and, in the event
of any failure on the part of Tenant to pay any of the same,
Landlord shall have all rights, powers and remedies provided
for herein or by law or equity or otherwise in the case of non-
payment of the Basic Rent.  Tenant will also pay Beneficiary,
at the office of Beneficiary, on demand, as additional rent,
interest at the Default Rate on all overdue installments of
Basic Rent, Percentage Rent, and all additional rent from the
due date thereof until payment.

5.  <u>No Counterclaim, Abatement, etc</u>.  The Basic Rent,
Percentage Rent, and such additional rent shall be paid without
notice, demand, counterclaim, setoff, deduction or defense, and
without abatement, suspension, deferment, diminution or reduc-
tion by reason of, and the obligations and liabilities of Tenant
under this Lease shall not be affected by, any circumstance or
occurrence whatsoever, including, without limitation, (a) any
damage to or destruction of the Demised Premises or any part
thereof (except as otherwise expressly provided in section 19),
(b) any restriction or prevention of or interference with any
use of the Demised Premises or any part thereof (except as
otherwise expressly provided in section 19), (c) any Taking of
the Demised Premises or any part thereof (except as otherwise
expressly provided in section 19), (d) except when caused solely
by the act or acts of Landlord, any title defect or encumbrance
or any eviction or prospective eviction from the Demised Prem-
ises or any part thereof by title paramount or otherwise, (e)
any bankruptcy, insolvency, reorganization, composition, adjust-
ment, dissolution, liquidation or other like proceeding of or
on the part of Landlord or any assignee of Landlord's equity in
the Demised Premises or any action taken with respect to this
Lease by any trustee or receiver of Landlord or of any such
assignee, or by any court in any such proceeding, (f) any
change, extension, waiver, indulgence or other action or omis-
sion in respect of any obligation or liability of Tenant, or
(g) any claim which Tenant has or might have against Landlord,
whether or not Tenant shall have had any notice or knowledge of
the foregoing.  Except as otherwise expressly provided in (d)
above and in section 19, Tenant waives all rights now or
hereafter conferred by statute or otherwise to quit, terminate
or surrender this Lease or the Demised Premises or any part
thereof, or to any abatement, suspension, deferment, diminution
or reduction of Basic Rent, Percentage Rent or additional rent,
on account of any occurrence.

6.  <u>Extension of Demised Term</u>.  Tenant shall have the
right and privilege, at its option, to extend the Demised Term

- 14 -

DFF/10-29-85
0723R

for one additional period of five (5) years commencing February
4, 2001, and terminating January 28, 2006 (the "First Ex-
tension"), and two additional periods of ten (10) years each,
the first commencing January 29, 2006, and terminating January
30, 2016 (the "Second Extension"), and the second commencing
January 31, 2016 and terminating January 31, 2026 (the "Third
Extension") (collectively the "Additional Extensions").
Tenant's right to extend the Demised Term for each respective
Additional Extension is expressly subject to the condition that
there shall not have been an Event of Default on the part of
Tenant that has occurred and is continuing and to the further
condition that on or before the date of such exercise Tenant
shall have extended the term of each of the other Leases for an
additional period extending at least through the termination
date of such Additional Extension.  During each such Additional
Extension, the terms and conditions of this Lease shall continue
in full force and effect, and the Basic Rent, Maximum Rent,
Applicable Percentage, Aggregate Maximum Rent and Aggregate
Basic Rent shall be as set forth in Exhibit B hereto for each
Lease Year during such Additional Extension.  The option to
extend the Demised Term for each respective Additional Extension
shall be exercisable by written notice given not less than
twelve (12) months prior to the expiration of the Demised Term,
and the giving of such notice shall have the effect, without
further action of Landlord or Tenant, of extending the Demised
Term for the period of the Additional Extension, and Tenant
shall not thereafter be entitled to revoke such extension.
[Lincoln Mall, Yorktown and North Riverside only]

     7.  Payment of Impositions, etc.  Subject to section
10 (relating to permitted contests), Tenant will pay (or cause
to be paid) all Impositions, whether accrued or arising before
or after the date of this Lease, before any fine, penalty,
interest or cost may be added for non-payment, provided that,
if any such Imposition may at the option of the payor be paid
in installments (whether or not interest shall accrue on the
unpaid balance of such Imposition), Tenant may exercise the
option to pay the same (and any accrued interest on the unpaid
balance of such Imposition) in installments and, in such event,
will pay such installments (or cause the same to be paid) before
delinquency.  Upon the expiration of the Demised Term, Tenant
shall be liable for such proportion of the Impositions as shall
be payable with respect to the Demised Premises or any part
thereof for the tax fiscal year in which the Demised Term ends
as the part of such tax fiscal year during which this Lease is
in effect shall bear to the whole of such tax fiscal year.
Tenant will furnish to Landlord, upon request, official receipts
for, or other reasonably satisfactory evidence of, payment of
Impositions.

- 15 -

DFF/10-29-85
0723R

8.  Compliance with Legal and Insurance Requirements,
Instruments, etc.  Subject to section 10 (relating to permitted
contests), Tenant at its expense will promptly comply with all
Legal Requirements and Insurance Requirements, whether or not
compliance therewith shall require structural changes in the
Improvements or interfere with the use and enjoyment of the
Demised Premises, and will procure, maintain and comply with
all permits, licenses and other authorizations required for any
use of the Demised Premises or any part thereof then being made,
and for the proper erection, installation, operation and main-
tenance of the Demised Premises and Tenant's Equipment or any
part thereof, and will comply with any Permitted Exceptions.

9.  Liens, etc.

9.1.  In General.  Subject to section 10 hereof
(relating to permitted contests), Tenant will not directly or
indirectly create or permit to be created and, if so created,
will promptly discharge, any mortgage, lien, encumbrance or
charge on, pledge of, or conditional sale or other title reten-
tion agreement with respect to the Demised Premises or any part
thereof or Tenant's interest therein other than the Permitted
Exceptions (excluding liens for unpaid amounts created pursuant
to the provisions thereof and Impositions), the Mortgage, the
Existing Mortgages and any other liens created by Landlord.

9.2.  Mechanics' or other liens.

(a)  Subject to Section 10 hereof (relating to
permitted contests), the Tenant shall (i) immediately after it
is filed or claimed, have released (by bonding or otherwise)
any mechanics', materialman's or other lien filed or claimed
against the Demised Premises by reason of labor or materials
provided for or about any or all of the Demised Premises during
or prior to the Demised Term (other than liens created by Land-
lord), or otherwise arising out of Tenant's use or occupancy of
any or all of the Demised Premises, and (ii) defend, indemnify
and hold Landlord harmless against and from any and all liabil-
ity, claim of liability or expense (including, by way of example
rather than of limitation, that of reasonable attorneys' fees)
incurred by the Landlord on account of any such lien or claim.

(b)  Subject to Section 10 hereof (relating to
permitted contests), if Tenant fails to discharge any such lien
within fifteen (15) days after it first becomes effective
against the Demised Premises, then, in addition to any other
right or remedy held by Landlord on account thereof, Landlord
may (i) discharge it by paying the amount claimed to be due or
by deposit or bonding proceedings, and/or (ii) in any such

- 16 -

DFF/10-29-85
0723R

event compel the prosecution of any action for the foreclosure
of any such lien by the lienor and pay the amount of any judg-
ment in favor of the lienor with interest, costs and allowances.
Tenant shall reimburse Landlord for any amount paid by Landlord
to discharge any such lien and all expenses incurred by Landlord
in connection therewith, together with interest thereon at the
Default Rate from the respective dates of Landlord's making such
payments or incurring such expenses.

   10.  Permitted Contests.  After prior written notice
to Landlord, Tenant, at its expense, may contest, or cause to be
contested, by appropriate legal or other proceedings conducted
in good faith and with due diligence, the amount or validity or
application, in whole or in part, of any Imposition or any Legal
Requirement or any Insurance Requirement or any lien, encum-
brance or charge referred to in section 9 or any charge referred
to in section 12, or any obligation or liability under any
instrument by which Tenant or CPS is bound, provided that:  (a)
in the case of an unpaid Imposition, lien (including mechanic's
liens), encumbrance or charge, such proceeding shall suspend the
collection thereof from Landlord and from the Demised Premises
and any rent or other income therefrom and shall not interfere
with the payment of any such rent or income, (b) neither the
Demised Premises or any rent therefrom nor any part thereof or
interest therein would be in any imminent danger of being sold,
forfeited or lost, (c) in the case of a Legal Requirement,
Landlord cannot be subject to material civil liability or any
criminal liability for failure to comply therewith, (d) Tenant
shall have furnished such security, if any, as may be required
in the proceedings, (e) the non-payment of the whole or any part
of any tax, assessment lien (including mechanic's liens), or
charge will not result in any execution upon, sale of, or for-
feiture of the Demised Premises or any part thereof because of
such nonpayment, (f) if the net worth of CPS for the previous
fiscal year, as determined in accordance with generally accepted
accounting principles, is less than One Hundred Forty-Five
Million Dollars ($145,000,000), then Tenant shall purchase a
surety bond in form, substance and amount acceptable to Landlord
indemnifying Landlord from losses resulting from such contest,
and (g) in the case of any Insurance Requirement, the failure
of Tenant to comply therewith shall not affect the validity of
any insurance required to be maintained by Tenant under section
18.1.  Any contest, whether before or after payment, may be made
in the name of Landlord or Tenant or both, as Tenant shall
determine, but, if the name of Landlord is used therein, Land-
lord shall be notified thereof at least 15 days prior to the
commencement of the proceeding.  If requested by Tenant, Land-
lord may, at its own expense, but shall not be required to,
participate actively in any such contest, but Tenant shall be

- 17 -

DFF/10-29-85
0723R

entitled to any refund of any such tax, assessment or charge
and penalties or interest thereon which have been paid by Ten-
ant, or by Landlord and reimbursed by Tenant to Landlord. So
long as Tenant is conducting any contest in accordance with the
provisions of this Section 10, Tenant shall not be in default
under any provision of this Lease with respect to the matter
being contested.

    11. **Use of Demised Premises, etc.**

    11.1. **Use; Name**. Tenant shall, for the benefit of
Landlord, during the Demised Term, continuously operate, or
cause to be operated, department store facilities on the Demised
Premises under its trade name which shall include the words
"Carson Pirie Scott & Co." or "Carsons" (such words being the
principal element of such trade name) or under such other trade
name as Tenant may from time to time be operating the majority
of its department stores in the Chicago metropolitan area. The
department store facilities so operated by Tenant shall have
standards of store operation, hours, merchandising and pricing
which are substantially similar to those generally utilized
from time to time by it in the operation of the majority of its
department stores located in the Chicago metropolitan area.
Tenant's covenants set forth in this section 11.1 shall be
inoperative during any period or periods of time that Tenant's
store on the Demised Premises is undergoing such repair,
rebuilding, alteration, razing or restoration permitted by and
in accordance with the terms of this Lease as shall result in
it being impracticable to comply with such covenants. Notwith-
standing any provision of this Lease, Tenant may, by notice to
Landlord, elect to cease operating the Demised Premises as a
department store in accordance with the foregoing provisions of
this section 11.1; however, upon such notice (and thereafter for
the remainder of the Demised Term unless Tenant exchanges the
Exchange Property for the Demised Premises as provided in sec-
tion 19.4) Maximum Rent for each Lease Year after the tenth
(10th) Lease Year (prorated to the date of such notice for the
Lease Year in which the notice is given) shall become due and
payable at such times and in the same manner as though such
Maximum Rent had been designated as Basic Rent for the balance
of the Demised Term after the tenth (10th) Lease Year, and
Tenant shall remain obligated to perform all of the other obli-
gations it is required to perform under this Lease. Upon such
election to cease operating and pay Maximum Rent, Tenant shall
no longer be obligated to pay Percentage Rent under section 3.2
hereof. Notwithstanding the foregoing provisions of this
section 11.1, nothing contained herein shall be deemed to
release Tenant from its duty to comply with the provisions of
the Operating Agreement.

- 18 -

DFF/10-29-85
0723R

11.2. <u>Operation of Business</u>. Subject to section 10
of this Lease (relating to permitted contests), Tenant, in the
use, occupation and control of the Demised Premises and in the
prosecution or conduct of any business therein covenants and
agrees that it will not use or permit to be used any part of
the Demised Premises for any dangerous, noxious, offensive or
unlawful trade or business. Tenant shall not cause or maintain
any nuisance in, at, or on the Demised Premises. Subject to
section 10 (relating to permitted contests), Tenant, at its
expense, will promptly comply with all agreements, conditions,
limitations and other terms of all leases, easements, rights of
way, grants, servitudes, privileges, permits, franchise, licen-
ses constituting the Permitted Exceptions, in each case, to the
extent compliance therewith is required of Landlord or Tenant
under the terms thereof. Tenant will not take any action which
results in a forfeiture or termination of the rights afforded
to Landlord or Tenant under any such instruments and will not,
without the prior written consent of Landlord (which consent
shall not unreasonably be withheld), amend in any material
respect any of such instruments.

11.3. <u>Operating Agreement</u>. Tenant shall comply with
all of the terms and provisions of the Operating Agreement which
affect the Demised Premises. Tenant, to the extent it is
entitled to do so, will maintain the Operating Agreement in
full force and effect and will, from time to time, upon request
by Landlord, take all necessary action to enforce Tenant's and
Landlord's rights thereunder and to assure the performance by
Tenant and the other parties to the Operating Agreement of its
and their respective obligations thereunder, provided, however,
that Tenant shall not be required to institute legal proceedings
against any other party to the Operating Agreement unless the
failure to do so is likely to result in a material adverse
impact upon either the value of the Demised Premises or the
amount of Gross Sales produced therefrom. Landlord and Tenant
agree that neither of them will (a) assign or otherwise transfer
its interests under the Operating Agreement, except, in the case
of Landlord, in connection with a conveyance or Mortgage of the
Demised Premises and, in the case of Tenant, in connection with
an assignment or transfer of this Lease by Tenant permitted
under section 29 hereof, (b) terminate or cancel the Operating
Agreement or consent to or accept any such termination or can-
cellation or do any act which would terminate or cancel the
same, or (c) amend or modify the Operating Agreement, or give
any consent, waiver or approval thereunder, or take any other
action in connection therewith, without in each instance, the
prior written consent of the other; provided, however, that
Landlord will consent to any amendment to the Operating Agree-
ment requested by Tenant which (i) does not materially adversely

- 19 -

DFF/10-29-85
0723R

affect Gross Sales from the Demised Premises or the value of the
Demised Premises, or (ii) to the extent, but only to the extent,
such amendment provides for a change in the expiration date of
the term during which Tenant must operate a "Carson Pirie
Scott" store on the Demised Premises to a date which is no
earlier than the expiration date of the Fixed Term.

      12.   <u>Utility Services</u>.  Tenant will pay or cause to be
paid (subject to section 10, relating to permitted contests) all
charges for all public and private utility services and all
sprinkler systems and protective services at any time rendered
to or in connection with the Demised Premises or any part
thereof, whether accrued or arising before or after the date of
this Lease, will comply with all contracts relating to any such
services, and (subject to Unavoidable Delays) will do all other
things reasonably required for the maintenance and continuance
of all such utility services and sprinkler systems.

      13.   <u>Indemnification by Tenant</u>.  Except in instances
of Landlord's negligence or willful misconduct, Tenant will
protect, indemnify, save harmless and defend Landlord from and
against any and all liabilities, obligations, claims, damages,
penalties, causes of action, costs and expenses (including,
without limitation, reasonable attorneys' fees of Landlord's
counsel and expenses), whether or not arising before or during
the Demised Term, imposed upon or incurred by or asserted
against Landlord by reason of any of the following:  (a) any
accident, injury to or death of persons (including workmen) or
loss of or damage to property occurring on or about the Demised
Premises or the adjoining property, sidewalks, curbs, vaults
and vault space, if any, streets, alleys or ways, (b) any use,
non-use or condition of the Demised Premises or the adjoining
sidewalks, curbs, vaults and vault space, if any, streets,
alleys or ways, (c) any failure on the part of Tenant to comply
with any of the terms of this Lease or (d) any work in connec-
tion with the performance in full of Tenant's obligations under
this Lease.  Landlord will promptly notify Tenant of any claim
asserted against Landlord on account of any such injury or
claimed injury to persons or property and shall promptly deliver
to Tenant the original or a true copy of any summons or other
process, pleading or notice issued in any action, suit or pro-
ceeding to assert or enforce any such claim and shall also
notify Tenant of any facts of which Landlord has actual notice
which could be asserted as a defense or counterclaim to such
claim.  Tenant may and, upon request of Landlord, shall, at
Tenant's expense, resist and defend any such suit with attorneys
designated by Tenant, and Landlord shall have the right, if it
sees fit, to participate in such defense at its own expense.
Landlord shall cooperate with Tenant, upon Tenant's request and

DFF/10-29-85
0723R

at Tenant's expense, in any such suit or action brought against
Tenant.  The obligations of Tenant under this section 13 relat-
ing to matters occurring during the Demised Term of this Lease
shall survive any termination of this Lease.

14.  Maintenance and Repair, etc.  Subject to the
provisions of section 15 and to Unavoidable Delays and excluding
Tenant's Equipment, Tenant will keep or cause to be kept the
Improvements and the sidewalks, curbs, vaults and vault space,
if any, adjoining the same, and the parking lot or lots located
on the Land, in good and substantial order and repair and at its
expense will promptly make or cause to be made all structural,
exterior and interior repairs, renewals and replacements neces-
sary to that end, in each case ordinary wear and tear excepted.
All replacements shall be at least equal in quality to the
original.  Tenant's obligation to repair shall include the
obligation to rebuild in the event of destruction however
caused, provided that damage by fire or other cause for which
Tenant is obligated to maintain insurance by any of the provi-
sions of section 18 shall be governed by the provisions of sec-
tions 18 and 19 and damage by any Taking shall be governed by
the provisions of section 19.  Landlord shall be under no obli-
gation to rebuild, replace, maintain or make repairs to the
Demised Premises during the Demised Term.

15.  Improvements, Alterations and Changes.

15.1.  General Provisions.  Tenant shall have the
right at any time and from time to time during the Demised Term
to make such changes and alterations to the Demised Premises as
Tenant shall deem necessary or desirable, which changes and
alterations shall be made in compliance with the terms and con-
ditions of the Operating Agreement, and shall be made in all
cases subject to the following terms and conditions, which
Tenant covenants to observe and perform:

(a) No change or alteration shall be undertaken
until Tenant shall have procured and paid for, so far as the
same may be required from time to time, all permits and autho-
rizations of the various state and municipal departments or
other governmental or quasi-governmental authorities having
jurisdiction, and Landlord agrees to join in the application
for such permits or authorizations whenever such action is
necessary; provided, however, that Tenant shall indemnify and
hold Landlord harmless from any liability under and in connec-
tion with any such permits or approvals.

(b) No structural change shall be undertaken, nor
shall any other change or alteration involving an estimated

- 23 -

DFF/10-29-85
0723R

cost of more than Five Hundred Thousand Dollars ($500,000) be
undertaken, until plans and specifications have first been
submitted to and approved in writing by Landlord and each
Mortgagee, such approvals not to be unreasonably withheld or
delayed and such approval to be given by Landlord and each
Mortgagee only if the changes and alterations when completed
will be of such a character as to not reduce or otherwise
adversely affect the fair market value and operational utility
of the Improvements.

(c) All work done in connection with any change
or alteration shall be done in a good and workmanlike manner
and in compliance with all Legal Requirements. The cost of any
such change or alteration shall be paid in cash so that the
Demised Premises shall at all times be free of liens (subject
to section 10 relating to permitted contests) for labor and
materials supplied or claimed to have been supplied to the
Demised Premises. The work of any change or alteration shall
be prosecuted with reasonable dispatch, subject to Unavoidable
Delays.

15.2. _Conditions of Total or Substantial Demolition_.
Prior to commencing any demolition permitted pursuant to section
15.1 of the whole or any "substantial" (as used herein, sub-
stantial shall mean at a cost of Five Hundred Thousand Dollars
($500,000) or more) part of any present or future building on
the Demised Premises pursuant to this section 15, and if the
net worth of CPS for the preceding fiscal year is less than One
Hundred Forty-Five Million Dollars ($145,000,000), as determined
in accordance with generally accepted accounting principles,
then Tenant shall, upon request by Landlord, either:

(a) deposit in escrow with a bank or trust company
or other financial institution specified by Landlord an amount
of money equal to the estimated cost of the demolition of the
building or buildings to be demolished and the construction of
the new building or buildings to be erected in substitution
therefor upon the Demised Premises, as the estimated cost of
such demolition and construction shall be determined by Tenant's
architect in charge of such work (who shall be so designated
subject to the approval of Landlord, which approval shall not
be unreasonably withheld) and approved by Landlord; and during
the course of such demolition and construction the amount so
deposited with such bank, trust company or other financial
institution shall be made available for and shall be paid out
by such bank or trust company or other financial institution to
Tenant from time to time as the work progresses in amounts equal
to the cost of labor and material incorporated into and used in
such work and builders', architects', and engineers' fees and

DFF/10-29-85
0723R

other charges and expenses in connection with such work, upon
delivery to said bank, trust company or other financial insti-
tution and Landlord of a certificate of the architect in charge
of such work certifying that the amounts to be paid to Tenant
are payable to Tenant in accordance with the provisions of this
section 15.2 and that such amounts are then due and payable or
have theretofore been paid; any balance remaining upon comple-
tion of such construction, so long as no Event of Default shall
have occurred and be continuing, to be returned to the Tenant;
or

(b) deliver to Landlord payment and performance
bonds from a surety company or other surety reasonably satis-
factory to Landlord in form reasonably satisfactory to Landlord
and in an amount equal to the estimated cost of the demolition
of the building or buildings to be demolished and the construc-
tion of such new building or buildings to be erected in substi-
tution therefor upon the Demised Premises, as the estimated cost
of such demolition and construction shall be determined by Ten-
ant's architect in charge of such work (who shall be so desig-
nated subject to the approval of Landlord, which approval shall
not be unreasonably withheld), to guarantee the completion of
and payment for such demolition and such new building or build-
ings.

15.3.  Title to Alterations.  All alterations, addi-
tions and improvements of the Demised Premises made pursuant to
this section 15 shall immediately become part of the Demised
Premises and shall be and remain the property of Landlord and
shall be subject to all of the terms and conditions of this
Lease.

16.  Improvements; Tenant's Equipment.

16.1.  Improvements Part of Realty.  Landlord and
Tenant acknowledge and agree that the Improvements shall be
deemed to constitute a part of the real property on which they
are located.

16.2.  Removal of Tenant's Equipment, etc.  Tenant
shall not be required to remove Tenant's Equipment on the expi-
ration or earlier termination of this Lease; however, any of
Tenant's Equipment not removed upon such expiration shall be
considered abandoned and may be appropriated, sold, destroyed,
or otherwise disposed of by Landlord without notice to Tenant,
CPS, any affiliate, sublessee, licensee or concessionaire of
either or any other person, firm or corporation and without
obligation to account therefor and Tenant shall remove all
trash and any personal property (other than Tenant's Equip-
ment) owned by Tenant and located on the Demised Premises.  If

- 23 -

DFF/10-29-85
0723R

Tenant elects to remove Tenant's Equipment at any time, whether
during or after the expiration of the Demised Term, Tenant at
its expense will promptly repair all damage to the Demised
Premises caused by any such removal.  Landlord shall not be
responsible for any loss of or damage to or loss of the use of
Tenant's Equipment resulting from the exercise of any of its
rights under this section 16.2.

      17.  No Claims Against Landlord, etc.  Nothing con-
tained herein shall be construed to be a consent or request by
Landlord or Tenant, express or implied, to permit the other to
subject the interest of Landlord or Tenant, as the case may be,
to any mechanics', materialmen's or similar liens, but on the
contrary any such consent is hereby expressly denied.

      18.  Insurance.

      18.1.  Risks to be Insured.  Tenant at its expense will
maintain with insurers approved by Landlord (which approval
shall not unreasonably be withheld) (a) insurance with respect
to the Improvements against loss or damage by fire and against
such other risks as are included in coverage of the type now
known as "all risk" coverage, in amounts equal to the full
replacement value thereof (excluding excavations, foundations,
and architect's and engineer's fees) without deduction for
depreciation, (b) public liability and property damage liability
insurance applicable to the Demised Premises in the amount of
$5,000,000 combined single limit, (c) explosion insurance in
respect of any steam and pressure boilers and similar apparatus
located in the Demised Premises in an amount not less than
$300,000, (d) war risk insurance (to the extent obtainable from
the United States Government or any agency thereof and if cus-
tomarily obtained by department stores of similar quality and
size to CPS), (e) appropriate workmen's compensation insurance
or other insurance against liability arising from the claims of
workmen in respect of any work done on or about the Demised
Premises in such amounts as are required by law and (f) such
other insurance in such amounts and against such insurable
hazards as Landlord from time to time may reasonably require by
written notice to Tenant.  For the purposes of this section
18.1, the full replacement value of the Improvements shall be
the amount necessary to replace the Improvements with property
and materials of a like kind, quality and value (excluding
excavations, foundations and architect's and engineer's fees),
without deduction for depreciation.  Notwithstanding the fore-
going, any of such insurance policies may provide for a deduct-
ible not in excess of One Hundred Thousand Dollars ($100,000)
and all such insurance policies shall be in such amounts so as
not to cause the Landlord, Tenant, or any Mortgagee to be a
co-insurer.  With the written approval of Landlord, the
foregoing coverages, as to both type and extent, may be changed

- 24 -

DFF/10-29-85
0723R

from time to time by Tenant to such coverages as are standard
at the time of change in the retail department store business.

18.2.  Policy Provisions and Certificates.  The insur-
ance maintained by Tenant under section 18.1 hereof shall name
Tenant, Landlord and each Mortgagee as additional insureds as
their respective interests may appear.  The insurance maintained
by Tenant under section 18.1 shall bear a mortgagee endorsement
and, if appropriate, a lender's loss payable endorsement in
favor of each Mortgagee and shall provide that all property
losses insured against shall be adjusted by Tenant (subject to
Landlord's approval of final settlement of estimated losses of
Two Hundred and Fifty Thousand Dollars ($250,000) or more) and
the proceeds thereof shall be paid, as to casualties resulting
in insurance proceeds of Two Hundred Fifty Thousand Dollars
($250,000) or greater, to the Landlord, to be applied in the
manner set forth in this Lease.  Casualties resulting in insur-
ance proceeds of less than Two Hundred Fifty Thousand Dollars
($250,000) shall be paid directly to Tenant and used by Tenant
for the Restoration of the Demised Premises.  All insurance
maintained by Tenant shall provide that (a) no deductions shall
be made from the amounts thereof, (b) no cancellation or reduc-
tion thereof shall be effective until at least thirty (30) days
after receipt by Mortgagee of written notice thereof, and (c)
all losses shall be payable as provided for in this Section
18.2 notwithstanding any act or negligence of Tenant, Landlord
or Mortgagee or their respective agents or employees which
might, absent such agreement, result in a forfeiture of all or
part of such insurance payment and notwithstanding (i) the
occupation or use of the Demised Premises for purposes more
hazardous than those permitted by the terms of such policy,
(ii) any foreclosure or other action or proceeding taken pur-
suant to any provisions of any Mortgage upon the happening of a
default thereunder or any change in title or ownership of the
Demised Premises or any part thereof.  Tenant may effect any of
the insurance required under section 18.1 under blanket policies
carried by Tenant covering the Demised Premises and other prop-
erty or assets not included within the Demised Premises, pro-
vided that any such policy shall specify that portion of the
total coverage of such policy that is allocated to the Demised
Premises and shall, in all other respects, comply with the
requirements of this section 18.

18.3.  Delivery of Policies, etc.  Prior to the
commencement date of this Lease and at least 30 days prior to
the expiration of any policy, Tenant will deliver to Landlord,
at the office of Beneficiary, and each Mortgagee certificates
for all policies evidencing all insurance Tenant is required to
maintain under this section 18 and if required by any Mortgagee
true and correct copies of all such policies; provided, that if
an Event of Default has occurred and remains uncured, then

- 25 -

DFF/10-29-85
0723R

Tenant shall deliver the originals of such insurance policies to Landlord. If required by any supervisory authority having jurisdiction over Mortgagee, then Tenant shall deliver the originals of all policies (other than blanket policies) evidencing such insurance to Landlord and evidence as to the payment of all premiums due thereon. In the event Tenant shall fail to effect or maintain any insurance which Tenant is obligated to effect or maintain pursuant to the provisions of this section 18, or shall fail to deliver to Landlord evidence of such coverage in the manner required hereby, Landlord may affect such insurance and Tenant shall reimburse Landlord for the cost thereof together with interest thereon at the Default Rate from the date incurred by Landlord.

19. Damage, Destruction or Taking; Substitution.

19.1. Taking.

(a) Assignment of Condemnation Awards. In case of any proposed Taking, Tenant, upon acquiring actual knowledge thereof, will forthwith give written notice thereof to Landlord and Mortgagee. Except in the case of a Taking described in subparagraph (b) hereof, Landlord shall, subject to the provisions of this section 19, be entitled to all awards or payments allocable to the Demised Premises on account of such Taking, and Tenant hereby irrevocably assigns to Landlord all rights of Tenant to any such award or payment. In the case of a Total Taking, Tenant irrevocably authorizes and empowers Landlord, in the name of Tenant or otherwise, to file and prosecute what would otherwise be Tenant's claim for any such award or payment with respect to the Demised Premises or any interest therein, and to collect, receipt for and retain the same.

(b) Temporary Taking. In case of a Taking for temporary use, this Lease shall remain in full force and effect and Tenant shall remain obligated to pay punctually all Basic Rent, Percentage Rent, additional rent and any other sums payable by it hereunder, without abatement or reduction by reason of such Taking, and shall remain obligated to perform and comply with all other terms of this Lease except as such performance or compliance may be rendered impracticable by reason of such Taking. Provided an Event of Default has not occurred and is continuing, Landlord irrevocably authorizes and empowers Tenant, in the name of Landlord or otherwise, to file and prosecute what would otherwise be Landlord's claim for any award or payment resulting from such temporary Taking, with respect to the Demised Premises and to collect, receipt for and retain the same.

- 26 -

DFF/10-29-85
0723R

(c)  Total Taking.  If the Demised Premises are
subject to a Total Taking, this Lease shall terminate on the
date on which title to so much of the Demised Premises as are
subject to the Total Taking vests in the condemning authority,
and the Basic Rent, Percentage Rent and any additional rent to
be paid by Tenant hereunder shall be apportioned and paid to
the date of such termination and any award resulting from such
Total Taking shall be the property of Landlord and paid to
Landlord, or as it may direct.

(d)  Partial Taking.  If the Demised Premises are
subject to a Taking other than a Taking described in subpara-
graphs (b) and (c) hereof, this Lease shall remain in full force
and effect, and, subject to the provisions of subparagraph (e)
hereof, all rent payable hereunder shall continue unabated.
Whether the proceeds or award from such Taking are available or
adequate, Tenant shall, promptly after the date on which title
to that part of the Demised Premises subject to the Taking vests
in the condemning authority, commence and complete Restoration
of the Demised Premises to an architectural whole, as nearly as
possible to its value, condition and character immediately
before such Taking, all in accordance with plans and specifica-
tions therefor which shall have been submitted to and approved
in writing by Landlord.  The proceeds or award resulting from
such Taking shall be received by Landlord and after deducting
all costs and expenses (including reasonable attorneys' fees)
incurred by Landlord in seeking and/or obtaining the same shall
be paid in the following order and manner:

(i)  Landlord shall, unless Tenant has com-
mitted an Event of Default hereunder which is continuing or a
condition exists which would, with notice and the passage of
time, constitute an Event of Default hereunder, pay, out of
such award, to Tenant, sums sufficient to pay or reimburse
Tenant for the cost of Restoration, subject to the following
terms and conditions:

(A)  there shall be paid to Tenant from
such proceeds or award all or such part thereof as shall equal
the cost to Tenant of effecting the Restoration of the Demised
Premises;

(B)  payment to Tenant pursuant to
subdivision (A) above shall be made by Landlord from time to
time as the Restoration progresses in amounts equal to the cost
of labor and material incorporated into and used in such Res-
toration and builders', architects' and engineers' fees and
other charges and expenses incurred in connection with such
Restoration, upon delivery to Landlord of: (1) the certificate

- 27 -

DFF/10-29-85
0723R

of the architect (designated by Tenant subject to the approval of Landlord) in charge of such work certifying, in each case, the amounts incurred to date by Tenant for Restoration costs and not previously reimbursed, and stating that the balance of proceeds held by Landlord after the making of such payment to Tenant will be sufficient to complete the Restoration, and (2) receipt by Landlord of evidence that there are no mechanics' liens or similar liens for labor or materials supplied in connection with the Restoration; and

(ii) the balance of such award shall be retained by Landlord and shall be the property of Landlord.

(e) Adverse Partial Taking. If a Taking described in subparagraph (d) hereof shall materially and adversely affect the Gross Sales achievable by Tenant from the Demised Premises and such material and adverse effect cannot be remedied by the Restoration of the Demised Premises and Tenant provides Landlord with credible evidence of such material and adverse effect, then the Basic Rent and Maximum Rent payable hereunder shall be equitably reduced as of the date of such Taking. If the parties cannot agree as to the amount of such reduction then such reduction shall be submitted to and settled by arbitration in the county and state in which the Demised Premises are located in accordance with the rules then obtaining of the American Arbitration Association and the decision rendered thereunder shall be final and binding upon the parties hereto and judgment thereon may be entered in any court having jurisdiction thereof.

19.2. Fire and Other Casualties.

(a) If all or substantially all of the Demised Premises are destroyed due to fire or any other casualty, then the Tenant shall promptly notify Landlord of such occurrence and, by delivering written notice thereof to Landlord within thirty (30) days following the occurrence of any such casualty, exercise one of the following options:

(i) Tenant may elect to pay punctually all Basic Rent, Percentage Rent, additional rent and any other sums payable under this Lease, without abatement or reduction, observe all of the provisions hereof and promptly commence and complete the Restoration of the Demised Premises with due diligence, at Tenant's expense and without regard to whether insurance proceeds are available or adequate, as nearly as is possible to the value, condition and character of the Demised Premises immediately before such casualty, all in accordance with plans and specifications submitted to and approved in

- 28 -

DFF/10-29-85
0723R

writing by Landlord.  All insurance proceeds payable as a result
of such casualty under policies of insurance against the same
shall become the property of Landlord and shall, unless Tenant
has committed an Event of Default hereunder which is continuing
or a condition exists which would, with notice and the passage
of time, constitute an Event of Default hereunder, be paid to
Tenant after deducting all costs and expenses (including
reasonable attorneys' fees) incurred by Landlord in seeking
and/or obtaining such proceeds subject to the following terms
and conditions:

       (A) there shall be paid to Tenant from
such proceeds all or such part thereof as shall equal the cost
to Tenant of effecting the Restoration of the Demised Premises;

       (B) payment to Tenant pursuant to sub-
section (A) above shall be made by Landlord from time to time
as the Restoration progresses in amounts equal to the cost of
labor and material incorporated into and used in such Resto-
ration and builders', architects' and engineers' fees and other
charges and expenses incurred in connection with such Restora-
tion, upon delivery to Landlord of:  (1) the certificate of the
architect (designated by Tenant subject to the approval of
Landlord) in charge of such work certifying, in each case, the
amount incurred to date by Tenant for Restoration costs and not
previously reimbursed, and stating that the balance of proceeds
held by Landlord after the making of such payment to Tenant
will be sufficient to complete the Restoration, and (2) receipt
by Landlord of evidence that there are no mechanics liens or
similar liens for labor or materials supplied in connection
with the Restoration; and

       (C) the balance of any proceeds shall
be retained by Landlord; or

       (ii)  Tenant may elect not to restore the
Demised Premises and, instead, pay Maximum Rent after the tenth
(10th) Lease Year for the remainder of the Demised Term (Tenant
thereafter being no longer obligated to pay Percentage Rent
under section 3.2 hereof) and the insurance proceeds resulting
from such casualty shall be the property of Landlord and be
promptly paid to Landlord or as it may direct; provided, how-
ever, that if Tenant's election not to restore the Demised
Premises shall constitute an event of default under the Operat-
ing Agreement, then Tenant shall not be entitled to elect to
proceed under this paragraph (ii); or

       (iii)  Tenant may elect not to restore the
Demised Premises and, instead, exchange the Demised Premises
for the Exchange Property in accordance with and subject to the
terms and conditions of section 19.4 of this Lease, including,
without limitation, compliance by Tenant at the time of notice

- 29 -

DFF/10-29-85
0723R

of its election to proceed under this paragraph (iii) with any
notice provisions provided thereunder, and the insurance pro-
ceeds resulting from such casualty, upon such exchange, after
deducting all costs and expenses described in Paragraph
19.2(a)(i) hereof, shall be the property of Tenant and be
promptly paid to Tenant or as it may direct; provided, however,
that if Tenant's election not to restore the Demised Premises
shall constitute an event of default under the Operating
Agreement, then Tenant shall not be entitled to elect to
proceed under this paragraph (iii). Notwithstanding any of the
foregoing provisions of this paragraph (iii), if Landlord
refuses to permit the exchange of the Exchange Property for the
Demised Premises as provided for in section 19.4 of this Lease,
then this Lease shall terminate and the Basic Rent, Percentage
Rent and any additional rent to be paid by Tenant under this
Lease shall be apportioned and paid to the date of such
termination and any insurance proceeds resulting from such
casualty, less any expenses incurred by Landlord in the
collection of such proceeds shall be paid to Landlord or as it
may direct.

(b)  If Tenant fails to deliver written notice of
its election in accordance with the foregoing paragraphs (i),
(ii) and (iii) within thirty (30) days following the occurrence
of any such casualty, Tenant shall be deemed to have elected
the option specified in paragraph (i).

(c)  Between the time of any such casualty and
the making by Tenant of its election under this subsection (a),
Tenant shall be obligated to continue to pay punctually all
Basic Rent, Percentage Rent, additional rent and any other sums
payable under this Lease, without abatement or reduction, and
to observe all of the provisions of this Lease.

(d)  If less than all or substantially all of the
Demised Premises are damaged or destroyed due to fire or other
casualty, then Tenant shall continue to pay punctually all Basic
Rent, Percentage Rent, additional rent and any other sums pay-
able under this Lease, without abatement or reduction, observe
all of the provisions hereof and, at Tenant's expense, immedi-
ately and with due diligence and without regard to whether
insurance proceeds are available or adequate, commence and
complete the Restoration of the Demised Premises as nearly as
is possible to the value, condition and character of the
Demised Premises immediately before such casualty, all in
accordance with plans and specifications submitted to and
approved in writing by Landlord.  The Restoration of the
Demised Premises and, subject to Section 18.2 hereof, the
disposition of any insurance proceeds resulting from such
casualty shall be in accordance with and subject to the terms
and conditions of section 19.2(a)(i) of this Lease.

- 30 -

DFF/10-29-85
0723R

19.3. <u>Event of Default</u>. If an Event of Default shall have occurred and be continuing hereunder, all proceeds of insurance or awards resulting from a Taking at the time held by Tenant or Landlord shall be retained by Landlord, and if in the possession of Tenant or any other person, be paid to Landlord, and Landlord shall have no further obligation to disburse any of such funds to Tenant, unless prior to the expiration of ten (10) days after notice to Tenant, Tenant shall have cured such Event of Default and no other Event of Default shall have occurred and be continuing hereunder. Notwithstanding the fore-going, Tenant shall not be relieved from any of its obligations hereunder including the obligation to restore the Demised Premises.

19.4. <u>Exchange of Demised Premises</u>.

(a) Tenant shall have the right at any time and from time to time during the Demised Term to exchange one or more different department stores owned by Tenant and then being operated by CPS as a "Carson Pirie Scott" department store, or under such other name as is permitted under the provisions of section 11.2 (hereinafter referred to as the "Exchange Property") for the Demised Premises, provided that such exchange shall not constitute an event of default under any agreements applicable to the Exchange Property similar to the Operating Agreement, and if the following conditions precedent are satisfied:

(i) Tenant shall notify Landlord in writing that it intends to cease operating a department store at the Demised Premises at least one hundred eighty (180) days prior to such cessation.

(ii) With the notice (or within sixty (60) days thereafter as to matters requiring the consent of Landlord and/or Mortgagee) described in (i) above Tenant shall offer to Landlord to exchange the Exchange Property for the Demised Premises and shall include with such notice the following:

(A) Legal description of the Exchange Property,

(B) Plat of survey of the Exchange Property on which the improvements thereon are shown in relation to the property lines (which survey shall comply with the require-ments of Mortgagee),

(C) Appraisals by members of the American Institute of Real Estate Appraisers, approved in advance by

DFF/10-29-85
0723R

Landlord and Mortgagee, demonstrating that as of a then reason-
ably current date (and in the event of a Taking or casualty, a
date before such Taking or casualty) the fair market value of
the Exchange Property is at least equal to that of the Demised
Premises without, in either instance, taking into account the
existence of this Lease,

(D) Certificate from the chief financial
officer of CPS, demonstrating that CPS's Gross Sales (as defined
herein) from the Exchange Property for the preceding three (3)
years were at least equal to the Gross Sales from the Demised
Premises for the same period, accompanied by a letter from an
Approved Independent Auditor stating that it has reviewed such
statements of Gross Sales and agrees with the amounts set forth
therein, or, in the case of Exchange Property that has less than
a three year operating history, demonstrating that the square
footage devoted to sales in the Exchange Property is at least
equal to such square footage in the Demised Premises accompanied
by projections by an independant real estate consulting firm
such as Real Estate Research Corporation or the equivalent
showing that Gross Sales from the Exchange Property for any
future portion of such three (3) year period will, when combined
with Gross Sales from any past portion of such three (3) year
period during which operations were conducted, at least equal
Gross Sales from the Demised Premises for the immediately pre-
ceding three (3) years; provided, however, that the Mortgagee's
consent shall be required in the case of Exchange Property that
has less than a three year operating history and no standard of
reasonableness shall be applicable to the Mortgagee's decision
in such regard. In the event that Mortgagee shall not consent
in the case of such Exchange Property, Landlord and Tenant
acknowledge and agree that the Lease shall remain in full force
and effect.

(E) Evidence that the Exchange Property is
owned in fee simple by Tenant or an affiliate of Tenant and is
not subject to any mortgages, deeds of trust, security agree-
ments or other instruments securing the repayment of any debt
or the performance of any obligation or undertaking,

(F) Certificate from the president or a vice
president of CPS to the effect that the Exchange Property
complies with all Legal Requirements and its condition and
intended use do not violate any covenant, restriction or agree-
ment affecting the Exchange Property,

(G) Certificate from the president or a vice
president of CPS to the effect that the Exchange Property and
the operation thereof will be in compliance with this Lease at
the time of the exchange,

(H) Certificate from the president or a vice
president of CPS to the effect that any operating agreement
covering the Exchange Property is in full force and effect and

DFF/10-29-85
0723R

that no defaults exist thereunder by Tenant or any other party
thereto, accompanied by an estoppel certificate in form and
substance provided for in such operating agreement or, if not
so provided, satisfactory to Landlord and Mortgagee from each
party to such operating agreement certifying as to same,

(I) Evidence that the Exchange Property is
covered by insurance and the delivery of certificates or
policies thereof as required in this Lease with evidence that
premiums due thereon are paid in full, all as more fully set
forth in section 18 of this Lease,

(J) Evidence reasonably satisfactory to
Landlord that the improvements located on the Exchange Property
are not in a flood or mudslide area pursuant to the provisions
of the Flood Disaster Protection Act of 1973,

(K) An Owner's Policy of Title Insurance
(1970 ALTA-Form B) for the Exchange Property, containing only
those exceptions approved by Landlord and with endorsements
reasonably requested by Landlord,

(L) Tenant's agreement to pay all costs in
connection with the exchange including, but not limited to,
recording charges, stamp taxes, transaction and other transfer
taxes, title insurance premiums, reasonable legal expenses of
Landlord and Mortgagee in effecting the exchange and other
reasonable out-of-pocket costs incurred by Landlord and Mort-
gagee which are directly related to the exchange, and any
liability for federal or state income taxes finally determined
to be payable by Landlord as a result of the exchange,

(M) Evidence satisfactory to Landlord that
such exchange will not cause a taxable event for Landlord under
the provisions of the Internal Revenue Code, and

(N) A true and correct copy of each instru-
ment affecting the Exchange Property similar in nature to the
Operating Agreement, which instruments shall not impose obliga-
tions or liabilities on Landlord or Mortgagee substantially
more burdensome than those imposed by the Operating Agreement.

(iii) All documentation with respect to the
release and exchange, including appropriate amendments to this
Lease, a special warranty deed conveying title to Landlord and
an assignment of Tenant's rights under the operating agreement
covering the Exchange Property, shall be in form and content
reasonably satisfactory to Mortgagee and Landlord. Closing of
the exchange transaction shall take place one hundred eighty

- 33 -

DFF/10-29-85
0723R

(180) days after the giving of the notice described in (1)
above at the office of Beneficiary.

        (b) If Landlord or Mortgagee disagrees with the certi-
fication of Gross Sales submitted pursuant to paragraph a(ii)(D)
above, Landlord or Mortgagee may audit the records of Tenant and
CPS with respect to such Gross Sales, and, if such audit shall
reveal that the Gross Sales from the Exchange Property do not
meet the requirements of paragraph (a)(ii)(D), Landlord shall
not be obligated to accept the exchange, if the results of such
audit together with notice of such non-acceptance are delivered
to Tenant within sixty (60) days of the delivery by Tenant to
Landlord of all of the items specified in (a)(i) and (a)(ii)
hereof.  If the results of such audit reveal that the require-
ments of paragraph (a)(ii)(D) have been met, then Landlord, by
notice to Tenant given within said sixty (60) day period, may
extend the date on which the exchange is to occur under para-
graph (a) for an additional sixty (60) days and extend the date
by which the Landlord must exercise its rights under paragraph
(d) for an additional sixty (60) days.  If Landlord notifies
Tenant of its non-acceptance of such sales certification and if
such audit was not performed by an Approved Independent Auditor,
Tenant, within fifteen (15) days after receipt thereof may
elect, at its expense, by notice to Landlord, to employ an
Approved Independent Auditor to conduct a second audit, and
Landlord and Tenant agree to be bound by the results thereof if
such results are delivered to Landlord within sixty (60) days
of Tenant's notice to Landlord.  If the results of such second
audit reveal that the requirements of paragraph (a)(ii)(D) have
been met, then Landlord may extend the date on which the
exchange is to occur under paragraph (a) for an additional sixty
(60) days from the delivery of the results of such second audit
and may extend the date by which Landlord must exercise its
rights under paragraph (d) for an additional sixty days from
the delivery of the results of such audit.

        (c) Landlord agrees that it will secure the
release of any Mortgage upon compliance by Tenant with the
foregoing terms and conditions provided that Mortgagee shall be
entitled to a mortgage lien on the Exchange Property having at
least the same priority and on the same terms and conditions as
the Mortgage.

        (d) Notwithstanding compliance with the foregoing
terms and conditions, Landlord may notify Tenant in writing
within ninety (90) days after receipt of the items required by
subsections (a)(i) and (a)(ii) of this section 19.4 that Land-
lord declines to accept such exchange and in such event, pro-
vided that all terms and conditions necessary for such exchange

- 34 -

DFF/10-29-85
0723R

have been satisfied, Tenant shall have the right to terminate
this Lease by giving Landlord written notice to that effect
within thirty (30) days after receipt of Landlord's notice
declining to accept such exchange.  Such right to terminate
this Lease shall expire if Tenant fails to give notice of
termination within said thirty (30) day period.

     20.   Events of Default; Termination.  If any one or
more of the following events (herein called "Events of Default")
shall occur:

     (a) if Tenant shall default in the due and
punctual payment of any Basic Rent, Percentage Rent, additional
rent or other sum payable to Landlord hereunder when the same
shall have become due and payable and such default shall con-
tinue for more than ten (10) days after written notice thereof
from Landlord; or

     (b) if Tenant shall default in the due performance
or observance of any of the terms of section 9 or 18 and such
default shall continue for more than ten (10) days after written
notice thereof from Landlord; or

     (c) if Tenant shall default in the due performance
or observance of any of the terms hereof other than those
referred to in the foregoing subparagraphs (a) and (b) and such
default shall continue for more than thirty (30) days after
written notice thereof from Landlord, or if such default shall
not be susceptible to cure within thirty (30) days, Tenant fails
either to commence to remedy such default within thirty (30)
days or thereafter diligently to prosecute the cure thereof to
completion with due diligence and without delay; or

     (d) if an Event of Default on the part of Tenant
shall exist under any Leases other than this Lease; or

     (e) if Tenant shall make a general assignment for
the benefit of creditors, or shall file any voluntary petition
seeking relief, under the federal bankruptcy law or similar
state insolvency law, or shall consent or acquiesce in the
appointment of any trustee or receiver of Tenant or substan-
tially all of its assets; or

     (f) if a petition is filed against Tenant seeking
dissolution or liquidation of substantially all of Tenant's
assets or similar relief under any present or future statute,
law or regulation, and Tenant shall fail timely to deny or
contest the material allegations of a petition against it for
any such relief, or its directors or a majority in interest of

- 35 -

DFF/10-29-85
0723R

its stockholders, or if a partnership its partners, shall take
any action involving or calculated to result in the dissolution
of Tenant or the liquidation of substantially all of Tenant's
assets; or if, within sixty (60) days after the commencement of
any proceedings against Tenant seeking the dissolution of Tenant
or the liquidation of substantially all of Tenant's assets or
similar relief under any present or future statute, law or
regulation, liquidation or similar relief in a proceeding to
which any of the events referred to in subdivision (f) relates,
such proceeding shall not have been dismissed, or such petition
denied or such order vacated, as the case may be, or if, within
sixty (60) days after the appointment, without the consent or
acquiescence of Tenant, of any trustee, receiver or liquidator
of Tenant or of all or substantially all of its assets for the
purpose of the dissolution of Tenant or the liquidation of
substantially all of Tenant's assets, such appointment shall
not have been vacated; or

                  (g) if CPS shall avail itself or be subject.
to any of the events described in paragraphs (e) and (f) above;

then and in any such event Landlord at any time thereafter may
(i) without further notice terminate this Lease, whereupon the
Demised Term of this Lease shall expire and terminate by limi-
tation (subject to the provisions of section 24 relating to the
survival of Tenant's obligations) and all rights of Tenant
under this Lease shall cease and/or (ii) pursue such other
remedies as are available to Landlord at law or in equity on
account of such Event of Default. All costs and expenses
incurred by or on behalf of Landlord, including, without
limitation, reasonable attorneys' fees and expenses, occasioned
by any default by Tenant under this Lease shall constitute
additional rent hereunder. Anything to the contrary contained
in this section 20 notwithstanding, if an Event of Default
occurs under subsection (c) hereof which (i) is not a material
default, (ii) is not an event which, if not cured, will consti-
tute a default under a Mortgage, (iii) cannot result in Landlord
being subject to any civil liability as to which Tenant has not
posted adequate security or any criminal liability, and (iv)
cannot result in the Demised Premises or any rent therefrom or
any part thereof or interest therein being in imminent danger
of being sold, encumbered, forfeited or lost, then, in such
event, Landlord shall not be entitled to terminate this Lease,
but shall be entitled to pursue any other remedy available here-
under or at law or in equity, including, without limitation,
its rights under section 31 hereof and its right to maintain an
action for damages.

- 36 -

DFF/10-29-85
0723R

21. Repossession, etc., by Landlord. At any time after
the termination of the Demised Term of this Lease pursuant to
section 20, Landlord may enter upon and repossess the Demised
Premises by force, summary proceedings, ejectment or otherwise,
and may remove Tenant and all other persons and any and all
property therefrom. Landlord shall be under no liability for
or by reason of any such entry, repossession or removal.

22. Reletting. After the termination of the Demised
Term of this Lease pursuant to section 20, Landlord shall use
commercially reasonable efforts to relet the Demised Premises
or any part thereof for the account of Tenant, in the name of
Tenant or Landlord or otherwise for such term or terms (which
may be greater or less than the period which would otherwise
have constituted the balance of the Demised Term of this Lease)
and on such conditions (which may include concessions and tenant
improvement allowances) and for such uses as Landlord, in its
uncontrolled discretion, may determine, and may collect and
receive the rents therefor; provided, however, that Landlord
shall be under no duty to relet the Demised Premises for less
than the fair market rental value thereof or to relet the
Demised Premises under any lease which is unacceptable to Land-
lord in the reasonable exercise of its judgment or unacceptable
to Mortgagee. Further, Tenant agrees that Landlord's duty to
relet under this section 22 shall be limited by and subject to
the right of Mortgagee to exercise its rights under the Mort-
gage, the exercise of such rights being an event over which the
Landlord has no control. In addition, any attempt by Landlord
to relet the Demised Premises or the actual reletting of the
Demises Premises shall not constitute a waiver by Landlord of
its rights and remedies under this Lease, and Tenant shall
remain subject to and liable for all of the terms and conditions
hereof. Landlord shall not be responsible or liable for any
failure to collect any rent due upon any such reletting.

23. [DELETED]

24. Survival of Tenant's Obligations; Damages.

24.1. Termination of Lease Not to Relieve Tenant
of Obligations. No termination of the Demised Term of this
Lease pursuant to section 20, and no repossession of the Demised
Premises or any part thereof pursuant to section 21 or otherwise
shall relieve Tenant of its liability and obligations under this
section 24, all of which shall survive any such termination or
repossession.

24.2. Current Damages. In the event of any such
termination during the Demised Term, Tenant will pay to Landlord

- 37 -

DFF/10-29-85
0723R

the Basic Rent, Percentage Rent, and all additional rent and
other sums required to be paid by Tenant, including, without
limitation, the Impositions, up to the time of such termination,
and thereafter Tenant until the end of what would have been the
Demised Term of this Lease in the absence of such termination,
and whether or not the Demised Premises or any part thereof
shall have been relet, shall be liable to Landlord for, and
shall pay to Landlord as and for liquidated and agreed current
damages for Tenant's default (it being agreed that it would be
impracticable or extremely difficult to fix the actual damages):

      (a) the Basic Rent, Percentage Rent, and all
additional rent and other sums which would be payable under this
Lease by Tenant for what would be the then unexpired Demised
Term of this Lease in the absence of such termination, less

      (b) the net proceeds, if any, of any relet-
ting effected for the account of Tenant pursuant to sections 22
and 23, after deducting from such proceeds all reasonable costs
and expenses incurred in connection with such reletting, includ-
ing, without limitation, all repossession costs, brokerage com-
missions, legal expenses, reasonable attorneys' fees and
expenses, alterations and/or repair costs, tenant allowances
and expenses of preparation for such reletting.

Tenant shall pay such current damages monthly on the days on
which the Basic Rent would have been payable under this Lease
in the absence of such termination, and Landlord shall be
entitled to recover the same from Tenant on each such day.

      24.3.  Final Damages.  At any time after any
termination referred to in section 20, whether or not Landlord
shall have collected any current damages as aforesaid, Landlord
shall be entitled to recover from Tenant and Tenant will pay to
Landlord, on demand, as and for liquidated and agreed final
damages for Tenant's default and in lieu of all current damages
described in section 24.2 beyond the date of such demand (it
being agreed that it would be impracticable or extremely dif-
ficult to fix actual damages), an amount equal to the
excess, if any, of

      (a) the Basic Rent, Percentage Rent, and
additional rent and other sums which would be payable under
this Lease from the date of such demand (or, if it be earlier,
from the date to which Tenant shall have satisfied in full its
obligations under section 24.2 to pay current damages) for what
would be the then unexpired Demised Term of this Lease in the
absence of such  expiration or termination, discounted at the

- 38 -

DFF/10-29-85
0723R

rate of eight percent (8%) per annum, compounded semi-annually, to its then present worth, over

(b) the fair net rental value of the Demised Premises for the same period.

If any statute or rule of law shall validly limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to such lesser amount allowable under such statute or rule of law.

24.4. Percentage Rent. For purposes of computing damages, the Percentage Rent payable with respect to each Lease Year following termination (including the Lease Year during which such termination shall take place) shall be conclusively presumed to be equal to the average Percentage Rent payable with respect to the two complete Lease Years preceding termination, or, if such termination shall take place before the expiration of the twelfth Lease Year, the Percentage Rent payable for the eleventh Lease Year.

25. Tenant's Waiver of Statutory Rights. In the event of any expiration or termination of the Demised Term of this Lease pursuant to section 20 or any repossession of the Demised Premises pursuant to section 21, Tenant, so far as permitted by law, hereby expressly waives (a) any right of redemption, re-entry or repossession, (b) any right to a trial by jury in the event of summary proceedings and (c) any right to a second or subsequent trial of any action of ejectment or similar suit, action or proceeding other than any right to a new trial granted by a court for cause. As used herein the word "re-entry" is not limited to its technical or common law meaning.

26. Assignment of Landlord's Interest. Landlord may at any time and from time to time assign, by way of security or otherwise, any or all of the rights, in whole or in part, of Landlord under this Lease, including any or all Basic Rent, Percentage Rent, additional rent or other sums payable under this Lease and any or all of the claims, rights, powers, privileges and remedies of Landlord under this Lease. No such assignment shall release Landlord from any of its obligations under this Lease or constitute an assumption of any such obligations on the part of the assignee. From and after any such assignment, the assignee may enforce any and all of the terms of this Lease, may exercise any and all of Landlord's claims, rights, powers, privileges and remedies hereunder, and shall be entitled to the benefit of any and all of Landlord's rights (including, without limitation, rights of indemnification and rights to reimbursement of costs and expenses), privileges and

DFF/10-29-85
0723R

immunities hereunder, all to the extent so assigned, as though
the assignee had been named as Landlord herein.  All the rights
and interests of the assignee herein shall be terminated upon
the termination of such assignment in the manner specified in
the instrument effecting such assignment.

27.  Surrender of Demised Premises, etc.  Subject to
the provisions of section 14 hereof, Tenant, upon any expiration
or earlier termination of this Lease for any reason whatsoever
(other than a termination of this Lease pursuant to section 19),
will peaceably vacate, yield up and surrender to Landlord the
Demised Premises, in good order, condition and repair pursuant
to the provisions of sections 14 and 19.  No surrender to Land-
lord of the Demised Premises or any part thereof or any interest
therein by Tenant at any time other than the expiration of the
Demised Term shall be valid or effective unless it be in writing
and unless agreed to and accepted in writing by Landlord.  No
act by any representative or agent of Landlord, other than such
a written agreement and acceptance by Landlord, shall constitute
or be deemed an acceptance of any such surrender.

28.  No Merger of Title.  There shall be no merger of
this Lease or of the leasehold estate created by this Lease with
the fee estate in the Demised Premises or any part thereof by
reason of the fact that the same person, firm, corporation or
other entity may acquire or own or hold directly or indirectly
(a) this Lease or the leasehold estate created by this Lease or
any interest in this Lease or in any such leasehold estate and
(b) the fee estate in the Demised Premises or any part thereof
or any interest in such fee estate, and no such merger shall
occur unless and until all corporations, firms and other enti-
ties, including Mortgagees, having any interest in (x) this
Lease or the leasehold estate created by this Lease or any
interest in this Lease or in any such leasehold estate and (y)
the fee estate in the Demised Premises or any part thereof or
any interest in such fee estate, shall join in a written instru-
ment effecting such merger and shall duly record the same.

29.  Assignment and Subletting.  Anything to the con-
trary contained in this section 29 notwithstanding, no assign-
ment, transfer or subletting and no grant of any license as
provided for in this section shall be effective or be permitted
hereunder if an Event of Default shall have occurred and be
continuing hereunder or if any consent or approval required
under the Operating Agreement for the action in question has
not been obtained and a copy thereof furnished to Landlord.

(a)  Except as provided in paragraphs (b) and (c)
of this section 29 and unless Tenant shall first agree in writ-

- 40 -

DFF/10-29-85
0723R

ing to pay the Maximum Rent after the tenth (10th) Lease Year
for the remainder of the Demised Term, Tenant shall not assign
or transfer this Lease or sublet all or any part of the Demised
Premises without the prior written consent of Landlord and
Mortgagee, such consents not to be unreasonably withheld.  If
Tenant agrees in writing to pay the Maximum Rent for the
remainder of the Demised Term after the tenth (10th) Lease Year
(in which event Tenant shall no longer be obligated to pay
Percentage Rent under section 3.2 hereof), Tenant shall have
the right at any time and from time to time, to assign or
transfer this Lease and sublet all or any part of the Demised
Premises without the consent of Landlord or Mortgagee; provided,
however, that such assignment or subletting does not violate
the terms and conditions of the Operating Agreement.

(b)   Tenant may grant licenses to concessionaires
or licensees and sublease space for the operation of leased
departments within Tenant's department store located on the
Demised Premises without the consent of Landlord or Mortgagee.

(c)   The consent of Landlord or Mortgagee shall
not be required for any assignment or transfer of this Lease at
any time or from time to time, whether by operation of law or
voluntary assignment, to another corporation or entity which (i)
shall acquire or succeed to all or substantially all of the
assets, business and good will of Tenant and CPS, (ii) immedi-
ately following such assignment or transfer shall have a net
worth equal to or in excess of the net worth of CPS immediately
prior thereto and in no case shall such net worth be less than
One Hundred Forty-Five Million Dollars, ($145,000,000), as
evidenced by financial statements of CPS and such transferee
delivered to Landlord not later than thirty (30) days after
such transfer prepared in accordance with generally accepted
accounting principles consistently applied and certified by
independent certified public accountants, and (iii) shall
expressly assume, by instrument, in form and content satisfac-
tory to Landlord, the obligations of Tenant hereunder, whether
accrued or accruing prior to or after the date of such assign-
ment or transfer; and such assignment or transfer shall operate
to release and discharge Tenant from any and all liability here-
under, whether accrued or accruing, prior to or after the date
of such assignment.  The foregoing right to assign or transfer
this Lease without the consent of Landlord or Mortgagee shall
inure to the benefit of each successive assignee or transferee
under this paragraph (c) and any such assignee or transferee,
upon making a further assignment of this Lease to a business
successor in compliance with the foregoing provisions of this
paragraph (c), shall thereupon be released from any further
liability or obligation hereunder, as hereinabove provided.

- 41 -

DFF/10-29-85
0723R

        (d)  The consent of Landlord or Mortgagee shall not be
required for any assignment or transfer of this Lease or any
subletting at any time or from time to time, to CPS or an
affiliate of CPS or, provided CPS or such affiliate shall
operate the business conducted in the Demised Premises under
the name "Carson Pirie Scott & Co." or "Carson's" or such other
name as is permitted under the provisions of section 11.2 and
shall have the use and benefit of Tenant's and CPS's good will,
and provided that Tenant and CPS shall remain liable on all of
their obligations under this Lease.

        (e)  Except as expressly provided to the contrary in
paragraph (c) of this Article no assignment, transfer or
subletting and no grant of any license shall release Tenant or
any guarantor of Tenant from any of its obligations under this
Lease.

        30.  <u>Consents and Approvals</u>.  Whenever the Landlord's
consent or approval is required or requested hereunder, Landlord
agrees that such consent or approval will not be unreasonably
withheld; provided, however, that the Landlord shall be entitled
to withhold its consent or approval as to any matter which
requires the consent or approval of Mortgagee under the terms
of the Mortgage if Mortgagee refuses to give such consent or
approval.  Whenever the Tenant's consent or approval is required
or requested hereunder, Tenant agrees that such consent or
approval will not be unreasonably withheld.

        31.  <u>Right of Landlord to Perform, etc</u>.  Regardless of
whether it is then an Event of Default, if Tenant shall fail to
make any payment or perform any act required to be made or per-
formed hereunder, Landlord, without notice to or demand upon
Tenant in an emergency (as determined by Landlord) and (subject
to section 10 relating to permitted contests) ten (10) days
following notice of such failure to Tenant in non-emergency
situations, and if Tenant has failed to cure such failure fol-
lowing notice thereof, and without waiving or releasing any
obligation or default, may (but shall be under no obligation to)
at any time thereafter make such payment or perform such act for
the account and at the expense of Tenant, and may enter upon the
Demised Premises for such purpose and take all such action
thereon as, in such Landlord's reasonable opinion, may be
necessary or appropriate therefor.  No such entry shall consti-
tute or be deemed an eviction of Tenant.  All sums so paid by
Landlord and all costs and expenses (including, without limita-
tion, reasonable attorneys' fees and expenses) so incurred,
together with interest thereon at the Default Rate from the date
of payment or incurring, whichever is earlier, shall constitute

DFF/10-29-85
0723R

additional rent hereunder and shall be paid by Tenant to Land-
lord on demand.

      32.  <u>Estoppel Certificate</u>.  Tenant will execute,
acknowledge and deliver to Landlord, within fifteen (15) days
of a request by Landlord, and Landlord will execute, acknowledge
and deliver to Tenant, promptly upon request by Tenant, a cer-
tificate executed by an authorized officer of Tenant or Land-
lord, as the case may be, certifying (a) that this Lease is
unmodified and in full force and effect (or, if there have been
modifications, that this Lease is in full force and effect, as
modified, and stating the modifications); (b) that the Tenant
has accepted possession of the Premises, and the date on which
the Demised Term commenced and will expire; (c) as to the dates
to which the Basic Rent, Percentage Rent, and any additional
Rent and other charges arising hereunder have been paid; (d) as
to the amount of any prepaid rent or any credit due to the
Tenant hereunder; (e) as to whether, to the best of such party's
knowledge, information and belief, the requesting party is then
in default in performing any of its obligations hereunder (and,
if so, specifying the nature of each such default); and (f) as
to any other fact or condition reasonably requested by the
requesting party; and acknowledging and agreeing that any
statement contained in such certificate may be relied upon by
the requesting party and any such other addressee.

      33.  <u>No Waiver, etc., by Landlord</u>.  No failure by
Landlord to insist upon the strict performance of any term
hereof or to exercise any right, power or remedy upon a breach
thereof, and no acceptance of full or partial rent during the
continuance of any such breach, shall constitute a waiver of
any such breach or of any such term.  No waiver of any breach
shall affect or alter this Lease, which shall continue in full
force and effect with respect to any other then existing or
subsequent breach.  No waiver of any term of this Lease shall
be valid unless reduced to writing and signed by the party
against which enforcement of the waiver is sought.

      34.  <u>Right to Enjoin</u>.  In addition to the other reme-
dies provided for in this Lease, Landlord shall be entitled to
the restraint by injunction of the violation or attempted or
threatened violation by Tenant of any of the terms, covenants,
conditions, provisions or agreements of this Lease.

      35.  <u>Remedies, etc., Cumulative</u>.  Each right, power
and remedy of Landlord provided for in this Lease or now or
hereafter existing at law or in equity or by statute or other-
wise shall be cumulative and concurrent and shall be in addition
to every other right, power or remedy provided for in this Lease

- 43 -

DFF/10-29-85
0723R

or now or hereafter existing at law or in equity or by statute
or otherwise, and the exercise or beginning of the exercise by
Landlord of any one or more of the rights, powers or remedies
provided for in this Lease or now or hereafter existing at law
or in equity or by statute or otherwise shall not preclude the
further exercise thereof or the simultaneous or later exercise
by Landlord of any or all such other rights, powers or remedies.

36. <u>Condition of Title and the Demised Premises</u>.
Landlord has made no warranties, representations or promises,
expressed or implied, with respect to the Demised Premises or
with respect to the Improvements or to any part thereof, except
those contained herein. Tenant has agreed to accept the
Demised Premises in "as is" condition and the taking of posses-
sion of the Demised Premises by Tenant shall be conclusive
evidence that the Demised Premises are in good and satisfactory
condition and acceptable to Tenant. Landlord has made no
warranties, representations or promises, express or implied,
regarding the condition or state of title to the Demised
Premises or regarding the compliance of the Demised Premises
with any Legal Requirements or with the requirements of any
contract, agreement or any other instrument relating to or
affecting the Demised Premises.

37. <u>Exhibition</u>. Subject to the exercise by the
Tenant of its options under section 40 hereof, Landlord shall
be entitled to exhibit the Demised Premises during business
hours for the purpose of selling or mortgaging Landlord's
interest under this Lease, and Landlord shall be entitled to
attach to the Demised Premises a notice or notices advertising
the Demised Premises for letting during a period of one hundred
eighty (180) days prior to the expiration of the Demised Term.
Landlord shall not unreasonably interfere with the Tenant's
business conducted by Tenant on the Demised Premises during
such exhibition.

38. <u>Inspection</u>. After reasonable notice to Tenant,
Landlord and Mortgagee and its and their agents shall be en-
titled to visit and inspect the Demised Premises during business
hours after reasonable notice to Tenant, but shall be under no
obligation to make any visit or inspection. Landlord shall
indemnify Tenant against loss or damage to property or person
resulting directly from such inspection and shall not unreason-
ably interfere with Tenant's business conducted on the Demised
Premises during such inspection.

39. <u>Subordination; Attornment and Nondisturbance</u>.

39.1. <u>Subordination of Lease; Nondisturbance</u>. Tenant
shall, promptly upon its receipt of a written demand therefor

- 44 -

DFF/10-29-85
0723R

from Landlord or the Mortgagee under any Mortgage becoming
effective at or after the entry into this Lease by the parties
hereto, subject and subordinate the Tenant's leasehold estate
hereunder in and to so much of the Demised Premises as is
covered by such Mortgage, to the lien, operation and effect
thereof (and of each renewal, modification, consolidation,
replacement or extension thereof), by executing and delivering
to such Mortgagee such subordination agreement and/or other
instrument in recordable form to effect the same as such Mort-
gagee may reasonably require; provided, that the Tenant shall
be entitled to condition its entry into such subordination
agreement or other instrument upon such Mortgagee's having
executed and delivered to the Tenant an instrument in recordable
form (which form such Mortgagee shall be entitled to prepare,
subject to its approval by the Tenant, which shall not unreason-
ably be withheld) under which such Mortgagee and the Tenant
agree that, if such Mortgage is foreclosed or title to the
Demised Premises is granted by deed in lieu of foreclosure, (a)
this Lease shall nevertheless remain in full force and effect,
and such Mortgagee and any purchaser at such foreclosure or any
grantee under any deed in lieu thereof shall take no action to
terminate this Lease except on the occurrence of an Event of
Default, and (b) Tenant shall attorn to such Mortgagee and any
purchaser at such foreclosure, or any grantee under any deed in
lieu thereof all as if such foreclosure had not occurred.

39.2. Subordination of Mortgage. Anything contained
in the provisions of this Lease to the contrary notwithstanding,
any Mortgagee may at any time subordinate its Mortgage to the
operation and effect of this Lease without obtaining the Ten-
ant's consent thereto, and without giving notice thereof, and
thereupon this Lease shall be deemed to be senior to such Mort-
gage without regard to their respective dates of execution,
delivery and/or recordation among the appropriate land records,
and thereafter, such Mortgagee shall have the same rights as to
this Lease as it would have had were this Lease executed,
delivered and recorded among the said land records before the
execution and delivery of such Mortgage, and assigned by the
Landlord to such Mortgagee as security.

40. Tenant's Purchase Options.

40.1 General. Tenant shall have the option to
purchase the Aggregate Demised Premises at the end (the "Effec-
tive Date") of the tenth, fifteenth, twentieth, thirtieth, and
fortieth Lease Years of the Demised Term. Tenant shall give
written notice to Landlord of the exercise of such option not
less than twelve (12) months and not more than fifteen (15)
months prior to the Effective Date. Upon the giving of such

DFF/10-29-85
0723R

notice, unless the exercise of the option is cancelled pursuant
to clause (b) of section 40.2 or clause (f) of section 40.3,
Tenant shall be obligated to purchase and Landlord shall be
obligated to sell, the Demised Premises subject to the provi-
sions set forth hereinbelow.  The purchase price ("Purchase
Price") payable by Tenant shall be determined in accordance
with the provisions set forth in section 40.2 and shall be paid
to Landlord less the principal amount of any Permitted Mortgages
(as hereinafter defined) and less any other adjustments, all as
hereinafter provided, in federal reserve funds deposited in
Landlord's account at closing.  Closing ("Closing") shall take
place as of the Effective Date through an escrow established at
Chicago Title and Trust Company, Chicago, Illinois, the terms
and provisions of such escrow to be consistent with the terms
and provisions hereof.

40.2  <u>Calculation of Purchase Price</u>.  The purchase
price for the Aggregate Demised Premises shall be the fair
market value of the Aggregate Demised Premises, without taking
into account the existence of this Lease or any of the Leases
and based on then current appraisal methods.  Tenant's notice
to Landlord exercising the option to purchase shall be accom-
panied by an appraisal, prepared by an appraiser who shall be a
member of the American Institute of Real Estate Appraisers of
the National Association of Realtors, Chicago, Illinois (the
"Institute"), familiar with the areas in which the Aggregate
Demised Premises are located, which shall state the opinion of
such appraiser as to the fair market value of the Aggregate
Demised Premises as of a date eighteen (18) months prior to the
Effective Date.  Within thirty (30) days after the receipt of
Tenant's notice and such appraisal, Landlord may, by notice to
Tenant, either accept the fair market value of the Aggregate
Demised Premises, as set forth in such appraisal, as the
Purchase Price for the Aggregate Demised Premises, or reject
such appraisal in which event Landlord may obtain no later than
one hundred eighty (180) days prior to the Effective Date, at
Landlord's expense, and submit to Tenant an appraisal by an
appraiser who shall be a member of the Institute, such appraiser
having been selected by the President of the Institute, familiar
with the areas in which the Aggregate Demised Premises are
located, which appraisal shall state the opinion of such
appraiser as to the fair market value of the Aggregate Demised
Premises as of the date of the appraisal.  Tenant shall then
have the option, to be exercised by giving written notice to
Landlord within five (5) days following receipt of Landlord's
appraisal, to (a) accept, as the Purchase Price for the Aggre-
gate Demised Premises, the fair market value of the Aggregate
Demised Premises as determined by the higher of the two
appraisals, or (b) cancel the exercise of its option to purchase

- 46 -

DFF/10-29-85
0723R

the Aggregate Demised Premises as of the Effective Date, or (c)
request a third appraisal. If Tenant requests a third
appraisal, then an appraiser who shall be a member of the
Institute, mutually acceptable to Landlord and Tenant, and
familiar with the areas in which the Aggregate Demised Premises
are located, shall promptly make an appraisal of the fair market
value of the Aggregate Demised Premises, at Tenant's expense,
and shall state, in his opinion, such fair market value thereof,
as of the date of such appraisal in accordance with the provi-
sions of this section 40. If Landlord and Tenant cannot agree
on such third appraiser within ten (10) days following Land-
lord's receipt of a request for a third appraisal, then the
third appraiser shall be selected by the President of the
Institute at the request of either party. Such appraisal shall
be delivered to Landlord and Tenant at least thirty (30) days
prior to the Effective Date. Upon receipt of the third
appraisal by the parties hereto, the Purchase Price for the
Aggregate Demised Premises shall be determined as follows: (i)
if the third appraisal provided for hereunder is higher than
either of the first two appraisals provided for in this section
40, then the Purchase Price for the Aggregate Demised Premises
shall be the fair market value of the Aggregate Demised Premises
as determined by the higher of said first two appraisals; or
(ii) if the third appraisal is lower than the first two
appraisals provided for in this section 40, then the purchase
price for the Aggregate Demised Premises shall be the fair
market value of the Aggregate Demised Premises as determined by
the lower of said first two appraisals; or (iii) if the third
appraisal is greater than the lower of said first two appraisals
and less than the higher of said first two appraisals, then the
Purchase Price for the Aggregate Demised Premises shall be the
fair market value of the Aggregate Demised Premises as deter-
mined by the third appraisal. If the Purchase Price determined
pursuant to the foregoing with respect to the purchase option
the Effective Date of which is the expiration of the tenth
(10th) Lease Year, is less than the lesser of (i) $75,000,000,
or (ii) the outstanding principal balance and accrued interest
which will exist on the Effective Date on the Mortgage existing
on the date of the commencement of this Lease (the "Floor
Amount"), then the Purchase Price shall be the Floor Amount.

40.3 Other Terms and Conditions. Following
exercise of the option by Tenant, the following terms and
conditions, in addition to those set forth above, shall apply:

(a) Beneficiary being the benefi-
ciary of the Illinois and Indiana land trusts
(collectively "Land Trusts" and individually
"Land Trust"), holding fee title to the

- 47 -

DFF/10-29-85
0723R

Aggregate Demised Premises, agrees to assign
to Tenant at Closing by separate instrument
for each Land Trust the entire beneficial
interest and power of direction in such Land
Trusts free and clear of all liens and
encumbrances, as to which free and clear
condition Beneficiary will *represent and
warrant* in the instrument of assignment.
Beneficiary will further represent and
warrant in each such instrument of assignment
that such instrument is good and sufficient
in all respects to vest title to the benefi-
cial interest and power of direction assigned
thereby in Tenant. At Closing, Beneficiary
will deliver to Tenant certificates of the
trustees holding title to the Land Trusts
certifying in each case that Beneficiary is
the sole *beneficiary of each Land Trust* and
holds the entire power of direction thereof,
that each such trustee is aware of no
assignment of or encumbrance on such benefi-
cial interest and power of direction or any
part thereof and that the list of instruments
appended to such certificate are the only
instruments signed by each such trustee as
trustee since taking fee title to the Demised
Premises. In addition, at Closing, Benefi-
ciary will deliver to Tenant the customary
*Uniform Commercial Code,* judgment and tax
lien searches showing no liens or encum-
brances against the beneficial interest and
power of direction of the Land Trusts.

(b) Any documentary stamp, trans-
fer, conveyance, transactions, or similar
taxes levied in connection with the foregoing
assignment of the beneficial interest and
power of direction in the Land Trusts shall
be paid by Tenant.

(c) At Closing, title to the
Aggregate Demised Premises shall be good and
marketable subject only to (i) the Permitted
Exceptions, and (ii) Mortgages in an aggre-
gate amount of unpaid principal and accrued
interest not in excess of the Purchase Price
(the "Permitted Mortgages") with respect to
which Landlord has delivered to Tenant true
and correct copies of the note, mortgage and

- 48 -

DFF/10-29-85
0723R

all other allied documents not less than two
(2) years prior to any Effective Date. At
Closing Beneficiary shall represent and
warrant to Tenant by written instrument
delivered to Tenant that Landlord is not in
default under any of the Permitted Mortgages
and the amount of the unpaid principal and
accrued interest thereunder as of Closing.

(d) At Closing, Tenant shall be
entitled to obtain at its expense an ALTA
Owner's Policy, Form B-1970 (or what is at
Closing the equivalent thereof if such Form
B-1970 is no longer in use) of Chicago Title
Insurance Company, or other title insurance
company designated by Tenant, dated the date
of the Closing, insuring Tenant in the amount
of the Purchase Price that the trustees hold-
ing title to the Aggregate Demised Premises
own good and marketable title thereto subject
only to the Permitted Exceptions, the Per-
mitted Mortgages, and the standard printed
exceptions to the Owner's Policy then in use,
including an exception(s) for matters which
would be removed by obtaining a current sur-
vey, such Owner's Policy to have attached
thereto the same endorsements as were
furnished Landlord at the time of Landlord's
purchase of the Aggregate Demised Premises
from Tenant.

(e) At Closing, Beneficiary shall
convey to Tenant by good and sufficient Bill
of Sale free and clear of all liens and
encumbrances the personal property conveyed
to Landlord at the time of Landlord's pur-
chase of the Aggregate Demised Premises from
Tenant and any renewals or replacements
thereof made by Tenant from time to time
during the Demised Term less such parts or
portions thereof as shall have been aban-
doned, lost or destroyed during Tenant's
occupation and operation of the Aggregate
Demised Premises.

(f) In the event that, following
the exercise by Tenant of its option to
purchase the Aggregate Demised Premises and
prior to Closing, the Aggregate Demised

- 49 -

DFF/10-29-85
0723R

Premises hereunder or any of the Demised
Premises under any of the Leases are des-
troyed or materially damaged by fire or
other casualty, or the whole or any part
thereof are taken through the exercise of
eminent domain or a petition to so condemn
is filed, Tenant shall have the option to
either (i) cancel the exercise of its option
to purchase the Aggregate Demised Premises
by giving Landlord written notice to that
effect not more than fifteen (15) days
following the date of such destruction,
damage, condemnation or receipt by Tenant of
notice as to the filing of such petition to
condemn, or (ii) proceed to Closing in which
event the Purchase Price shall not be reduced
but Landlord shall pay to Tenant all insur-
ance proceeds or condemnation awards received
by Landlord in connection therewith and
assign to Tenant all of its right, title and
interest in and to any such awards or pro-
ceeds not yet paid.

(g)  At Closing, interest on the
Permitted Mortgages shall be prorated, pre-
paid interest being credited to Landlord and
interest accrued but unpaid being credited
to Tenant.

(h)  At Closing, the interest of
Landlord under the Operating Agreements for
the Aggregate Demised Premises and all
insurance policies, certificates, licenses,
guaranties, warranties and the like covering
the Aggregate Demised Premises and assigned
to Landlord by Tenant shall be reassigned
(to the extent assignable) to Tenant by good
and sufficient instruments of assignment.

(i)  At or prior to Closing, Land-
lord and Tenant will cooperate with each
other by the filing of such certificates,
reports or affidavits as may be required by
law to avoid withholding of a part of the
Purchase Price to satisfy income or other
tax requirements.

41.  Liability of Beneficiary.  If Beneficiary, or any
successor or assign, shall fail to perform any covenant, term

- 50 -

DFF/10-29-85
0723R

or condition of this Lease upon Landlord's part to be performed,
Tenant's sole recourse shall be against the right, title and
interest of Beneficiary in the land trust holding title to the
Demised Premises, the assets of such land trust and the rents
or other income from such property receivable by Landlord, sub-
ject, nevertheless, to the rights of any Mortgagee, and neither
Beneficiary nor any successor or assign of Beneficiary nor any
of the general partners, limited partners, shareholders,
officers or directors of Beneficiary or of any successor or
assign of Beneficiary, shall be personally liable hereunder.

     42.  <u>Notices, etc</u>.  *All notices, demands, requests,*
consents, approvals and other instruments under this Lease
shall be in writing and shall be deemed to have been properly
given if and when mailed by first class registered or certified
mail, return receipt requested, postage prepaid, addressed (a)
if to Tenant, at One South Street, Chicago, Illinois 60603, or
at such other address as Tenant may have designated by notice
to Landlord or (b) if to Landlord, at Suite 650, 502 Washington
Avenue, Towson, Maryland 21204, or at such other address as
Beneficiary may have designated by notice to Tenant.

     43.  <u>Exculpation of Land Trustee</u>.  This Agreement is
executed by Chicago Title and Trust Company, not personally but
as Land Trustee as aforesaid in the exercise of the power and
authority conferred upon and vested in it as such Trustee and
it is expressly understood and agreed that nothing herein shall
be construed as creating any liability in said Chicago Title
and Trust Company personally to perform any covenant either
express or implied herein contained, all such liability, if
any, being expressly waived by every person now or hereafter
claiming any right hereunder, and that any person claiming any
right hereunder shall look solely to the assets of the trust
for the enforcement of the agreements and covenants herein.

     44.  <u>Miscellaneous</u>.  If any term or provision of this
Lease or any application thereof shall be invalid or unenforce-
able, the remainder of this Lease and any other application of
such provision shall not be affected thereby.  This Lease shall
be deemed to be a contract governed by and to be construed and
enforced in accordance with the laws of the State of Illinois.
Neither this Lease nor any provision hereof may be changed,
waived, discharged or terminated orally, but only by an
instrument in writing signed by the party against which
enforcement of the change, waiver, discharge or termination is
sought.  Subject to the provisions of section 29 (relating to
subleases and assignments by Tenant, respectively), all the
terms and provisions of this Lease shall be binding upon and
inure to the benefit of Tenant, its successors and assigns, and

- 51 -

DFF/10-29-85
0723R

Landlord, its successors and assigns. The headings in this
Lease are for convenience of reference only and shall not limit
or otherwise affect the meaning hereof. This Lease may be
executed in several counterparts, each of which shall be an
original, but all of which shall constitute one and the same
instrument.

        IN WITNESS WHEREOF, Landlord and Tenant have respec-
tively caused their corporate seals to be hereunto affixed and
these presents to be signed by their respective duly authorized
officers, as of the day and year first above written.

WITNESS or ATTEST:                    LANDLORD:

                                      CHICAGO TITLE & TRUST COMPANY, as
                                      trustee under a Trust Agreement
                                      dated June 15, 1985 and known as
                                      Trust No. 1085900,

                                      By: _____
_____          ASST. VICE PI ...  "Land Trustee"
                    ASST. SECRETARY

                                      SIX ANCHORS LIMITED PARTNERSHIP, a
                                      Maryland limited partnership

                                      By: DWT Venture, Incorporated, a
                                      Maryland corporation, General
                                      Partner

_____       By: _____
                                                                "Beneficiary"

ATTEST:                               TENANT:

                                      CPS REALTY, an Illinois general
                                      partnership

                                      By Carson Pirie Scott & Company, a
                                      Delaware corporation, General
                                      Partner

_____       by: _____
                                                          , Vice President

- 52 -

EXI ··· A TO NORTH RIVERSIDE ·  :E

PARCEL 1:

THAT PART OF THE NORTH EAST 1/4 OF SECTION 25, TOWNSHIP 39 NORTH, RANGE
12 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS;

BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT 50 FEET SOUTH AND 33 FEET EAST OF THE NORTH WEST
CORNER OF THE NORTH EAST 1/4 OF SAID SECTION; THENCE SOUTH 0 DEGREES 10
MINUTES 52 SECONDS EAST ALONG A STRAIGHT LINE 33 FEET EAST OF AND
PARALLEL WITH THE WEST LINE OF SAID NORTH EAST 1/4 A DISTANCE OF
1,589.31 FEET TO A POINT; THENCE NORTH 89 DEGREES 58 MINUTES 52 SECONDS
WEST ALONG A STRAIGHT LINE A DISTANCE OF 33.0 FEET TO A POINT IN THE
WEST LINE OF THE SAID NORTH EAST 1/4; THENCE SOUTH 0 DEGREES 10 MINUTES
52 SECONDS EAST ALONG SAID WEST LINE OF SAID NORTH EAST 1/4 A DISTANCE
OF 149.15 FEET TO A POINT IN THE NORTHERLY RIGHT OF WAY OF THE ILLINOIS
CENTRAL RAILROAD; THENCE SOUTH 67 DEGREES 12 MINUTES 02 SECONDS EAST
ALONG SAID NORTHERLY LINE OF THE ILLINOIS CENTRAL RAILROAD A DISTANCE
OF 438.79 FEET; THENCE DUE NORTH ALONG A STRAIGHT LINE A DISTANCE OF
450.53 FEET TO A POINT; THENCE DUE EAST ALONG A STRAIGHT LINE A
STRAIGHT LINE A DISTANCE OF 55.00 FEET TO A POINT; THENCE DUE NORTH
ALONG A STRAIGHT LINE A DISTANCE OF 238.5 FEET TO A POINT; THENCE DUE
EAST ALONG A STRAIGHT LINE A DISTANCE OF 120.00 FEET TO A POINT; THENCE
DUE NORTH ALONG A STRAIGHT LINE A DISTANCE OF 303.00 FEET TO A POINT;
THENCE DUE WEST ALONG A STRAIGHT LINE A DISTANCE OF 136.38 FEET TO A
POINT; THENCE DUE NORTH ALONG A STRAIGHT LINE A DISTANCE OF 88.5 FEET
TO A POINT; THENCE DUE WEST ALONG A STRAIGHT LINE A DISTANCE OF 358.00
FEET TO A POINT; THENCE NORTH 0 DEGREES 10 MINUTES 52 SECONDS WEST
ALONG A STRAIGHT LINE A DISTANCE OF 648.00 FEET TO A POINT; THENCE DUE
WEST ALONG A STRAIGHT LINE A DISTANCE OF 20.00 FEET TO A POINT; THENCE
NORTH SOUTH 0 DEGREES 10 MINUTES 52 SECONDS WEST ALONG A STRAIGHT LINE
A DISTANCE OF 115.00 FEET TO A POINT; THENCE NORTH 44 DEGREES 54
MINUTES 34 SECONDS EAST ALONG A STRAIGHT LINE A DISTANCE OF 56.48 FEET
TO A POINT; THENCE DUE EAST ALONG A STRAIGHT LINE A DISTANCE OF 218.00
FEET TO A POINT; THENCE SOUTH 80 DEGREES 32 MINUTES 33 SECONDS EAST
ALONG A STRAIGHT LINE A DISTANCE OF 152.15 FEET TO A POINT; THENCE
NORTH 0 DEGREES 10 MINUTES 52 SECONDS WEST ALONG A STRAIGHT LINE A
DISTANCE OF 50.00 FEET TO A POINT; THENCE DUE WEST ALONG A STRAIGHT
LINE A DISTANCE OF 443.00 FEET TO THE POINT OF BEGINNING;

PARCEL 2:

THE RECIPROCAL AND NON-EXCLUSIVE EASEMENTS FOR RETENTION BASIN AND FOR
INGRESS AND EGRESS, PARKING, UTILITIES, AND CONSTRUCTION,
RECONSTRUCTION, ERECTION AND MAINTENANCE OF FOUNDATION, FOOTINGS,
SUPPORTS, CANOPIES, ROOFS, BUILDING AND OTHER OVERHANGS OR PROJECTIONS,
AWNING, ALARM BELLS, SIGNS, LIGHTS, AND LIGHTING DEVISES, UTILITY
VAULTS, STAIRCASES AND OTHER SIMILAR APPURTENANCES TO PARCEL 1 ABOVE,
CREATED, DEFINED AND LIMITED BY THAT CERTAIN RECIPROCAL OPERATION AND
EASEMENT AGREEMENT DATED DECEMBER 6, 1973, AND RECORDED ON JANUARY 2,
1974, AS DOCUMENT NUMBER 22584954 AS AMENDED BY DOCUMENT RECORDED
JANUARY 7, 1976 AS DOCUMENT 23346268, IN THE OFFICE OF THE RECORDER OF
DEEDS OF COOK COUNTY, ILLINOIS, BY AND AMONG RIVERSIDE MALL ASSOCIATES,

-1-

AN ILLINOIS LI....:.ED PARTNERSHIP, J. C. PENNEY PROPERITES, INC., A
DELAWARE CORPORATION, CARSON PIRIE SCOTT AND COMPANY, A DELAWARE
CORPORATION, AND MONTGOMERY WARD DEVELOPMENT CORPORATION, A DELAWARE
CORPORATION, IN, OVER, UPON, AND UNDER AS SHOWN ON THE PLOT PLAN
ATTACHED TO SAID AGREEMENT, IN COOK COUNTY, ILLINOIS

SUBPARCEL 'D':

THAT PART OF THE NORTH EAST 1/4 OF SECTION 25, TOWNSHIP 39 NORTH, RANGE
12 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS
BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT 40 FEET WEST OF THE WEST LINE OF THE NORTH-SOUTH
ILLINOIS CENTRAL RAILROAD RIGHT OF WAY AND 50 FEET SOUTH OF THE NORTH
LINE OF SAID QUARTER SECTION; THENCE DUE WEST ALONG A STRAIGHT LINE 50
FEET SOUTH OF AND PARALLEL WITH THE NORTH LINE OF SAID NORTH EAST 1/4 A
DISTANCE OF 419.70 FEET TO A POINT; THENCE DUE SOUTH ALONG A STRAIGHT
LINE A DISTANCE OF 210.00 FEET TO A POINT; THENCE DUE WEST ALONG A
STRAIGHT LINE A DISTANCE OF 50.00 FEET TO A POINT; THENCE DUE SOUTH
ALONG A STRAIGHT LINE A DISTANCE OF 468.00 FEET TO A POINT; THENCE DUE
WEST ALONG A STRAIGHT LINE A DISTANCE OF 427.38 FEET TO A POINT; THENCE
DUE SOUTH ALONG A STRAIGHT LINE A DISTANCE OF 238.5 FEET TO A POINT;
THENCE DUE EAST ALONG A STRAIGHT LINE A DISTANCE OF 136.38 FEET TO A
POINT; THENCE DUE SOUTH ALONG A STRAIGHT LINE A DISTANCE OF 303.00 FEET
TO A POINT; THENCE DUE WEST ALONG A STRAIGHT LINE A DISTANCE OF 120.00
FEET TO A POINT; THENCE DUE SOUTH ALONG A STRAIGHT LINE A DISTANCE OF
238.5 FEET TO A POINT; THENCE DUE EAST ALONG A STRAIGHT LINE A DISTANCE
OF 484.00 FEET TO A POINT; THENCE DUE SOUTH ALONG A STRAIGHT LINE A
DISTANCE OF 200.00 FEET TO A POINT; THENCE DUE EAST ALONG A STRAIGHT
LINE A DISTANCE OF 200.00 FEET TO A POINT; THENCE DUE NORTH ALONG A
STRAIGHT LINE A DISTANCE OF 943.00 FEET TO A POINT; THENCE DUE EAST
ALONG A STRAIGHT LINE A DISTANCE OF 198.01 FEET TO A POINT; THENCE
NORTH 0 DEGREES 06 MINUTES 18 SECONDS WEST ALONG A STRAIGHT LINE A
DISTANCE OF 715 FEET TO THE POINT OF BEGINNING;

SUB-PARCEL R: (RETENTION BASIN):

THAT PART OF THE NORTH EAST 1/4 OF SECTION 25, TOWNSHIP 39 NORTH, RANGE
12 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS
BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE WESTERLY LINE OF THE NORTH-SOUTH ILLINOIS
CENTRAL RAILROAD RIGHT OF WAY WHICH IS 2020.46 FEET SOUTH OF THE NORTH
LINE OF SAID QUARTER SECTION; THENCE SOUTH 67 DEGREES 01 MINUTES 23
SECONDS WEST ALONG A STRAIGHT LINE A DISTANCE OF 449.89 FEET TO A POINT
IN THE NORTHERLY LINE OF THE EASTERLY-WESTERLY ILLINOIS CENTRAL
RAILROAD RIGHT OF WAY; THENCE SOUTH 67 DEGREES 12 MINUTES 02 SECONDS
EAST ALONG SAID NORTHERLY RIGHT OF WAY LINE OF THE ILLINOIS CENTRAL

-2-

RAILROAD RIGHT WAY A DISTANCE OF 450.00 FE. TO A POINT; THENCE NORTH 0 DEGREE. 6 MINUTES 18 SECONDS WEST ALONG A STRAIGHT LINE A DISTANCE OF 350.00 FEET TO THE POINT OF BEGINNING;

SUB-PARCEL ' E':

THAT PART OF THE NORTH EAST QUARTER OF SECTION 25, TOWNSHIP 39 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE SOUTHERLY LINE OF THE EASTERLY-WESTERLY ILLINOIS CENTRAL RAILROAD RIGHT OF WAY WITH THE NORTHERLY LINE OF 26TH STREET, THENCE NORTH 87 DEGREES 48 MINUTES 59 SECONDS WEST ALONG SAID NORTHERLY LINE OF 26TH STREET A DISTANCE OF 656.43 FEET TO A POINT OF BEGINNING; THENCE NORTHERLY ALONG A CURVED LINE CONCAVE WESTERLY WITH A CENTRAL ANGLE OF 26 DEGREES AND A RADIUS OF 149 FEET, A DISTANCE OF 67.61 FEET; WITH A CHORD DISTANCE OF 67.04 FEET, AND A CHORD BEARING OF NORTH 10 DEGREES 48 MINUTES 53 SECONDS WEST, TO A POINT OF TANGENCY; THENCE NORTH 23 DEGREES 48 MINUTES 53 SECONDS WEST ALONG A STRAIGHT LINE TANGENT TO THE LAST DESCRIBED CURVE AT THE LAST DESCRIBED POINT, A DISTANCE OF 118.05 FEET TO A POINT OF CURVATURE; THENCE NORTHERLY ALONG A CURVED LINE CONCAVE EASTELRY WITH A RADIUS OF 249 FEET, AND A CENTRAL ANGLE OF 26 DEGREES 13 MINUTES 15 SECONDS, A DISTANCE OF 113.95 FEET WITH A CHORD DISTANCE OF 112.96 FEET, AND A CHORD BEARING OF NORTH 10 DEGREES 42 MINUTES 15 SECONDS WEST TO A POINT ON THE SOUTHERLY LINE OF THE EASTERLY-WESTERLY ILLINOIS CENTRAL RAILROAD; THENCE NORTH 67 DEGREES 12 MINUTES 02 SECONDS WEST ALONG SAID SOUTHERLY RIGHT OF WAY LINE OF THE ILLINOIS CENTRAL RAILROAD, A DISTANCE OF 81.89 FEET TO A POINT; THENCE SOUTHERLY ALONG A CURVED LINE CONCAVE EASTERLY WITH A RADIUS OF 327 FEET AND A CENTRAL ANGLE OF 31 DEGREES 13 MINUTES 37 SECONDS A DISTANCE OF 178.22 FEET, WITH A CHORD DISTANCE OF 176.02 FEET, AND A CHORD BEARING OF SOUTH 8 DEGREES 12 MINUTES 04 SEOCNDS EAST, TO A POINT OF TANGENCY; THENCE SOUTH 23 DEGREES 48 MINUTES 53 SECONDS EAST ALONG A STRAIGHT LINE, TANGENT TO THE LAST DESCRIBED CURVE AT THE LAST DESCRIBED POINT, A DISTANCE OF 118.05 FEET TO A POINT OF CURVATURE; THENCE SOUTHERLY ALONG A CURVED LINE, TANGENT TO THE LAST DESCRIBED LINE AT THE LAST DESCRIBED POINT, CONCAVE WESTERLY, WITH A RADIUS OF 71 FEET; AND A CENTRAL ANGLE OF 16 DEGREES 09 MINUTES 39 SECONDS, A DISTANCE OF 20.03 FEET TO A POINT ON SAID NORTHERLY LINE OF 26TH STREET, THENCE EASTERLY ALONG SAID NORTHERLY LINE OF 26TH STREET A DISTANCE OF 79.97 FEET TO THE POINT OF BEGINNING;

SUB-PARCEL ' B':

THAT PART OF THE NORTH EAST 1/4 OF SECTION 25, TOWNSHIP 39 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS BOUNDED AND DESCRIBED AS FOLLOWS:

-3-

BEGINNING AT A POINT 75.00 FEET SOUTH OF THE NORTH LINE AND 148.00 FEET
EAST OF THE WEST LINE OF THE NORTH EAST 1/4 OF SAID SECTION; THENCE
SOUTH 0 DEGREES 10 MINUTES 52 SECONDS EAST ALONG A STRAIGHT LINE A
DISTANCE OF 155.00 FEET TO A POINT; THENCE DUE WEST ALONG A STRAIGHT
LINE A DISTANCE OF 80.00 FEET TO A POINT; THENCE NORTH 0 DEGREES 10
MINUTES 52 SECONDS WEST ALONG A STRAIGHT LINE A DISTANCE OF 115.00 FEET
TO A POINT; THENCE NORTH 44 DEGREES 54 MINUTES 34 SECONDS EAST ALONG A
STRAIGHT LINE A DISTANCE OF 56.48 FEET TO A POINT; THENCE DUE EAST
ALONG A STRAIGHT LINE A DISTANCE OF 40.00 FEET TO THE POINT OF
BEGINNING;

SUB-PARCEL 'P':

THAT PART OF THE NORTH EAST 1/4 OF SECTION 25, TOWNSHIP NORTH, RANGE
12, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS
BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE WEST LINE OF THE NORTH-SOUTH ILLINOIS
CENTRAL RAILROAD RIGHT OF WAY 50 FEET SOUTH OF THE NORTH LINE OF SAID
QUARTER SECTION; THENCE SOUTH 0 DEGREES 06 MINUTES 18 SECONDS EAST
ALONG SAID WEST LINE OF THE ILLINOIS CENTRAL RAILROAD A DISTANCE OF
1970.46 FEET TO A POINT; THENCE SOUTH 67 DEGREES 01 MINUTES 23 SECONDS
WEST ALONG A STRAIGHT LINE A DISTANCE OF 449.89 FEET TO A POINT ON THE
NORTHERLY LINE OF THE EASTERLY-WESTERLY RIGHT OF WAY OF THE ILLINOIS
CENTRAL RAILROAD; THENCE NORTH 67 DEGREES 12 MINUTES 02 SECONDS WEST
ALONG SAID NORTHERLY LINE OF THE ILLINOIS CENTRAL RAILROAD A DISTANCE
OF 613.00 FEET TO A POINT; THENCE DUE NORTH ALONG A STRAIGHT LINE A
DISTANCE OF 450.53 FEET TO A POINT; THENCE DUE EAST ALONG A STRAIGHT
LINE A DISTANCE OF 539.00 FEET TO A POINT; THENCE DUE SOUTH ALONG A
STRAIGHT LINE A DISTANCE OF 200.00 FEET TO A POINT; THENCE DUE EAST
ALONG A STRAIGHT LINE A DISTANCE OF 200.00 FEET TO A POINT; THENCE DUE
NORTH ALONG A STRAIGHT LINE A DISTANCE OF 943.00 FEET TO A POINT;
THENCE DUE EAST ALONG A STRAIGHT LINE A DISTANCE OF 198.01 FEET TO A
POINT; THENCE NORTH 0 DEGREES 06 MINUTES 18 SECONDS WEST ALONG A
STRAIGHT LINE A DISTANCE OF 715.00 FEET TO A POINT 50 FEET SOUTH OF THE
NORTH LINE OF SAID QUARTER SECTION; THENCE EAST ALONG A STRAIGHT LINE
50 FEET SOUTH OF AND PARALLEL WITH THE NORTH LINE OF SAID QUARTER
SECTION A DISTANCE OF 40.00 FEET TO THE POINT OF BEGINNING;

SUB-PARCEL 'A':

THAT PART OF THE NORTH EAST 1/4 OF SECTION 25, TOWNSHIP 39 NORTH, RANGE
12 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS,
BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT, SAID POINT BEING 50 FEET SOUTH OF AND 476 FEET
EAST OF THE NORTH WEST CORNER OF SAID NORTH EAST QUARTER; THENCE EAST

ALONG A STRAIGHT LINE 50 FEET SOUTH OF AND PARALLEL TO THE NORTH LINE OF SAID NORTH EAST 1/4 A DISTANCE OF 450.00 FEET TO A POINT; THENCE DUE SOUTH ALONG A STRAIGHT LINE A DISTANCE OF 210.00 FEET TO A POINT; THENCE DUE WEST ALONG A STRAIGHT LINE A DISTANCE OF 50.00 FEET TO A POINT; THENCE DUE SOUTH ALONG A STRAIGHT LINE A DISTANCE OF 468.00 FEET TO A POINT; THENCE DUE WEST ALONG A STRAIGHT LINE A DISTANCE OF 427.38 FEET TO A POINT; THENCE DUE SOUTH ALONG A STRAIGHT LINE A DISTANCE OF 150 FEET TO A POINT; THENCE DUE WEST ALONG A STRAIGHT LINE A DISTANCE OF 358.00 FEET TO A POINT; THENCE NORTH 0 DEGREES 10 MINUTES 52 SECONDS WEST ALONG A STRAIGHT LINE A DISTANCE OF 648.00 FEET TO A POINT; THENCE DUE EAST ALONG A STRAIGHT LINE A DISTANCE OF 60.00 FEET TO A POINT; THENCE NORTH 00 DEGREES 10 MINTUES 52 SECONDS WEST ALONG A STRAIGHT LINE A DISTANCE OF 155.00 FEET TO A POINT; THENCE EAST ALONG A STRAIGHT LINE A DISTANCE OF 178.00 FEET TO A POINT; THENCE SOUTH 80 DEGREES 32 MINUTES 33 SECONDS EAST ALONG A STRAIGHT LINE A DISTANCE OF 152.15 FEET TO A POINT; THENCE NORTH 0 DEGREES 10 MINUTES 52 SECONDS WEST ALONG A STRAIGHT LINE A DISTANCE OF 50.00 FEET TO THE POINT OF BEGINNING;

PARCEL 3:

EASEMENT FOR INGRESS AND EGRESS FOR THE BENEFIT OF PARCEL 1 CREATED, DEFINED AND LIMITED IN THAT CERTAIN RECIPROCAL OPERATION AND EASEMENT AGREEMENT, DATED DECEMBER 6, 1973, AND RECORDED JANUARY 2, 1974, AS DOCUMENT NUMBER 22584954 AMENDED BY DOCUMENT RECORDED JANUARY 7, 1976 AS 23346268 AND FURTHER AMENDED BY DOCUMENT RECORDED NOVEMBER 23, 1976 AS DOCUMENT 23721362 IN THE OFFICE OF THE RECORDER OF DEEDS OF COOK COUNTY, ILLINOIS, OVER AND ACROSS

LEASEHOLD ESTATE CREATED BY A CERTAIN INDENTURE OF LEASE MADE BY ILLINOIS CENTRAL GULF RAILROAD COMPANY TO RIVERSIDE MALL ASSOCIATES, A LIMITED PARTNERSHIP OF ILLINOIS DATED FEBRUARY 9, 1973 AND RECORDED JANUARY 2, 1974 AS SCHEDULE B OF DOCUMENT 22584954 DEMISING AND LEASING FOR A TERM OF 53 YEARS BEGINNING JULY 1, 1972 AND ENDING JUNE 30, 2025, THE FOLLOWING DESCRIBED PREMISES, TO WIT:

SUB-PARCEL 'F':

THAT PART OF THE ILLINOIS CENTRAL RAILROAD RIGHT OF WAY IN THE NORTH EAST 1/4 OF SECTION 25, TOWNSHIP 39 NORTH, RANGE 12 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS; BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE WESTERLY LINE OF THE NORTH-SOUTH ILLINOIS CENTRAL RAILROAD RIGHT OF WAY WITH THE NORTHERLY LINE OF THE EASTELRY-WESTERLY ILLINOIS CENTRAL RAILROAD RIGHT OF WAY; THENCE NORTH 67 DEGREES 12 MINUTES 02 SECONDS WEST ALONG SAID NORTHERLY LINE OF THE ILLINOIS CENTRAL RAILROAD RIGHT OF WAY A DISTANCE OF 426.84 FEET FOR A POINT OF BEGINNING; THENCE CONTINUING NORTH 67 DEGREES 12 MINUTES 02

-5-

SECONDS WEST ALONG SAID NORTHERLY LINE OF THE ILLINOIS CENTRAL RAILROAD
RIGHT OF WAY A DISTANCE OF 100 FEET TO A POINT; THENCE SOUTHWESTERLY,
FORMING A RIGHT ANGLE WITH THE LAST DESCRIBED COURSE, A DISTANCE OF 100
FEET TO A POINT ON THE SOUTHERLY LINE OF SAID EASTERLY-WESTERLY
ILLINOIS CENTRAL RAILROAD RIGHT OF WAY; THENCE SOUTH 67 DEGREES 12
MINUTES 02 SECONDS EAST ALONG SAID SOUTHERLY RAILROAD RIGHT OF WAY LINE
A DISTANCE OF 100 FEET TO A POINT; THENCE NORTHEASTERLY, FORMING A
RIGHT ANGLE WITH THE LAST DESCRIBED COURSE, A DISTANCE OF 100 FEET TO
THE POINT OF BEGINNING

EXHIBIT B TO LEASE
BETWEEN
SIX ANCHORS LIMITED PARTNERSHIP
AND
CPS REALTY PARTNERSHIP

BASIC RENT

| YEAR | LINCOLN MALL | NORTH RIVERSIDE | ORLAND SQUARE | SOUTHLAKE MALL | STRATFORD SQUARE | YORKTOWN | TOTALS |
|------|------|------|------|------|------|------|------|
| 1 | $1,021,148 | $1,157,057 | $1,308,263 | $758,269 | $1,011,121 | $1,911,773 | $7,167,651 |
| 2 | $1,041,948 | $1,100,625 | $1,334,911 | $773,714 | $1,031,717 | $1,950,714 | $7,313,629 |
| 3 | $1,100,745 | $1,256,335 | $1,428,515 | $823,330 | $1,097,877 | $2,075,807 | $7,782,629 |
| 4 | $1,200,402 | $1,369,232 | $1,548,167 | $897,317 | $1,196,536 | $2,262,346 | $8,462,000 |
| 5 | $1,283,401 | $1,454,305 | $1,644,357 | $953,069 | $1,270,879 | $2,402,909 | $9,009,000 |
| 6 | $1,299,153 | $1,472,062 | $1,664,435 | $964,706 | $1,286,396 | $2,432,248 | $9,119,000 |
| 7 | $1,379,646 | $1,563,269 | $1,767,561 | $1,024,478 | $1,366,899 | $2,582,947 | $9,684,000 |
| 8 | $1,464,984 | $1,659,964 | $1,876,892 | $1,087,046 | $1,458,599 | $2,742,714 | $10,282,999 |
| 9 | $1,555,450 | $1,762,471 | $1,992,795 | $1,155,023 | $1,540,177 | $2,912,083 | $10,917,999 |
| 10 | $1,500,864 | $1,789,684 | $1,933,110 | $1,120,430 | $1,494,848 | $2,824,865 | $10,571,001 |
| 11-15 | $1,510,146 | $1,711,137 | $1,934,753 | $1,121,382 | $1,495,317 | $2,827,265 | $10,630,000 |
| 16-20 | $1,595,626 | $1,807,994 | $2,044,267 | $1,184,856 | $1,579,958 | $2,987,299 | $11,201,000 |
| 21-25 | $1,809,326 | $2,050,136 | $2,318,053 | $1,343,543 | $1,791,559 | $3,387,304 | $12,700,001 |
| 26-30 | $1,809,326 | $2,050,136 | $2,318,053 | $1,343,543 | $1,791,559 | $3,387,304 | $12,700,001 |
| 31-35 | $1,951,792 | $2,211,564 | $2,500,576 | $1,449,333 | $1,932,627 | $3,654,107 | $13,699,999 |
| 36-40 | $2,136,999 | $2,421,420 | $2,737,857 | $1,586,861 | $2,116,015 | $4,000,947 | $14,999,999 |

| YEAR | LINCOLN MALL | NORTH RIVERSIDE | ORLAND SQUARE | SOUTHLAKE MALL | STRATFORD SQUARE | YORKTOWN | TOTALS |
|------|------|------|------|------|------|------|------|
| 11-15 | $1,709,599 | $1,937,136 | $2,190,286 | $1,269,489 | $1,692,812 | $3,200,678 | $12,000,000 |
| 16-20 | $1,700,832 | $2,017,850 | $2,281,548 | $1,322,384 | $1,763,346 | $3,334,039 | $12,499,999 |
| 21-25 | $2,065,765 | $2,340,706 | $2,646,595 | $1,533,966 | $2,045,401 | $3,867,486 | $14,499,999 |
| 26-30 | $2,393,439 | $2,711,991 | $3,066,400 | $1,777,285 | $2,369,937 | $4,480,949 | $16,800,001 |
| 31-35 | $2,778,090 | $3,147,846 | $3,559,215 | $2,062,928 | $2,750,819 | $5,201,102 | $19,500,300 |
| 36-40 | $3,205,490 | $3,632,131 | $4,106,706 | $2,380,292 | $3,174,022 | $6,001,271 | $22,500,000 |

| YEAR | AGGREGATE BASIC RENT | AGGREGATE MAXIMUM RENT | APPLICABLE PERCENTAGE |
|------|------|------|------|
| 11-15 | $10,600,000 | $12,000,000 | 4.00% |
| 16-20 | $11,200,000 | $12,500,000 | 3.00% |
| 21-25 | $12,700,000 | $14,500,000 | 3.00% |
| 26-30 | $12,700,000 | $16,800,000 | 3.00% |
| 31-35 | $13,700,000 | $19,500,000 | 3.00% |
| 36-40 | $15,600,000 | $22,500,000 | 3.00% |

## EXHIBIT C

## NORTH RIVERSIDE LEASE
Schedule of Leases

1. Lease by and between Chicago Title & Trust Company,
   as trustee under a Trust Agreement dated June 15,
   1985 and known as Trust No. 1085200, and Six Anchors
   Limited Partnership, a Maryland limited partnership,
   as Landlord; and CPS Realty Partnership, an Illinois
   general partnership, as Tenant, of property at Lincoln
   Mall, Matteson, Illinois.

2. Lease by and between Chicago Title & Trust Company,
   as trustee under a Trust Agreement dated June 15,
   1985 and known as Trust No. 1086200, and Six Anchors
   Limited Partnership, a Maryland limited partnership,
   as Landlord; and CPS Realty Partnership, an Illinois
   general partnership, as Tenant, of property at York-
   town Mall, Lombard, Illinois.

3. Lease by and between Chicago Title & Trust Company,
   as trustee under a Trust Agreement dated July 8,
   1985 and known as Trust No. 1086600, and Six Anchors
   Limited Partnership, a Maryland limited partnership,
   as Landlord; and CPS Realty Partnership, an Illinois
   general partnership, as Tenant, of property at
   Stratford Square, Bloomingdale, Illinois.

4. Lease by and between Chicago Title & Trust Company,
   as trustee under a Trust Agreement dated June 15,
   1985 and known as Trust No. 1086100, and Six Anchors
   Limited Partnership, a Maryland limited partnership,
   as Landlord; and CPS Realty Partnership, an Illinois
   general partnership, as Tenant, of property at
   Orland Park, Orland Park, Illinois.

5. Lease by and between Lake County Trust Company,
   as trustee under a Trust Agreement dated June 15,
   1985 and known as Trust No. 3501, and Six Anchors
   Limited Partnership, a Maryland limited partnership,
   as Landlord; and CPS Realty Partnership, an Illinois
   general partnership, as Tenant, of property at South-
   lake Mall, Merriville, Indiana.

DFF/10-11-85
0723R

EXHIBIT D

[DELETED]

Exhibit E

Schedule of Lease Years

| Lease Year | Commences | Ends |
|------------|-----------|------|
| 11 | 2-4-96 | 2-1-97 |
| 12 | 2-2-97 | 1-31-98 |
| 13 | 2-1-98 | 1-30-99 |
| 14 | 1-31-99 | 1-29-00 |
| 15 | 1-30-00 | 2-3-01 |
| 16 | 2-4-01 | 2-2-02 |
| 17 | 2-3-02 | 2-1-03 |
| 18 | 2-2-03 | 1-31-04 |
| 19 | 2-1-04 | 1-29-05 |
| 20 | 1-30-05 | 1-28-06 |
| 21 | 1-29-06 | 2-3-07 |
| 22 | 2-4-07 | 2-2-08 |
| 23 | 2-3-08 | 1-31-09 |
| 24 | 2-1-09 | 1-30-10 |
| 25 | 1-31-10 | 1-29-11 |
| 26 | 1-30-11 | 1-28-12 |
| 27 | 1-29-12 | 2-2-13 |
| 28 | 2-3-13 | 2-1-14 |
| 29 | 2-2-14 | 1-31-15 |
| 30 | 2-1-15 | 1-30-16 |
| 31 | 1-31-16 | 1-28-17 |
| 32 | 1-29-17 | 2-3-18 |

| Lease Year | Commences | Ends |
|:---:|:---:|:---:|
| 33 | 2-4-18 | 2-2-19 |
| 34 | 2-3-19 | 2-1-20 |
| 35 | 2-2-20 | 1-30-21 |
| 36 | 1-31-21 | 1-29-22 |
| 37 | 1-30-22 | 1-28-23 |
| 38 | 1-29-23 | 2-3-24 |
| 39 | 2-4-24 | 2-1-25 |
| 40 | 2-2-25 | 1-31-26 |

Exhibit F

NORTH RIVERSIDE MALL LEASE

Schedule of Instruments Constituting Operating Agreements

Reciprocal Operation and Easement Agreement dated
12/6/73 and recorded 1/2/74 as Document 22584954, as
amended by instrument recorded 1/7/76 as Document
23346268, and amended by instrument recorded 11/23/76
as Document 23721362 between Riverside Mall Associates,
J.C. Penney Properties, Inc., Carson Pirie Scott and
Company and Montgomery Ward Development Corporation -
North Riverside Land.

DFF/10-11-85
0723R

EXHIBIT G

{DELETED}

EXHIBIT H

Description of Existing Mortgages

North Riverside Land

Mortgage dated 1/27/76 and recorded 1/27/76 as Document 23372793 made by Lathrop Avenue Corporation to First National Bank of Chicago to secure a Note for $6,600,000.

Assignment of Note, Mortgage and Assignment of Rents and Lessor's Interest in Leases dated 1/29/76 and recorded 1/29/76 as Document 23375463 from First National Bank of Chicago to Western Saving Fund Society of Philadelphia.

Financing Statement executed by Lathrop Avenue Corporation in favor of The Philadelphia Saving Fund Society, successor to The Western Saving Fund Society of Philadelphia, filed 8/10/82 as No. 82U30434.

Financing Statement executed by Lathrop Avenue Corporation in favor of The Philadelphia Savings Fund Society, successor to the Western Saving Fund of Philadelphia, filed 8/5/82 as No. 82U29923.

NORTH RIVERSIDE

## AMENDMENT OF LEASE

THIS AMENDMENT OF LEASE is effective as of August 1, 1993, but is being executed on _Februm̲ 1̲_, 1994, by and among CHICAGO TITLE AND TRUST COMPANY, as Trustee ("Land Trustee") under a Trust Agreement dated June 15, 1985 and known as Trust No. 1085900 ("Trust"), ILLINOIS PARTNERS LIMITED PARTNERSHIP, a Maryland limited partnership, formerly known as Six Anchors Limited Partnership, a Maryland limited partnership ("Beneficiary"; hereinafter collectively with the Land Trustee, "Landlord"), and CPS DEPARTMENT STORES, INC., a Delaware corporation ("Tenant"),

### W I T N E S S E T H:

WHEREAS, Land Trustee, and Six Anchors Limited Partnership, as the beneficiary under the Trust, collectively as the landlord, and CPS Realty Partnership, an Illinois general partnership ("CPS Partnership"), as the lessee, entered into a lease ("Lease") dated October 31, 1985 relating to certain premises constituting a portion of the North Riverside Shopping Center in North Riverside, Illinois; and

WHEREAS, pursuant to that certain Order (1) Authorizing CPS Realty Partnership to Assume Certain Leases with Illinois Partners Limited Partnership, as Amended, and (2) Establishing Cure Default Procedure entered by the United States Bankruptcy Court for the Eastern District of Wisconsin on October 15, 1993 (the "Lease Assumption Order"), CPS Partnership assumed the Leases subject to the terms of the Letter Agreement (as hereinafter defined). CPS Partnership is obligated pursuant to Section 365 of the Bankruptcy Code (11 U.S.C. §101 Et seq.) and the Lease Assumption Order to cure any defaults under the Leases or to provide adequate assurance of such cure.

WHEREAS, as provided in the Fourth Amended Joint Plan of Reorganization in the Matter of P.A. Bergner & Co. Holding Company, et al. as confirmed on October 15, 1993 by the United States Bankruptcy Court for the Eastern District of Wisconsin (the "Plan of Reorganization") and pursuant to that certain Assignment and Assumption of Leases, Ground leases and Agreement dated October 29, 1993 by and among CPS Partnership, Chicago Title and Trust Company, as Trustee under Trust Agreement dated May 15, 1985 and known as Trust No. 1083000 and CPS Holding Co., (formerly Carson Pirie Scott & Company), a Delaware corporation ("CPS Holding"), CPS Partnership assigned, conveyed, transferred and delivered its entire right, title and interest in, to and under the Lease to CPS Holding and CPS Holding assumed and agreed to perform all of the terms, covenants and conditions imposed on the lessee under the Lease; and

WHEREAS, as provided in the Plan of Reorganization and pursuant to that certain Assignment and Assumption of Leases, Ground Leases and Agreement dated October 29, 1993 by and among CPS Holding and Tenant, CPS Holding assigned, conveyed, transferred and delivered its entire right, title and interest in, to and under the Lease to Tenant and Tenant assumed and agreed to perform all of the terms, covenants and conditions imposed on the lessee under the Lease; and

WHEREAS, by Letter Agreement dated April 21, 1993, as amended by Letter Agreements dated May 26, 1993, June 25, 1993, July 27, 1993, August 20, 1993, September 7, 1993 and September 24, 1993 respectively (collectively "Letter Agreement"), Beneficiary and CPS Partnership agreed upon certain amendments to the Lease to become effective as of August 1, 1993; and

WHEREAS, Landlord and Tenant desire to formally amend the Lease to incorporate the provisions of the Letter Agreement and to make certain other modifications to the Lease.

NOW, THEREFORE, for and in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant agree that effective August 1, 1993 the Lease is amended as follows (all defined terms, unless otherwise defined herein, shall have the same meaning as set forth in the Lease):

1. Exhibit B-1 attached hereto is hereby substituted for Exhibit B to the Lease, and each reference to "Exhibit B" in the Lease is deleted and "Exhibit B-1" is substituted in lieu thereof.

2. The termination of the Fixed Term set forth in section 1 of the Lease is extended from February 3, 2001 to February 1, 2014.

3. The definition of Aggregate Basic Rent under section 2 of the Lease is deleted and the following is substituted in lieu thereof:

"Aggregate Basic Rent" means the total of the Basic Rent under all of the Leases, in the amount labelled "TOTAL" on Exhibit B-1."

4. The definitions of Aggregate Maximum Rent and Maximum Rent under section 2 are deleted, and all references to and uses of such defined terms in the Lease are also deleted.

5.    The first sentence of Section 3.1 of the Lease is deleted in its entirety and the following is substituted in lieu thereof:

"Tenant covenants and agrees to pay as net rental (over and above any additional payments to be made by Tenant as hereinafter provided) to Landlord for the Demised Premises, annual Basic Rent for the Demised Premises in the respective amounts and for the respective periods set forth in Exhibit B-1 attached hereto (hereinafter referred to as the "Basic Rent")."

6.    Section 3.1 is amended by adding the following sentences thereto:

"Landlord may, from time to time, designate a lock box or other similar account to receive payment of Basic Rent, Percentage Rent and other amounts payable by Tenant to Landlord under the terms of this Lease and upon such a designation Tenant shall make such payments by wire transfer to such lock box account on or before the respective dates such payments are due hereunder."

"Concurrently with each payment by Tenant into such lock box account, Tenant shall, as part of Tenant's wire transfer instructions, use reasonable efforts to identify the purposes(s) for which such payments are being made.  For example, in connection with a monthly payment of Basic Rent, Tenant shall specify that such payment is being made for "Basic Rent for _____", and in connection with a payment of Percentage Rent, Tenant shall specify that such payment is being made for "Percentage Rent for the calendar year ____"."

7.    Section 6 of the Lease is deleted in its entirety and the following new section 6 is substituted in lieu thereof:

"6.    Extension of Demised Term.  Tenant shall have the right, at its option, to extend the Demised Term for five (5) separate, consecutive renewal terms of five (5) years each ("Additional Extension"), the first for the period commencing February 2, 2014 and terminating February 2, 2019 ("First Extension"); the second for the period commencing February 3, 2019 and terminating February 3, 2024 ("Second Extension"); the third for the period commencing February 4, 2024 and terminating February 3, 2029 ("Third Extension"); the fourth for the period commencing February 4, 2029 and terminating January 28, 2034 ("Fourth Extension"); and the fifth for the period commencing January 29, 2034 and terminating January 29, 2039.  Tenant's right to extend the Demised Term for each respective Additional Extension is expressly subject to the conditions that

(i) an Event of Default shall not have occurred and be continuing at the time of Tenant's exercise of such right or at the commencement of the Additional Extension, and (ii) Tenant shall have exercised its right to extend the term of each of the Leases other than this Lease to the date on which the Additional Extension shall terminate. The right to extend the Demised Term shall be exercisable by written notice to Landlord and shall be given (i) if for the First Extension, on or before February 2, 2012; if for the Second Extension, on or before February 3, 2017; if for the Third Extension, on or before February 4, 2022; if for the Fourth Extension, on or before February 4, 2027; and if for the Fifth Extension, on or before January 29, 2032. The giving of such notice shall have the effect, without further action of Landlord or Tenant, of extending the Demised Term for the period of the Additional Extension, and Tenant shall not thereafter be entitled to revoke such extension.

During each Additional Extension, the terms and conditions of this Lease shall continue in full force and effect, except that the annual Basic Rent for each Additional Extension shall be equal to ninety-five percent (95%) of the annual average of the annual Basic Rent and annual Percentage Rent paid by Tenant during the last three (3) years of the immediately preceding Fixed Term or Additional Extension, as the case may be, but in no event shall the annual Basic Rent for any Additional Extension be less than the annual Basic Rent for the last year of the immediately preceding Fixed Term or Additional Extension, as the case may be. Percentage Rent for each Additional Extension shall be determined in accordance with the provisions of section 3.2 of the Lease, as amended by this Amendment of Lease."

8.   Section 3.2.1 of the Lease is deleted in its entirety and the following new section 3.2.1 is substituted in lieu thereof:

"Section 3.2.1 Defined. Commencing August 1, 1993 and for each Lease Year thereafter during the Demised Term, Tenant shall, in addition to Basic Rent and all other sums required to be paid by Tenant to Landlord hereunder, pay to Landlord, in the manner and to the extent set forth in section 3.2.2, a sum ("Percentage Rent") equal to the product obtained by multiplying (a) a fraction, the numerator of which is the Basic Rent hereunder for each Lease Year or partial Lease Year and the denominator of which is the Aggregate Basic Rent for such Lease Year or partial Lease Year, times (b) the amount by which the product obtained by multiplying three percent (3%) times Gross

Sales for such Lease Year or partial Lease Year
exceeds, if at all, the Aggregate Basic Rent for such
Lease Year or partial Lease Year."

9.   Section 3.2.2 of the Lease is deleted in its
entirety and the following new section 3.2.2 is substituted
in lieu thereof:

"3.2.2   Payment of Percentage Rent.   Percentage
Rent due for any Lease Year or partial Lease Year shall
be due and payable concurrently with the delivery by
Tenant to Landlord, within ninety (90) days after the
close of each Lease Year, of the annual statement of
Gross Sales provided for in section 3.2.6.   Tenant's
obligation to pay accrued but unpaid Percentage Rent
for any Lease Year shall survive any termination of
this Lease or any expiration of the Demised Term."

10.   Section 3.2.3 of the Lease is deleted in its
entirety.

11.   Section 3.2.4 of the Lease is deleted in its
entirety, and the following new section 3.2.4 is substituted
in lieu thereof:

"3.2.4   "Lease Year" Defined.   The first Lease Year
shall commence on the first day of the Demised Term and
shall end at the close of the twelfth full calendar
month following the commencement of the Demised Term.
Thereafter for the next five (5) years of the Demised
Term each Lease Year shall consist of successive
periods of twelve (12) calendar months.   The seventh
Lease Year shall commence on the day following the last
day of the sixth Lease Year and shall end on January
29, 1993.   Thereafter, each Lease Year of the Demised
Term shall be as shown on Exhibit E-1 hereto."

12.   Section 3.2.6 of the Lease is deleted in its
entirety, and the following new section 3.2.6 is substituted
in lieu thereof:

"Section 3.2.6   Statements of Gross Sales.   Tenant
shall deliver or cause to be delivered to Landlord at
the office of Beneficiary within ninety (90) days after
the close of each Lease Year, a statement of Gross
Sales for the preceding Lease Year or partial Lease
Year.   Such statements shall be prepared on a property-
by-property basis for the Demised Premises and each of
the other premises demised under the Leases and on an
aggregate basis as well, and shall be computed on a
consistent basis for each Lease Year, in the manner
used by Tenant in generating its audited annual
statements and in accordance with section 3.2.5 hereof.
The annual statement shall be accompanied by the signed

certificate of Tenant's chief financial officer certifying specifically that (i) such officer has examined the report of Gross Sales for the preceding Lease Year or partial Lease Year, (ii) such officer's examination included such tests of Tenant's books and records as such officer considered necessary or appropriate under the circumstances, (iii) such report presents fairly the Gross Sales of the preceding Lease Year or partial Lease Year, and (iv) the reported Gross Sales conform with and are computed in compliance with the definition of Gross Sales contained in section 3.2.5 hereof.

If Tenant shall fail to deliver such annual statement and certificate to Landlord within such ninety (90) day period, Landlord shall have the right, unless such failure is cured within fifteen (15) days following notice by Landlord to Tenant of such failure, thereafter to employ an Approved Independent Auditor to examine such books and records, as may be necessary to certify the amount of Gross Sales for such Lease Year or partial Lease Year, and Tenant shall pay to Landlord the cost thereof as additional rent. If there is an intentional misrepresentation in the annual statement prepared by Tenant's chief financial officer then the Landlord may require the certification of all such annual statements thereafter by an Approved Independent Auditor employed by and at Tenant's expense."

13. In the tenth line of the second paragraph of Section 3.2.7 of the Lease, "eleventh (11th)" is deleted and "eighth (8th)" is substituted in lieu thereof.

14. Section 3.2.8 of the Lease is deleted in its entirety, and the following new section 3.2.8 is substituted in lieu thereof:

"3.2.8 Adjustment to Aggregate Basic Rent. In the event of (a) termination of any of the Leases other than this Lease pursuant to the provisions contained in any of the other Leases similar to those contained in sections 19 and 20 hereof, or (b) a reduction in Basic Rent under any of the Leases other than this Lease pursuant to a Partial Taking with respect to the portion of the Aggregate Demised Premises covered thereby, or (c) a cessation of operations under any other Lease pursuant to provisions similar to those contained in section 11.1 hereof, then (i) the Aggregate Basic Rent shall be deemed to be reduced by (A) the amount of the Basic Rent payable under any other Lease so terminated or any other Lease where operations have ceased as described above, and by (B) the amount of the reduction in Basic Rent under such other Leases as a result of a Partial Taking, and (ii)

the Aggregate Demised Premises shall no longer include any premises covered by a Lease so terminated or by a Lease where operations have ceased as described above."

15. Section 3.2.9 of the Lease is deleted in its entirety.

16. Section 11.1 of the Lease is deleted in its entirety, and the following new section 11.1 is substituted in lieu thereof:

"11.1 Use; Name. Tenant shall, for the benefit of Landlord, during the Demised Term, continuously operate, or cause to be operated, department store facilities on the Demised Premises under its trade name which shall include the words "Carson Pirie Scott & Co." or "Carsons" (such words being the principal element of such trade name) or under such other trade name as Tenant may from time to time be operating the majority of its department stores in the Chicago metropolitan area. The department store facilities so operated by Tenant shall have standards of store operation, hours, merchandising and pricing which are substantially similar to those generally utilized from time to time by it in the operation of the majority of its department stores located in the Chicago metropolitan area. Tenant's covenants set forth in this section 11.1 shall be inoperative during any period or periods of time that Tenant's store on the Demised Premises is undergoing such repair, rebuilding, alteration, razing or restoration permitted by and in accordance with the terms of this Lease as shall result in it being impracticable to comply with such covenants. Notwithstanding the foregoing provisions of this section 11.1, nothing contained herein shall be deemed to release Tenant from its duty to comply with the provisions of the Operating Agreement."

17. Section 11.3 of the Lease is amended by adding the following sentence thereto:

"Tenant agrees to furnish Landlord a copy of any written notice it receives from or gives to any party under the Operating Agreement. Tenant shall deliver such copy simultaneously with the sending of any such notice and within three (3) business days after Tenant's receipt of any such notice."

18. Section 19.2(a)(ii) of the Lease is deleted in its entirety.

19.  Section 19.2 is amended by adding a new paragraph (e) thereto as follows:

"(e) If Tenant elects (or is deemed to have elected) to effect a Restoration of the Demised Premises under paragraph (a)(i) above and such election occurs within the last three (3) years of the Fixed Term or the last three (3) years of any Additional Extension, then Landlord shall have the right to terminate this Lease by giving Tenant written notice to that effect within fifteen (15) days after receipt of Tenant's election (or the date on which Tenant is deemed to have elected) to effect a Restoration of the Demised Premises, such termination to be effective ten (10) days following the giving of such notice of termination by Landlord. Tenant, however, can avoid such termination by giving Landlord written notice within such ten (10) day period that Tenant elects to extend the Demised Term for the succeeding Additional Extension of five (5) years as provided in section 6 of this Lease, if Tenant can satisfy all of the conditions to such election under said Section 6. If Tenant so elects to extend (and satisfies the conditions to such election), Tenant shall proceed with the Restoration in accordance with paragraph (a)(i) above."

20.  Subparagraphs (a) and (c) of section 20 of the Lease are deleted and the following new subparagraphs (a) and (c) are substituted in lieu thereof:

"(a) if Tenant shall default in the due and punctual payment of any Basic Rent, Percentage Rent, additional rent or other sum payable to Landlord hereunder when the same shall have become due and payable and such default shall continue for more than five (5) days in the case of Basic Rent and ten (10) days in the case of Percentage Rent, additional rent or other sum payable to Landlord hereunder, in each case after written notice thereof from Landlord; or

(c) if Tenant shall default in the due performance or observance of any of the terms hereof other than those referred to in the foregoing subparagraphs (a) and (b) and such default shall continue for more than twenty (20) days after written notice thereof from Landlord, or if such default shall not be susceptible to cure within twenty (20) days, Tenant fails either to commence to remedy such default within twenty (20) days or thereafter diligently to prosecute

the cure thereof to completion with due diligence and without delay; or"

21. The following is added to the end of section 20:

"If Landlord has delivered a notice of default to Tenant under this section 20, as soon as reasonably possible after Tenant has cured such default, Tenant shall notify Landlord thereof and shall submit to Landlord reasonable evidence verifying such cure. If Tenant receives written notice from the person or entity administering the lock box account referred to in Section 3.1 hereof stating that Tenant has failed to make a Basic Rent payment when the same was due and payable under this Lease, such notice shall constitute Landlord's written notice for purposes of paragraph (a) of this Section 20, and the 5-day cure period specified in said paragraph (a) shall commence upon delivery of such notice."

22. Paragraph (a) of section 29 of the Lease is deleted and the following new paragraph (a) is substituted in lieu thereof:

"(a) Except as provided in paragraphs (b) and (c) of this section 29, Tenant shall not assign or transfer this Lease or sublet all or any part of the Demised premises without the prior written consent of Landlord and Mortgagee, such consents not to be unreasonably withheld."

23. Section 40.1 of the Lease is deleted and the following new section 40.1 is substituted in lieu thereof:

"40.1 General. Tenant shall have the option to purchase the Demised Premises only in connection with and as part of its purchase of all of the Aggregate Demised Premises at the end of the Fixed Term on February 1, 2014, and provided it has exercised its right to renew this Lease for such Additional Extension, at the end of the First Extension on February 2, 2019; the Second Extension on February 3, 2024; the Third Extension on February 3, 2029; the Fourth Extension on January 28, 2034; and the Fifth Extension on January 29, 2039 ("Effective Date"). Tenant shall give written notice to Landlord of the exercise of such option not less than twenty-four (24) months and not more than twenty-seven (27) months prior to the Effective Date. Upon the giving of such notice, unless the exercise of the option is cancelled pursuant to clause (b) of section 40.2 or clause (f) of section 40.3, Tenant shall be obligated to purchase and Landlord shall be obligated to sell, the Demised

Premises subject to the provisions set forth
hereinbelow. The purchase price ("Purchase Price")
payable by Tenant shall be determined in accordance
with the provisions set forth in section 40.2 and shall
be paid to Landlord, less the principal amount of any
Permitted Mortgages (as hereinafter defined) and less
any other adjustments, all as hereinafter provided, in
federal reserve funds deposited in Landlord's account
at closing. Closing ("Closing") shall take place as of
the Effective Date through an escrow established at
Chicago Title and Trust Company, Chicago, Illinois, the
terms and provisions of such escrow to be consistent
with the terms and provisions hereof."

    24. Section 40.2 of the Lease is deleted and the
following new section 40.2 is substituted in lieu thereof:

    "40.2 <u>Calculation of Purchase Price</u>. The
purchase price for the Aggregate Demised Premises shall
be equal to the greater of (a) Forty Million Dollars
($40,000,000), or (b) the fair market value of the
Aggregate Demised Premises, without taking into account
the existence of this Lease or any of the other Leases
and based on then current appraisal methods. Tenant's
notice to Landlord exercising the option to purchase
shall be accompanied by an appraisal, prepared by an
appraiser who shall be a member of the American
Institute of Real Estate Appraisers of the National
Association of Realtors, Chicago, Illinois (the
"Institute"), familiar with the areas in which the
Aggregate Demised Premises are located, which shall
state the opinion of such appraiser as to the fair
market value of the Aggregate Demised Premises as of a
date thirty (30) months prior to the Effective Date.
Within thirty (30) days after the receipt of Tenant's
notice and such appraisal, Landlord may, by notice to
Tenant, either accept the fair market value of the
Aggregate Demised Premises, as set forth in such
appraisal, and, if such fair market value is in excess
of Forty Million Dollars ($40,000,000), as the Purchase
Price for the Aggregate Demised Premises, or reject
such appraisal, in which event Landlord may obtain, no
later than eighteen months (18) prior to the Effective
Date, at Landlord's expense, and submit to Tenant, an
appraisal by an appraiser who shall be a member of the
Institute, such appraiser having been selected by the
President of the Institute, familiar with the areas in
which the Aggregate Demised Premises are located, which
appraisal shall state the opinion of such appraiser as
to the fair market value of the Aggregate Demised
Premises as of the date of the appraisal. Tenant shall
then have the option, to be exercised by giving written
notice to Landlord within five (5) days following
receipt of Landlord's appraisal, to (a) accept, as the

Purchase Price for the Aggregate Demised premises, the
greater of Forty Million Dollars ($40,000,000) or the
fair market value of the Aggregate Demised Premises as
determined by the higher of the two appraisals, or (b)
cancel the exercise of its option to purchase the
Aggregate Demised Premises as of the Effective Date, or
(c) request a third appraisal.  If Tenant requests a
third appraisal, then an appraiser who shall be a
member of the Institute, mutually acceptable to
Landlord and Tenant, and familiar with the areas in
which the Aggregate Demised Premises are located, shall
promptly make an appraisal of the fair market value of
the Aggregate Demised Premises, at Tenant's expense,
and shall state, in his opinion, such fair market value
thereof, as of the date of such appraisal in accordance
with the provisions of this section 40.  If Landlord
and Tenant cannot agree on such third appraiser within
ten (10) days following Landlord's receipt of a request
for a third appraisal, then the third appraiser shall
be selected by the President of the Institute at the
request of either party.  Such appraisal shall be
delivered to Landlord and Tenant at least fifteen (15)
months prior to the Effective Date.  Upon receipt of
the third appraisal by the parties hereto, the Purchase
Price for the Aggregate Demised Premises shall be
determined as follows:  (i) if the third appraisal
provided for hereunder is higher than either of the
first two appraisals provided for in this section 40,
then the Purchase Price for the Aggregate Demised
Premises shall be the greater of Forty Million Dollars
($40,000,000) or the fair market value of the Aggregate
Demised Premises as determined by the higher of said
first two appraisals; or (ii) if the third appraisal is
lower than the first two appraisals provided for in
this section 40, then the purchase price for the
Aggregate Demised Premises shall be the greater of
Forty Million Dollars ($40,000,000) or the fair market
value of the Aggregate Demised Premises as determined
by the lower of said first two appraisals; or (iii) if
the third appraisal is greater than the lower of said
first two appraisals and less than the higher of said
first two appraisals, then the Purchase Price for the
Aggregate Demised Premises shall be the greater of
Forty Million Dollars ($40,000,000) or the fair market
value of the Aggregate Demised Premises as determined
by the third appraisal."

     25.  Section 42 of the Lease is deleted and the
following new section 42 is substituted in lieu thereof:

     "42.  <u>Notices, etc</u>.  All notices, demands,
requests, consents, approvals and other instruments
under this Lease shall be in writing and shall be
deemed to have been properly given if and when (i)

mailed by first class registered or certified mail,
return receipt requested, postage prepaid, addressed as
follows, or (ii) sent by telephonically confirmed
facsimile transmission to the telephone numbers set
forth below:

If to Tenant, at

CPS Department Stores, Inc.
c/o Carson Pirie Scott & Co.
331 West Wisconsin Avenue
Milwaukee, Wisconsin 53203
Attn:  General Counsel
Facsimile No.:  (414) 276-9108
with a copy to:

The Dial Corp
1850 North Central Avenue
Phoenix, Arizona 85077-2109
Attn:  Richard C. Stephan
Facsimile No.:  (602) 207-5665

and to:

The Trustees of Mellon Participating
Mortgage Trust Commercial Properties
Series 85/10
c/o Mellon/McMahan Real Estate Advisors, Inc.
444 Market Street
Suite 2100
San Francisco, CA 94111
Attn:  Mr. John McMahan
Facsimile No.:  (415) 398-1237

If to Landlord, at

Illinois Partners Limited Partnership
c/o The Prime Group, Inc.
77 West Wacker Drive
Suite 3900
Chicago, Illinois 60601
Attn:  General Counsel
Facsimile No.:  (312) 782-5867

with a copy to:

The Dial Corp
1850 North Central Avenue
Phoenix, Arizona 85077-2109
Facsimile No.:  (602) 207-5665

\leasprop\riverside  gwc 3/7/94                    -12-

and to:

The Trustees of Mellon Participating
Mortgage Trust Commercial Properties
Series 85/10
c/o Mellon/McMahan Real Estate Advisors, Inc.
444 Market Street
Suite 2100
San Francisco, CA 94111
Attn: Mr. John McMahan
Facsimile No.: (415) 398-1237

or at such other address or to such other telephone
facsimile numbers as the parties may have designated by
notice to the other. The respective addresses for
Tenant and Landlord set forth in this section 42 shall
be substituted for the respective addresses set forth
in the Preamble to this Lease."

26. Exhibit E to the Lease is deleted and Exhibit E-1
attached hereto and made a part hereof is substituted in
lieu thereof, and each reference to "Exhibit E" in the Lease
is deleted and "Exhibit E-1" is substituted in lieu thereof.

27. Tenant has cured or shall cure or otherwise
satisfy any outstanding defaults existing under the Lease
and the Operating Agreement as of August 1, 1993, other than
defaults which have been expressly waived by Landlord under
paragraph 6 of the Letter Agreement.

28. Notwithstanding anything contained herein to the
contrary, Landlord and Tenant agree that paragraphs 8 and 14
of the Letter Agreement are hereby incorporated herein and
made a part hereof. Landlord and Tenant agree to perform
their obligations under such paragraphs in accordance with
the provisions thereof.

29. This Amendment of Lease is executed by Chicago
Title and Trust Company, not personally but as Land Trustee
as aforesaid in the exercise of the power and authority
conferred upon and vested in it as such Trustee and it is
expressly understood and agreed that nothing herein shall be
construed as creating any liability in said Chicago Title
and Trust Company personally to perform any covenant either
express or implied herein contained, all such liability, if
any, being expressly waived by every person now or hereafter
claiming any right hereunder, and that any person claiming
any right hereunder shall look solely to the assets of the
trust for the enforcement of the agreements and covenants
herein.

This Amendment of Lease is intended to modify the Lease
only to the extent set forth herein and all other terms and
conditions of the Lease are hereby ratified and confirmed.

\leasprop\riverside gwc 3/7/94                -13-

IN WITNESS WHEREOF, the parties hereto have executed this Amendment of Lease as of the date first above written.

Landlord:

CHICAGO TITLE AND TRUST COMPANY, not personally or individually, but solely as Trustee under Trust Agreement dated June 15, 1985 and known as Trust No. 1085900

By: _____
ASST. VICE PRESIDENT

Attest: _____
ASST. SECRETARY

ILLINOIS PARTNERS LIMITED PARTNERSHIP, an Illinois

limited

partnership

By: _____
Dennis W. Townsend, a General Partner

By: DWT VENTURE, INCORPORATED, a General Partner

Attest: _____    By: _____
President DENNIS W. TOWNSEND

By: RETAIL PARTNERS, INC., a General partner

Attest: _____    By: _____
Vice-President JEFFREY A. PATTERSON

Tenant:

CPS DEPARTMENT STORES,INC., a
Delaware corporation

By: _Paul E. Ruby_
Title:_____

Paul E. Ruby
Vice President – Real Estate

Attest: _____

GEORGE W. CARLIS
ASSISTANT SECRETARY

\leaseprop\riverside  gwc  3/7/94

-15-

**EXHIBIT B-1**
**ANNUAL BASIC RENT**

| Period | Lincoln Mall | North Riverside | Orland Square | Southlake Mall | Stratford Square | Yorktown | TOTAL |
|---|---|---|---|---|---|---|---|
| 8/1/93 - 7/31/98 | $ 956,980 | $1,101,039 | $1,219,428 | $ 682,657 | $1,025,127 | $2,014,769 | $7,000,000 |
| 8/1/98 - 7/31/03 | $1,025,336 | $1,179,685 | $1,306,531 | $ 731,418 | $1,098,351 | $2,158,679 | $7,500,000 |
| 8/1/03 - 7/31/08 | $1,093,692 | $1,258,330 | $1,393,632 | $ 780,179 | $1,171,574 | $2,302,593 | $8,000,000 |
| 8/1/08 - 2/1/14 | $1,162,048 | $1,336,976 | $1,480,734 | $ 828,940 | $1,244,797 | $2,446,505 | $8,500,000 |

## Exhibit E-1

### Schedule of Lease Years

| Lease Year | Commences | Ends |
|------------|-----------|------|
| 8 | 1-30-93 | 1-29-94 |
| 9 | 1-30-94 | 1-28-95 |
| 10 | 1-29-95 | 2-3-96 |
| 11 | 2-4-96 | 2-1-97 |
| 12 | 2-2-97 | 1-31-98 |
| 13 | 2-1-98 | 1-30-99 |
| 14 | 1-31-99 | 1-29-00 |
| 15 | 1-30-00 | 2-3-01 |
| 16 | 2-4-01 | 2-2-02 |
| 17 | 2-3-02 | 2-1-03 |
| 18 | 2-2-03 | 1-31-04 |
| 19 | 2-1-04 | 1-29-05 |
| 20 | 1-30-05 | 1-28-06 |
| 21 | 1-29-06 | 2-3-07 |
| 22 | 2-4-07 | 2-2-08 |
| 23 | 2-3-08 | 1-31-09 |
| 24 | 2-1-09 | 1-30-10 |
| 25 | 1-31-10 | 1-29-11 |
| 26 | 1-30-11 | 1-28-12 |
| 27 | 1-29-12 | 2-2-13 |
| 28 | 2-3-13 | 2-1-14 |
| 29 | 2-2-14 | 1-31-15 |
| 30 | 2-1-15 | 1-30-16 |
| 31 | 1-31-16 | 1-28-17 |
| 32 | 1-29-17 | 2-3-18 |
| 33 | 2-4-18 | 2-2-19 |
| 34 | 2-3-19 | 2-1-20 |
| 35 | 2-2-20 | 1-30-21 |
| 36 | 1-31-21 | 1-29-22 |
| 37 | 1-30-22 | 1-28-23 |
| 38 | 1-29-23 | 2-3-24 |
| 39 | 2-4-24 | 2-1-25 |
| 40 | 2-2-25 | 1-31-26 |
| 41 | 2-1-26 | 1-30-27 |
| 42 | 1-31-27 | 1-29-28 |
| 43 | 1-30-28 | 2-3-29 |
| 44 | 2-4-29 | 2-2-30 |
| 45 | 2-3-30 | 2-1-31 |
| 46 | 2-2-31 | 1-31-32 |
| 47 | 2-1-32 | 1-29-33 |
| 48 | 1-30-33 | 1-28-34 |
| 49 | 1-29-34 | 2-3-35 |
| 50 | 2-4-35 | 2-2-36 |
| 51 | 2-3-36 | 1-31-37 |
| 52 | 2-1-37 | 1-30-38 |
| 53 | 1-31-38 | 1-29-39 |

NORTH RIVERSIDE

## AMENDMENT OF LEASE

THIS AMENDMENT OF LEASE is effective as of August 1, 1993, but is being executed on February 1, 1994, by and among CHICAGO TITLE AND TRUST COMPANY, as Trustee ("Land Trustee") under a Trust Agreement dated June 15, 1985 and known as Trust No. 1085900 ("Trust"), ILLINOIS PARTNERS LIMITED PARTNERSHIP, a Maryland limited partnership, formerly known as Six Anchors Limited Partnership, a Maryland limited partnership ("Beneficiary"; hereinafter collectively with the Land Trustee, "Landlord"), and CPS DEPARTMENT STORES, INC., a Delaware corporation ("Tenant"),

W I T N E S S E T H:

WHEREAS, Land Trustee, and Six Anchors Limited Partnership, as the beneficiary under the Trust, collectively as the landlord, and CPS Realty Partnership, an Illinois general partnership ("CPS Partnership"), as the lessee, entered into a lease ("Lease") dated October 31, 1985 relating to certain premises constituting a portion of the North Riverside Shopping Center in North Riverside, Illinois; and

WHEREAS, pursuant to that certain Order (1) Authorizing CPS Realty Partnership to Assume Certain Leases with Illinois Partners Limited Partnership, as Amended, and (2) Establishing Cure Default Procedure entered by the United States Bankruptcy Court for the Eastern District of Wisconsin on October 15, 1993 (the "Lease Assumption Order"), CPS Partnership assumed the Leases subject to the terms of the Letter Agreement (as hereinafter defined). CPS Partnership is obligated pursuant to Section 365 of the Bankruptcy Code (11 U.S.C. §101 Et seq.) and the Lease Assumption Order to cure any defaults under the Leases or to provide adequate assurance of such cure.

WHEREAS, as provided in the Fourth Amended Joint Plan of Reorganization in the Matter of P.A. Bergner & Co. Holding Company, et al, as confirmed on October 15, 1993 by the United States Bankruptcy Court for the Eastern District of Wisconsin (the "Plan of Reorganization") and pursuant to that certain Assignment and Assumption of Leases, Ground leases and Agreement dated October 29, 1993 by and among CPS Partnership, Chicago Title and Trust Company, as Trustee under Trust Agreement dated May 15, 1985 and known as Trust No. 1083000 and CPS Holding Co., (formerly Carson Pirie Scott & Company), a Delaware corporation ("CPS Holding"), CPS Partnership assigned, conveyed, transferred and delivered its entire right, title and interest in, to and under the Lease to CPS Holding and CPS Holding assumed and agreed to perform all of the terms, covenants and conditions imposed on the lessee under the Lease; and

WHEREAS, as provided in the Plan of Reorganization and pursuant to that certain Assignment and Assumption of Leases, Ground Leases and Agreement dated October 29, 1993 by and among CPS Holding and Tenant, CPS Holding assigned, conveyed, transferred and delivered its entire right, title and interest in, to and under the Lease to Tenant and Tenant assumed and agreed to perform all of the terms, covenants and conditions imposed on the lessee under the Lease; and

WHEREAS, by Letter Agreement dated April 21, 1993, as amended by Letter Agreements dated May 26, 1993, June 25, 1993, July 27, 1993, August 20, 1993, September 7, 1993 and September 24, 1993 respectively (collectively "Letter Agreement"), Beneficiary and CPS Partnership agreed upon certain amendments to the Lease to become effective as of August 1, 1993; and

WHEREAS, Landlord and Tenant desire to formally amend the Lease to incorporate the provisions of the Letter Agreement and to make certain other modifications to the Lease.

NOW, THEREFORE, for and in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant agree that effective August 1, 1993 the Lease is amended as follows (all defined terms, unless otherwise defined herein, shall have the same meaning as set forth in the Lease):

1.   Exhibit B-1 attached hereto is hereby substituted for Exhibit B to the Lease, and each reference to "Exhibit B" in the Lease is deleted and "Exhibit B-1" is substituted in lieu thereof.

2.   The termination of the Fixed Term set forth in section 1 of the Lease is extended from February 3, 2001 to February 1, 2014.

3.   The definition of Aggregate Basic Rent under section 2 of the Lease is deleted and the following is substituted in lieu thereof:

"Aggregate Basic Rent" means the total of the Basic Rent under all of the Leases, in the amount labelled "TOTAL" on Exhibit B-1."

4.   The definitions of Aggregate Maximum Rent and Maximum Rent under section 2 are deleted, and all references to and uses of such defined terms in the Lease are also deleted.

5.  The first sentence of Section 3.1 of the Lease is deleted in its entirety and the following is substituted in lieu thereof:

"Tenant covenants and agrees to pay as net rental (over and above any additional payments to be made by Tenant as hereinafter provided) to Landlord for the Demised Premises, annual Basic Rent for the Demised Premises in the respective amounts and for the respective periods set forth in Exhibit B-1 attached hereto (hereinafter referred to as the "Basic Rent")."

6.  Section 3.1 is amended by adding the following sentences thereto:

"Landlord may, from time to time, designate a lock box or other similar account to receive payment of Basic Rent, Percentage Rent and other amounts payable by Tenant to Landlord under the terms of this Lease and upon such a designation Tenant shall make such payments by wire transfer to such lock box account on or before the respective dates such payments are due hereunder."

"Concurrently with each payment by Tenant into such lock box account, Tenant shall, as part of Tenant's wire transfer instructions, use reasonable efforts to identify the purposes(s) for which such payments are being made.  For example, in connection with a monthly payment of Basic Rent, Tenant shall specify that such payment is being made for "Basic Rent for _____", and in connection with a payment of Percentage Rent, Tenant shall specify that such payment is being made for "Percentage Rent for the calendar year ____"."

7.  Section 6 of the Lease is deleted in its entirety and the following new section 6 is substituted in lieu thereof:

"6.  <u>Extension of Demised Term</u>.  Tenant shall have the right, at its option, to extend the Demised Term for five (5) separate, consecutive renewal terms of five (5) years each ("Additional Extension"), the first for the period commencing February 2, 2014 and terminating February 2, 2019 ("First Extension"); the second for the period commencing February 3, 2019 and terminating February 3, 2024 ("Second Extension"); the third for the period commencing February 4, 2024 and terminating February 3, 2029 ("Third Extension"); the fourth for the period commencing February 4, 2029 and terminating January 28, 2034 ("Fourth Extension"); and the fifth for the period commencing January 29, 2034 and terminating January 29, 2039.  Tenant's right to extend the Demised Term for each respective Additional Extension is expressly subject to the conditions that

(i) an Event of Default shall not have occurred and be continuing at the time of Tenant's exercise of such right or at the commencement of the Additional Extension, and (ii) Tenant shall have exercised its right to extend the term of each of the Leases other than this Lease to the date on which the Additional Extension shall terminate. The right to extend the Demised Term shall be exercisable by written notice to Landlord and shall be given (i) if for the First Extension, on or before February 2, 2012; if for the Second Extension, on or before February 3, 2017; if for the Third Extension, on or before February 4, 2022; if for the Fourth Extension, on or before February 4, 2027; and if for the Fifth Extension, on or before January 29, 2032. The giving of such notice shall have the effect, without further action of Landlord or Tenant, of extending the Demised Term for the period of the Additional Extension, and Tenant shall not thereafter be entitled to revoke such extension.

During each Additional Extension, the terms and conditions of this Lease shall continue in full force and effect, except that the annual Basic Rent for each Additional Extension shall be equal to ninety-five percent (95%) of the annual average of the annual Basic Rent and annual Percentage Rent paid by Tenant during the last three (3) years of the immediately preceding Fixed Term or Additional Extension, as the case may be, but in no event shall the annual Basic Rent for any Additional Extension be less than the annual Basic Rent for the last year of the immediately preceding Fixed Term or Additional Extension, as the case may be. Percentage Rent for each Additional Extension shall be determined in accordance with the provisions of section 3.2 of the Lease, as amended by this Amendment of Lease."

8. Section 3.2.1 of the Lease is deleted in its entirety and the following new section 3.2.1 is substituted in lieu thereof:

"Section 3.2.1 Defined. Commencing August 1, 1993 and for each Lease Year thereafter during the Demised Term, Tenant shall, in addition to Basic Rent and all other sums required to be paid by Tenant to Landlord hereunder, pay to Landlord, in the manner and to the extent set forth in section 3.2.2, a sum ("Percentage Rent") equal to the product obtained by multiplying (a) a fraction, the numerator of which is the Basic Rent hereunder for each Lease Year or partial Lease Year and the denominator of which is the Aggregate Basic Rent for such Lease Year or partial Lease Year, times (b) the amount by which the product obtained by multiplying three percent (3%) times Gross

Sales for such Lease Year or partial Lease Year
<u>exceeds</u>, if at all, the Aggregate Basic Rent for such
Lease Year or partial Lease Year."

9.   Section 3.2.2 of the Lease is deleted in its
entirety and the following new section 3.2.2 is substituted
in lieu thereof:

"3.2.2   <u>Payment of Percentage Rent</u>.   Percentage
Rent due for any Lease Year or partial Lease Year shall
be due and payable concurrently with the delivery by
Tenant to Landlord, within ninety (90) days after the
close of each Lease Year, of the annual statement of
Gross Sales provided for in section 3.2.6.   Tenant's
obligation to pay accrued but unpaid Percentage Rent
for any Lease Year shall survive any termination of
this Lease or any expiration of the Demised Term."

10.   Section 3.2.3 of the Lease is deleted in its
entirety.

11.   Section 3.2.4 of the Lease is deleted in its
entirety, and the following new section 3.2.4 is substituted
in lieu thereof:

"3.2.4   <u>"Lease Year" Defined</u>.   The first Lease Year
shall commence on the first day of the Demised Term and
shall end at the close of the twelfth full calendar
month following the commencement of the Demised Term.
Thereafter for the next five (5) years of the Demised
Term each Lease Year shall consist of successive
periods of twelve (12) calendar months.   The seventh
Lease Year shall commence on the day following the last
day of the sixth Lease Year and shall end on January
29, 1993.   Thereafter, each Lease Year of the Demised
Term shall be as shown on Exhibit E-1 hereto."

12.   Section 3.2.6 of the Lease is deleted in its
entirety, and the following new section 3.2.6 is substituted
in lieu thereof:

"Section 3.2.6   <u>Statements of Gross Sales</u>.   Tenant
shall deliver or cause to be delivered to Landlord at
the office of Beneficiary within ninety (90) days after
the close of each Lease Year, a statement of Gross
Sales for the preceding Lease Year or partial Lease
Year.   Such statements shall be prepared on a property-
by-property basis for the Demised Premises and each of
the other premises demised under the Leases and on an
aggregate basis as well, and shall be computed on a
consistent basis for each Lease Year, in the manner
used by Tenant in generating its audited annual
statements and in accordance with section 3.2.5 hereof.
The annual statement shall be accompanied by the signed

certificate of Tenant's chief financial officer certifying specifically that (i) such officer has examined the report of Gross Sales for the preceding Lease Year or partial Lease Year, (ii) such officer's examination included such tests of Tenant's books and records as such officer considered necessary or appropriate under the circumstances, (iii) such report presents fairly the Gross Sales of the preceding Lease Year or partial Lease Year, and (iv) the reported Gross Sales conform with and are computed in compliance with the definition of Gross Sales contained in section 3.2.5 hereof.

If Tenant shall fail to deliver such annual statement and certificate to Landlord within such ninety (90) day period, Landlord shall have the right, unless such failure is cured within fifteen (15) days following notice by Landlord to Tenant of such failure, thereafter to employ an Approved Independent Auditor to examine such books and records, as may be necessary to certify the amount of Gross Sales for such Lease Year or partial Lease Year, and Tenant shall pay to Landlord the cost thereof as additional rent. If there is an intentional misrepresentation in the annual statement prepared by Tenant's chief financial officer then the Landlord may require the certification of all such annual statements thereafter by an Approved Independent Auditor employed by and at Tenant's expense."

13. In the tenth line of the second paragraph of Section 3.2.7 of the Lease, "eleventh (11th)" is deleted and "eighth (8th)" is substituted in lieu thereof.

14. Section 3.2.8 of the Lease is deleted in its entirety, and the following new section 3.2.8 is substituted in lieu thereof:

"3.2.8 Adjustment to Aggregate Basic Rent. In the event of (a) termination of any of the Leases other than this Lease pursuant to the provisions contained in any of the other Leases similar to those contained in sections 19 and 20 hereof, or (b) a reduction in Basic Rent under any of the Leases other than this Lease pursuant to a Partial Taking with respect to the portion of the Aggregate Demised Premises covered thereby, or (c) a cessation of operations under any other Lease pursuant to provisions similar to those contained in section 11.1 hereof, then (i) the Aggregate Basic Rent shall be deemed to be reduced by (A) the amount of the Basic Rent payable under any other Lease so terminated or any other Lease where operations have ceased as described above, and by (B) the amount of the reduction in Basic Rent under such other Leases as a result of a Partial Taking, and (ii)

the Aggregate Demised Premises shall no longer include any premises covered by a Lease so terminated or by a Lease where operations have ceased as described above."

15. Section 3.2.9 of the Lease is deleted in its entirety.

16. Section 11.1 of the Lease is deleted in its entirety, and the following new section 11.1 is substituted in lieu thereof:

"11.1 <u>Use; Name</u>. Tenant shall, for the benefit of Landlord, during the Demised Term, continuously operate, or cause to be operated, department store facilities on the Demised Premises under its trade name which shall include the words "Carson Pirie Scott & Co." or "Carsons" (such words being the principal element of such trade name) or under such other trade name as Tenant may from time to time be operating the majority of its department stores in the Chicago metropolitan area. The department store facilities so operated by Tenant shall have standards of store operation, hours, merchandising and pricing which are substantially similar to those generally utilized from time to time by it in the operation of the majority of its department stores located in the Chicago metropolitan area. Tenant's covenants set forth in this section 11.1 shall be inoperative during any period or periods of time that Tenant's store on the Demised Premises is undergoing such repair, rebuilding, alteration, razing or restoration permitted by and in accordance with the terms of this Lease as shall result in it being impracticable to comply with such covenants. Notwithstanding the foregoing provisions of this section 11.1, nothing contained herein shall be deemed to release Tenant from its duty to comply with the provisions of the Operating Agreement."

17. Section 11.3 of the Lease is amended by adding the following sentence thereto:

"Tenant agrees to furnish Landlord a copy of any written notice it receives from or gives to any party under the Operating Agreement. Tenant shall deliver such copy simultaneously with the sending of any such notice and within three (3) business days after Tenant's receipt of any such notice."

18. Section 19.2(a)(ii) of the Lease is deleted in its entirety.

19. Section 19.2 is amended by adding a new paragraph (e) thereto as follows:

"(e) If Tenant elects (or is deemed to have elected) to effect a Restoration of the Demised Premises under paragraph (a)(i) above and such election occurs within the last three (3) years of the Fixed Term or the last three (3) years of any Additional Extension, then Landlord shall have the right to terminate this Lease by giving Tenant written notice to that effect within fifteen (15) days after receipt of Tenant's election (or the date on which Tenant is deemed to have elected) to effect a Restoration of the Demised Premises, such termination to be effective ten (10) days following the giving of such notice of termination by Landlord. Tenant, however, can avoid such termination by giving Landlord written notice within such ten (10) day period that Tenant elects to extend the Demised Term for the succeeding Additional Extension of five (5) years as provided in section 6 of this Lease, if Tenant can satisfy all of the conditions to such election under said Section 6. If Tenant so elects to extend (and satisfies the conditions to such election), Tenant shall proceed with the Restoration in accordance with paragraph (a)(i) above."

20. Subparagraphs (a) and (c) of section 20 of the Lease are deleted and the following new subparagraphs (a) and (c) are substituted in lieu thereof:

"(a) if Tenant shall default in the due and punctual payment of any Basic Rent, Percentage Rent, additional rent or other sum payable to Landlord hereunder when the same shall have become due and payable and such default shall continue for more than five (5) days in the case of Basic Rent and ten (10) days in the case of Percentage Rent, additional rent or other sum payable to Landlord hereunder, in each case after written notice thereof from Landlord; or

(c) if Tenant shall default in the due performance or observance of any of the terms hereof other than those referred to in the foregoing subparagraphs (a) and (b) and such default shall continue for more than twenty (20) days after written notice thereof from Landlord, or if such default shall not be susceptible to cure within twenty (20) days, Tenant fails either to commence to remedy such default within twenty (20) days or thereafter diligently to prosecute

the cure thereof to completion with due diligence and without delay; or"

21.   The following is added to the end of section 20:

"If Landlord has delivered a notice of default to Tenant under this section 20, as soon as reasonably possible after Tenant has cured such default, Tenant shall notify Landlord thereof and shall submit to Landlord reasonable evidence verifying such cure.  If Tenant receives written notice from the person or entity administering the lock box account referred to in Section 3.1 hereof stating that Tenant has failed to make a Basic Rent payment when the same was due and payable under this Lease, such notice shall constitute Landlord's written notice for purposes of paragraph (a) of this Section 20, and the 5-day cure period specified in said paragraph (a) shall commence upon delivery of such notice."

22.   Paragraph (a) of section 29 of the Lease is deleted and the following new paragraph (a) is substituted in lieu thereof:

"(a) Except as provided in paragraphs (b) and (c) of this section 29, Tenant shall not assign or transfer this Lease or sublet all or any part of the Demised premises without the prior written consent of Landlord and Mortgagee, such consents not to be unreasonably withheld."

23.   Section 40.1 of the Lease is deleted and the following new section 40.1 is substituted in lieu thereof:

"40.1  General.  Tenant shall have the option to purchase the Demised Premises only in connection with and as part of its purchase of all of the Aggregate Demised Premises at the end of the Fixed Term on February 1, 2014, and provided it has exercised its right to renew this Lease for such Additional Extension, at the end of the First Extension on February 2, 2019; the Second Extension on February 3, 2024; the Third Extension on February 3, 2029; the Fourth Extension on January 28, 2034; and the Fifth Extension on January 29, 2039 ("Effective Date"). Tenant shall give written notice to Landlord of the exercise of such option not less than twenty-four (24) months and not more than twenty-seven (27) months prior to the Effective Date.  Upon the giving of such notice, unless the exercise of the option is cancelled pursuant to clause (b) of section 40.2 or clause (f) of section 40.3, Tenant shall be obligated to purchase and Landlord shall be obligated to sell, the Demised

Premises subject to the provisions set forth
hereinbelow.  The purchase price ("Purchase Price")
payable by Tenant shall be determined in accordance
with the provisions set forth in section 40.2 and shall
be paid to Landlord, less the principal amount of any
Permitted Mortgages (as hereinafter defined) and less
any other adjustments, all as hereinafter provided, in
federal reserve funds deposited in Landlord's account
at closing.  Closing ("Closing") shall take place as of
the Effective Date through an escrow established at
Chicago Title and Trust Company, Chicago, Illinois, the
terms and provisions of such escrow to be consistent
with the terms and provisions hereof."

24.  Section 40.2 of the Lease is deleted and the
following new section 40.2 is substituted in lieu thereof:

"40.2  _Calculation of Purchase Price_.  The
purchase price for the Aggregate Demised Premises shall
be equal to the greater of (a) Forty Million Dollars
($40,000,000), or (b) the fair market value of the
Aggregate Demised Premises, without taking into account
the existence of this Lease or any of the other _Leases_
and based on then current appraisal methods.  Tenant's
notice to Landlord exercising the option to purchase
shall be accompanied by an appraisal, prepared by an
appraiser who shall be a member of the American
Institute of Real Estate Appraisers of the National
Association of Realtors, Chicago, Illinois (the
"Institute"), familiar with the areas in which the
Aggregate Demised Premises are located, which shall
state the opinion of such appraiser as to the fair
market value of the Aggregate Demised Premises as of a
date thirty (30) months prior to the Effective Date.
Within thirty (30) days after the receipt of Tenant's
notice and such appraisal, Landlord may, by notice to
Tenant, either accept the fair market value of the
Aggregate Demised Premises, as set forth in such
appraisal, and, if such fair market value is in excess
of Forty Million Dollars ($40,000,000), as the Purchase
Price for the Aggregate Demised Premises, or reject
such appraisal, in which event Landlord may obtain, no
later than eighteen months (18) prior to the Effective
Date, at Landlord's expense, and submit to Tenant, an
appraisal by an appraiser who shall be a member of the
Institute, such appraiser having been selected by the
President of the Institute, familiar with the areas in
which the Aggregate Demised Premises are located, which
appraisal shall state the opinion of such appraiser as
to the fair market value of the Aggregate Demised
Premises as of the date of the appraisal.  Tenant shall
then have the option, to be exercised by giving written
notice to Landlord within five (5) days following
receipt of Landlord's appraisal, to (a) accept, as the

Purchase Price for the Aggregate Demised premises, the
greater of Forty Million Dollars ($40,000,000) or the
fair market value of the Aggregate Demised Premises as
determined by the higher of the two appraisals, or (b)
cancel the exercise of its option to purchase the
Aggregate Demised Premises as of the Effective Date, or
(c) request a third appraisal. If Tenant requests a
third appraisal, then an appraiser who shall be a
member of the Institute, mutually acceptable to
Landlord and Tenant, and familiar with the areas in
which the Aggregate Demised Premises are located, shall
promptly make an appraisal of the fair market value of
the Aggregate Demised Premises, at Tenant's expense,
and shall state, in his opinion, such fair market value
thereof, as of the date of such appraisal in accordance
with the provisions of this section 40. If Landlord
and Tenant cannot agree on such third appraiser within
ten (10) days following Landlord's receipt of a request
for a third appraisal, then the third appraiser shall
be selected by the President of the Institute at the
request of either party. Such appraisal shall be
delivered to Landlord and Tenant at least fifteen (15)
months prior to the Effective Date. Upon receipt of
the third appraisal by the parties hereto, the Purchase
Price for the Aggregate Demised Premises shall be
determined as follows: (i) if the third appraisal
provided for hereunder is higher than either of the
first two appraisals provided for in this section 40,
then the Purchase Price for the Aggregate Demised
Premises shall be the greater of Forty Million Dollars
($40,000,000) or the fair market value of the Aggregate
Demised Premises as determined by the higher of said
first two appraisals; or (ii) if the third appraisal is
lower than the first two appraisals provided for in
this section 40, then the purchase price for the
Aggregate Demised Premises shall be the greater of
Forty Million Dollars ($40,000,000) or the fair market
value of the Aggregate Demised Premises as determined
by the lower of said first two appraisals; or (iii) if
the third appraisal is greater than the lower of said
first two appraisals and less than the higher of said
first two appraisals, then the Purchase Price for the
Aggregate Demised Premises shall be the greater of
Forty Million Dollars ($40,000,000) or the fair market
value of the Aggregate Demised Premises as determined
by the third appraisal."

    25. Section 42 of the Lease is deleted and the
following new section 42 is substituted in lieu thereof:

        "42. Notices, etc. All notices, demands,
    requests, consents, approvals and other instruments
    under this Lease shall be in writing and shall be
    deemed to have been properly given if and when (i)

mailed by first class registered or certified mail,
return receipt requested, postage prepaid, addressed as
follows, or (ii) sent by telephonically confirmed
facsimile transmission to the telephone numbers set
forth below:

If to Tenant, at

CPS Department Stores, Inc.
c/o Carson Pirie Scott & Co.
331 West Wisconsin Avenue
Milwaukee, Wisconsin 53203
Attn:  General Counsel
Facsimile No.:  (414) 276-9108
with a copy to:

The Dial Corp
1850 North Central Avenue
Phoenix, Arizona 85077-2109
Attn:  Richard C. Stephan
Facsimile No.:  (602) 207-5665

and to:

The Trustees of Mellon Participating
Mortgage Trust Commercial Properties
Series 85/10
c/o Mellon/McMahan Real Estate Advisors, Inc.
444 Market Street
Suite 2100
San Francisco, CA 94111
Attn:  Mr. John McMahan
Facsimile No.:  (415) 398-1237

If to Landlord, at

Illinois Partners Limited Partnership
c/o The Prime Group, Inc.
77 West Wacker Drive
Suite 3900
Chicago, Illinois 60601
Attn:  General Counsel
Facsimile No.:  (312) 782-5867

with a copy to:

The Dial Corp
1850 North Central Avenue
Phoenix, Arizona 85077-2109
Facsimile No.:  (602) 207-5665

and to:

The Trustees of Mellon Participating
Mortgage Trust Commercial Properties
Series 85/10
c/o Mellon/McMahan Real Estate Advisors, Inc.
444 Market Street
Suite 2100
San Francisco, CA 94111
Attn: Mr. John McMahan
Facsimile No.: (415) 398-1237

or at such other address or to such other telephone
facsimile numbers as the parties may have designated by
notice to the other. The respective addresses for
Tenant and Landlord set forth in this section 42 shall
be substituted for the respective addresses set forth
in the Preamble to this Lease."

26. Exhibit E to the Lease is deleted and Exhibit E-1
attached hereto and made a part hereof is substituted in
lieu thereof, and each reference to "Exhibit E" in the Lease
is deleted and "Exhibit E-1" is substituted in lieu thereof.

27. Tenant has cured or shall cure or otherwise
satisfy any outstanding defaults existing under the Lease
and the Operating Agreement as of August 1, 1993, other than
defaults which have been expressly waived by Landlord under
paragraph 6 of the Letter Agreement.

28. Notwithstanding anything contained herein to the
contrary, Landlord and Tenant agree that paragraphs 8 and 14
of the Letter Agreement are hereby incorporated herein and
made a part hereof. Landlord and Tenant agree to perform
their obligations under such paragraphs in accordance with
the provisions thereof.

29. This Amendment of Lease is executed by Chicago
Title and Trust Company, not personally but as Land Trustee
as aforesaid in the exercise of the power and authority
conferred upon and vested in it as such Trustee and it is
expressly understood and agreed that nothing herein shall be
construed as creating any liability in said Chicago Title
and Trust Company personally to perform any covenant either
express or implied herein contained, all such liability, if
any, being expressly waived by every person now or hereafter
claiming any right hereunder, and that any person claiming
any right hereunder shall look solely to the assets of the
trust for the enforcement of the agreements and covenants
herein.

This Amendment of Lease is intended to modify the Lease
only to the extent set forth herein and all other terms and
conditions of the Lease are hereby ratified and confirmed.

\leasprop\riverside gwc 3/7/94                    -13-

IN WITNESS WHEREOF, the parties hereto have executed this Amendment of Lease as of the date first above written.

Landlord:

CHICAGO TITLE AND TRUST COMPANY, not personally or individually, but solely as Trustee under Trust Agreement dated June 15, 1985 and known as Trust No. 1085900

By: _____
ASST. VICE PRESIDENT

Attest: _____
ASST. SECRETARY

limited

ILLINOIS PARTNERS LIMITED PARTNERSHIP, an Illinois

partnership

By: _____
Dennis W. Townsend, a General Partner


By: DWT VENTURE, INCORPORATED, a General Partner

Attest: _____

By: _____
President DENNIS W. TOWNSE


By: RETAIL PARTNERS, INC., a General partner

Attest: _____

By: _____
Vice-President JEFFREY A. PATTERSON

Tenant:

CPS DEPARTMENT STORES,INC., a
Delaware corporation

By: _____
Title:_____

     Paul E. Ruby
     Vice President – Real Estate

Attest:

GEORGE W. CARLIS
ASSISTANT SECRETARY

\leasprop\riverside gwc 3/7/94         **-15-**

**EXHIBIT B-1**
**ANNUAL BASIC RENT**

| Period | Lincoln Mall | North Riverside | Orland Square | Southlake Mall | Stratford Square | Yorktown | TOTAL |
|---|---|---|---|---|---|---|---|
| 8/1/93 - 7/31/98 | $ 956,980 | $1,101,039 | $1,219,428 | $ 682,657 | $1,025,127 | $2,014,769 | $7,000,000 |
| 8/1/98 - 7/31/03 | $1,025,336 | $1,179,685 | $1,306,531 | $ 731,418 | $1,098,351 | $2,158,679 | $7,500,000 |
| 8/1/03 - 7/31/08 | $1,093,692 | $1,258,330 | $1,393,632 | $ 780,179 | $1,171,574 | $2,302,593 | $8,000,000 |
| 8/1/08 - 2/1/14 | $1,162,048 | $1,336,976 | $1,480,734 | $ 828,940 | $1,244,797 | $2,446,505 | $8,500,000 |

## Exhibit E-1

## Schedule of Lease Years

| Lease Year | Commences | Ends |
|---|---|---|
| 8 | 1-30-93 | 1-29-94 |
| 9 | 1-30-94 | 1-28-95 |
| 10 | 1-29-95 | 2-3-96 |
| 11 | 2-4-96 | 2-1-97 |
| 12 | 2-2-97 | 1-31-98 |
| 13 | 2-1-98 | 1-30-99 |
| 14 | 1-31-99 | 1-29-00 |
| 15 | 1-30-00 | 2-3-01 |
| 16 | 2-4-01 | 2-2-02 |
| 17 | 2-3-02 | 2-1-03 |
| 18 | 2-2-03 | 1-31-04 |
| 19 | 2-1-04 | 1-29-05 |
| 20 | 1-30-05 | 1-28-06 |
| 21 | 1-29-06 | 2-3-07 |
| 22 | 2-4-07 | 2-2-08 |
| 23 | 2-3-08 | 1-31-09 |
| 24 | 2-1-09 | 1-30-10 |
| 25 | 1-31-10 | 1-29-11 |
| 26 | 1-30-11 | 1-28-12 |
| 27 | 1-29-12 | 2-2-13 |
| 28 | 2-3-13 | 2-1-14 |
| 29 | 2-2-14 | 1-31-15 |
| 30 | 2-1-15 | 1-30-16 |
| 31 | 1-31-16 | 1-28-17 |
| 32 | 1-29-17 | 2-3-18 |
| 33 | 2-4-18 | 2-2-19 |
| 34 | 2-3-19 | 2-1-20 |
| 35 | 2-2-20 | 1-30-21 |
| 36 | 1-31-21 | 1-29-22 |
| 37 | 1-30-22 | 1-28-23 |
| 38 | 1-29-23 | 2-3-24 |
| 39 | 2-4-24 | 2-1-25 |
| 40 | 2-2-25 | 1-31-26 |
| 41 | 2-1-26 | 1-30-27 |
| 42 | 1-31-27 | 1-29-28 |
| 43 | 1-30-28 | 2-3-29 |
| 44 | 2-4-29 | 2-2-30 |
| 45 | 2-3-30 | 2-1-31 |
| 46 | 2-2-31 | 1-31-32 |
| 47 | 2-1-32 | 1-29-33 |
| 48 | 1-30-33 | 1-28-34 |
| 49 | 1-29-34 | 2-3-35 |
| 50 | 2-4-35 | 2-2-36 |
| 51 | 2-3-36 | 1-31-37 |
| 52 | 2-1-37 | 1-30-38 |
| 53 | 1-31-38 | 1-29-39 |

## SECOND AMENDMENT TO LEASE
### (North Riverside Shopping Center; North Riverside, Illinois Property)

THIS SECOND AMENDMENT TO LEASE (this "Amendment") is effective as of August 5, 1998, by and among WEC 98C-4 LLC, a Texas limited liability company ("Landlord"), and CPS Department Stores, Inc., a Delaware corporation ("Tenant").

### W I T N E S S E T H :

WHEREAS, Chicago Title & Trust Company, as Trustee ("Land Trustee") under a Trust Agreement dated June 15, 1985, and known as Trust No. 1085900, and Six Anchors Limited Partnership, a Maryland limited partnership currently known as Illinois Partners Limited Partnership, as beneficiary under the Trust, collectively as Landlord (the "Former Landlord"), and CPS Realty Partnership, an Illinois general partnership ("CPS Partnership"), as the Tenant, entered into a Lease dated October 31, 1985, relating to certain premises constituting a portion of the North Riverside Shopping Center in North Riverside, Illinois, as such premises are more fully described in said Lease (the "Original Lease");

WHEREAS, pursuant to that certain Order (1) Authorizing CPS Realty Partnership to Assume Certain Leases with Illinois Partners Limited Partnership, as Amended, and (2) Establishing Cure Default Procedure entered by the United States Bankruptcy Court for the Eastern District of Wisconsin on October 15, 1993 (the "Lease Assumption Order"), CPS Partnership assumed the Original Lease subject to the terms of the Letter Agreement (as hereinafter defined);

WHEREAS, as provided in the Fourth Amended Joint Plan of Reorganization in the Matter of P.A. Bergner & Co. Holding Company, et al., as confirmed on October 15, 1993, by the United States Bankruptcy Court for the Eastern District of Wisconsin (the "Plan of Reorganization") and pursuant to that certain Assignment and Assumption of Leases, Ground Leases and Agreement dated October 29, 1993, by and among CPS Partnership, Chicago Title and Trust Company, as Trustee under Trust Agreement dated May 15, 1985, and known as Trust No.1083000 and CPS Holding Co. (formerly Carson Pirie Scott & Company), a Delaware corporation ("CPS Holding"), CPS Partnership assigned, conveyed, transferred and delivered its entire right, title and interest in, to and under the Original Lease to CPS Holding and CPS Holding assumed and agreed to perform all of the terms, covenants and conditions imposed on the lessee under the Original Lease;

WHEREAS, as provided in the Plan of Reorganization and pursuant to that certain Assignment and Assumption of Leases, Ground Leases and Agreement dated October 29, 1993, by and among CPS Holding and Tenant, CPS Holding assigned, conveyed, transferred and delivered its entire right, title and interest in, to and under the Original Lease to Tenant and Tenant assumed and agreed to perform all of the terms, covenants and conditions imposed on the lessee under the Original Lease;

WHEREAS, by Letter Agreement dated April 21, 1993, as amended by Letter Agreements dated May 26, 1993, June 25, 1993, July 27, 1993, August 20, 1993, September 7, 1993, and September 24, 1993, respectively (collectively, "Letter Agreement"), Illinois Partners Limited Partnership and CPS Partnership agreed upon certain amendments to the Original Lease to become effective as of August 1, 1993, which amendments were incorporated into an Amendment of Lease (the "First Amendment") entered into by and among the Land Trustee, Illinois Partners Limited Partnership, and Tenant (the Original Lease as so amended by the First Amendment is hereinafter referred to as the "Lease"); and

WHEREAS, Landlord has purchased the property constituting the Demised Premises (as defined in the Lease) from the Former Landlord effective as of the date of this Amendment and in connection with the Landlord's

purchase of such property Tenant has agreed to amend certain terms and provisions of the Lease as more fully set forth herein.

NOW, THEREFORE, for and in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Landlord and Tenant do hereby agree as follows:

1.    Defined Terms.  Except as otherwise defined herein, all terms used in this Amendment with their initial letters capitalized which have been defined in the Lease shall have the same meaning herein as set forth in the Lease.

2.    Amendments to Lease.  The Lease is hereby modified and amended as follows:

2.1.    The last paragraph of Section 1 of the Lease is hereby amended to change the date "February 1, 2014" to be "January 31, 2024", thereby extending the termination of the Fixed Term set forth in Section 1 of the Lease from February 1, 2014, to January 31, 2024.

2.2.    Exhibit B-1 attached hereto is hereby substituted for Exhibit B-1 to the Lease.

2.3.    The definition of "Approved Independent Auditor" set forth in Section 2 of the Lease is hereby amended to read in its entirety as follows:

"Approved Independent Auditor: means an independent certified public accounting firm which, at the time in question, is considered to be a "Big Six" accounting firm."

2.4.    The definition of "Existing Mortgages" is hereby deleted from the Lease, and all references in the Lease to "Existing Mortgages" (including, without limitation, Exhibit H attached to the Lease) are hereby deleted.

2.5.    The definition of the term "Permitted Exceptions" contained in the Lease is hereby amended to read in its entirety as follows:

"Permitted Exceptions: all encumbrances, liens and other matters affecting title to or the use of the Demised Premises listed on Exhibit K attached hereto and made a part hereof, and any other such matters created by or the creation of which is consented to by or arises as a result of the acts or omissions of Tenant (except the Mortgage)."

2.6.    The Lease is hereby amended to add a new Exhibit K thereto which shall be in the same form as Exhibit K to this Amendment.

2.7    The Lease is hereby amended as follows to make reference to Proffitt's, Inc., a Tennessee corporation, in the following sections of the Lease:

(a)    A definition of "Proffitt's" is hereby added to the Lease immediately after the definition of "Permitted Exceptions" to read as follows:

-2-

"Proffitt's" means Proffitt's, Inc., a Tennessee corporation, its permitted successors and assigns."

(b)    Subpart (f) of Section 10 of the Lease is hereby amended to delete the term "CPS" therefrom, and to substitute in its place the term "Proffitt's".

(c)    The first paragraph of Section 15.2 of the Lease is hereby amended to delete the term "CPS" therefrom, and to substitute in its place the term "Proffitt's".

(d)    Subpart (ii) of Section 29(c) of the Lease is hereby amended to delete the term "CPS" wherever such term appears therein, and to substitute in its place the term "Proffitt's".

(e)    Section 29(d) of the Lease is hereby amended to delete the term "CPS" wherever it appears therein, and to substitute in its place the term "Proffitt's".

2.8.    The Lease is hereby amended to delete the requirement that Percentage Rent be paid pursuant thereto.  The Lease is hereby amended as follows to effect said change:

(a)    Section 2 of the Lease is hereby amended to delete the definitions of "Aggregate Basic Rent" and "Percentage Rent" therefrom.

(b)    Except as hereinafter provided, Section 3.2 of the Lease is hereby deleted; provided, however, that Section 3.2.4 and 3.2.5 of the Lease are not deleted therefrom.

(c)    The Lease is hereby amended by deleting Section 24.4 thereof.

(d)    The Lease is hereby amended to delete references to "Percentage Rent" wherever they appear throughout the remainder of the Lease.

2.9.    Section 5 of the Lease is hereby amended to read in its entirety as follows:

"5.    No Counterclaim, Abatement, etc.  The Basic Rent, all additional rent and all other sums payable hereunder shall be paid without notice, demand, counterclaim, setoff, deduction or defense, and without abatement, suspension, deferment, diminution or reduction by reason of, and the obligations and liabilities of Tenant under this Lease shall not be affected by, any circumstance or occurrence whatsoever, including, without limitation, (a) any damage to or destruction of the Demised Premises or any part thereof (except as otherwise expressly provided in Section 19), (b) any restriction or prevention of or interference with any use of the Demised Premises or any part thereof (except as otherwise expressly provided in Section 19), (c) any Taking of the Demised Premises or any part thereof (except as otherwise expressly provided in Section 19), (d) any title defect or encumbrance or, except when caused solely by the act or acts of Landlord, any eviction or prospective eviction from the Demised Premises or any part thereof by title paramount or otherwise, (e) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding of or on the part of Landlord or any assignee of Landlord's equity in the Demised Premises or any action taken with respect to this Lease by any trustee or receiver of Landlord or of any such assignee, or by any court in any such proceeding, (f) any change, extension, waiver, indulgence or other action or omission in respect of any obligation or liability of Tenant, (g)

-3-

any claim which Tenant has or might have against Landlord, whether or not Tenant shall have had any notice or knowledge of the foregoing, or (h) the exercise of any remedy under the Mortgage (including, without limitation, foreclosure). Except as otherwise expressly provided in (d) above and in Section 19, Tenant waives all rights now or hereafter conferred by statute or otherwise to quit, terminate or surrender this Lease or the Demised Premises or any part thereof, or to any abatement, suspension, deferment, diminution, setoff or reduction of Basic Rent or additional rent on account of any occurrence. Landlord and Tenant agree that this Lease is a true lease and does not represent a financing arrangement."

2.10. Section 6 of the Lease is deleted in its entirety and the following new Section 6 is substituted in lieu thereof:

"6. <u>Extension of Demised Term</u>. Tenant shall have the right, at its option, to extend the Demised Term for five (5) separate, consecutive renewal terms of five (5) years each (each, an "Additional Extension"), the first for the period commencing February 1, 2024, and terminating January 31, 2029 ("First Extension"); the second for the period commencing February 1, 2029, and terminating January 31, 2034 ("Second Extension"); the third for the period commencing February 1, 2034, and terminating January 31, 2039 (the "Third Extension"); the fourth for the period commencing February 1, 2039, and terminating January 31, 2044 (the "Fourth Extension"); and the fifth for the period commencing February 1, 2044, and terminating January 31, 2049 (the "Fifth Extension"). Tenant's right to extend the Demised Term for each respective Additional Extension is expressly subject to the condition that an Event of Default shall not have occurred and be continuing at the time of Tenant's exercise of such right or at the commencement of the Additional Extension. The right to extend the Demised Term shall be exercisable by written notice to Landlord and shall be given (i) if for the First Extension, on or before February 1, 2022; if for the Second Extension, on or before February 1, 2027; if for the Third Extension, on or before February 1, 2032; if for the Fourth Extension, on or before February 1, 2037; and if for the Fifth Extension, on or before February 1, 2042; <u>provided</u>, that, if Tenant fails to timely give notice to Landlord of the extension of the Lease for any of the Additional Extensions on or before the date required in this section, then the date by which Tenant must give such notice for such Additional Extension shall be extended to the date that is twenty (20) days after Landlord has given Tenant notice that it has an option which it will lose if it does not exercise the option within twenty (20) days after such notice is given by Landlord to Tenant. The giving of each such notice shall have the effect, without further action of Landlord or Tenant, of extending the Demised Term for the period of the respective Additional Extension, and Tenant shall not thereafter be entitled to revoke such extension. If Tenant fails to extend the Demised Term for any particular Additional Extension, then all rights and options to extend the Demised Term with the regard to subsequent Additional Extensions shall expire and be null and void. During each Additional Extension, the terms and conditions of this Lease shall continue in full force and effect, except that the annual Basic Rent for each Additional Extension shall be in the amounts determined in accordance with the schedule set forth on <u>Exhibit B-1</u> hereto."

2.11. Section 8 of the Lease is hereby amended by adding the phrase "and perform all obligations of the owner of the Demised Premises under" between the words "with" and "any Permitted Exceptions" in the last line of Section 8 of the Lease. Notwithstanding the foregoing, Tenant shall not be obligated to remove encroachments from the Demised Premises onto adjacent properties which are listed on <u>Exhibit K</u> hereto.

2.12.  Section 11.3 of the Lease is hereby amended to add a new paragraph at the end of such Section 11.3, which paragraph shall read in its entirety as follows:

"Tenant agrees that Tenant is obligated to and shall perform all obligations of the owner of the Demised Premises under and pay all expenses which the owner of the Demised Premises may be required to pay in accordance with the Operating Agreement or any other agreement or document included within the Permitted Exceptions.  Tenant further covenants and agrees to indemnify, defend and hold harmless Landlord and Mortgagee against any claim, loss or damage suffered by Landlord or Mortgagee by reason of Tenant's failure to perform any obligations or pay any expenses as required under the Operating Agreement or any other agreement or document included within the Permitted Exceptions or comply with the terms and conditions as hereinabove provided during the Demised Term of this Lease.  The obligations of Tenant under this section 11.3 relating to matters occurring during the Demised Term of this Lease will survive any termination of this Lease."

Notwithstanding the foregoing, Tenant shall not be obligated to remove encroachments from the Demised Premises onto adjacent properties which are listed on Exhibit K hereto.

2.13.  Section 12 of the Lease is hereby amended to add the following sentence at the end thereof:

"Tenant shall make its own arrangements for the installation and provision of all such utilities and Landlord shall not be responsible to furnish any utilities to the Demised Premises and shall not be liable for any interruption or failure of any such utilities."

2.14.  Section 18.1 of the Lease is hereby amended to add the words "and Mortgagee" immediately after the word "Landlord" on the second line of said Section 18.1.

2.15.  Section 18.1 of the Lease is hereby amended to add the following sentence at the end thereof:

"All insurance required by this Section 18.1 shall be issued by insurance companies having and maintaining a Standard and Poor's rating of "AA" or better and a general policy rating of "AA" or better and a financial class of "VI" or better by A.M. Best Company, Inc.'s Key Rating Guide."

2.16.  Section 18.2 of the Lease is hereby amended to add the phrase "Landlord and" between the words "by" and "Mortgagee" on the twenty-first (21ˢᵗ) line of said Section 18.2.

2.17.  Section 19.1(c) of the Lease is hereby amended to read in its entirety as follows:

"(c)    Total Taking.

(i)    In the event of a Total Taking during the Fixed Term, then the Tenant shall, on the date of such Total Taking (the date the sale of the Demised Premises is consummated in accordance with this Section 19.1(c) is referred to herein as the "Termination Date"), purchase the remaining portion of the Demised Premises and the award (or if no part of the Demised Premises shall remain, the entire award) for the applicable price (the "Purchase Price") computed in accordance with the schedule annexed hereto and marked Exhibit I plus all Basic Rent, additional rent and other amounts which may be due and owing under this Lease for the period prior to the Termination Date (the "Additions to Purchase Price").  This

-5-

Lease shall terminate on the date of the closing of the sale of the remaining portion of the Demised Premises under this Section 19.1(c).

        (ii)     Title shall close and the Purchase Price and Additions to Purchase Price shall be paid as hereinafter provided and thereafter Tenant shall be entitled to and shall receive any and all awards with respect to such Total Taking and Landlord shall assign (or in case of any award previously made, deliver to Tenant on the Termination Date) such award as may be made with respect to the Demised Premises. Title shall close on the date of the Total Taking at noon at the local office of Landlord's counsel, or at such other time and place as the Landlord and Tenant may agree upon, and this Lease shall remain in full force and effect until the closing of title to the Property under this section 19.1(c). On the Termination Date Tenant shall pay the Purchase Price and Additions to Purchase Price by transferring immediately available funds to such account or accounts and in such bank or banks as Mortgagee or Landlord, in that order, shall designate, upon delivery to Tenant of a special warranty deed (or local equivalent) conveying the remaining portion of the Demised Premises and all other required documents including an assignment or delivery of any award in connection with such Total Taking. The special warranty deed (or local equivalent) shall convey title, free from encumbrances other than (A) Permitted Exceptions, (B) liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to observe or perform any of the terms, covenants or agreements herein provided to be observed and performed by Tenant, and (C) any installments of Impositions then affecting the Demised Premises. The remaining portion of the Demised Premises shall be conveyed pursuant to this Section 19.1(c) "AS-IS". The Purchase Price and Additions to Purchase Price payable as hereinabove provided shall be charged or credited, as the case may be, on the Termination Date to reflect adjustments of Basic Rent paid or payable to and including the Termination Date, apportioned as of the Termination Date. Tenant shall pay all documentary stamps, conveyance, transfer, transaction, sales and like taxes required in connection with the purchase, regardless of who is required to pay such taxes under State or local law or custom (and Tenant shall also pay to Landlord any amount necessary to yield to Landlord the entire Purchase Price and Additions to Purchase Price if as a matter of the law of the State or locality such tax cannot be paid directly by Tenant). Landlord shall cause any Mortgage (or other liens and encumbrances created by Landlord which are not Permitted Exceptions) to be paid and released at the Closing on the Termination Date. At the Closing of the sale under this Section 19.1(c), (A) Tenant shall pay to Landlord the Purchase Price and all Additions to the Purchase Price, and (B) Landlord and Tenant will cooperate with each other by the filing of such certificates, reports or affidavits (1) as may be required by law to avoid withholding of a part of the Purchase Price to satisfy income or other tax requirements, or (2) as may reasonably be required by the title company or the other party to close the transaction as contemplated by this Section 19.1(c).

        (iii)    In the event that during any Additional Extension a Total Taking shall occur, this Lease and the Term hereof shall terminate on the date of such Total Taking; and in such event the entire award to be made as a result of the Total Taking shall be paid to Mortgagee or to Landlord, in that order; provided, however, that in the event of a Total Taking during any Additional Extension, the Tenant shall be entitled to pursue an award on account of Tenant's leasehold estate hereunder to the extent and only to the extent that such award does

-6-

not reduce the award to which Landlord is or would be entitled in connection with such Total Taking in the event that Tenant did not pursue such an award."

2.18.    The Lease is hereby amended to attach thereto a new Exhibit I which shall be in the form attached to this Amendment as Exhibit I.

2.19.    Section 19.1(d) of the Lease is hereby amended as follows:

(a)    The words "or Mortgagee, as the case may be," are hereby added immediately after the word "Landlord" where it appears in the first (1st) line of Section 19.1(d)(i); and

(b)    The words "or Mortgagee" shall be added immediately after the word "Landlord" where it appears on the second (2nd) line of Section 19.1(d)(i)(B).

2.20.    Section 19.1(e) of the Lease is hereby deleted, and a new Section 19.1(e) is substituted in its place which shall read as follows:

"(e)    Except with respect to an award or payment to which Tenant is entitled pursuant to the provisions of Sections 19.1(b) or 19.1(c) hereof, no agreement with any governmental authority in settlement of or under threat of any Taking shall be made by either Landlord or Tenant without the prior written consent of the other, and of the Mortgagee, if the Demised Premises are then subject to a Mortgage.  Except in the event of a Total Taking as described in Section 19.1(c) above, in no event shall the Basic Rent, additional rent, or any other amount due under or with respect to this Lease be reduced in the event of any Taking."

2.21.    Section 19.2(a)(iii) is hereby amended by deleting the last sentence thereof.

2.22.    Section 19.4 of the Lease is hereby amended as follows:

(a)    Section 19.4(a) of the Lease is hereby amended to add the words "after August 1, 1999," between the words "time" and "and" on the first line thereof, and to insert the word "thereafter" after the word "time" and before the word "during" on the second line of such Section 19.4(a).

(b)    Section 19.4(a)(ii)(B) is hereby amended to read in its entirety as follows:

"(B)    Plat of survey of the Exchange Property on which the improvements thereon are shown in relation to the property lines (which survey shall comply with the standard survey requirements of Mortgagee)."

(c)    Section 19.4(a)(ii)(C) is hereby amended to read in its entirety as follows:

"(C)    Appraisals by members of the American Institute of Real Estate Appraisers in good standing having not less than ten (10) years experience in appraising commercial properties of the same or similar nature, size, use and regional location as the Demised Premises, demonstrating that as of a then reasonably current date (and in the event of a Taking or casualty, a date before such Taking or casualty) (i) the fair market value of the

Exchange Property is at least equal to that of the Demised Premises, and (ii) the expected fair market value of the Exchange Property as of the maturity date of the Mortgage is at least equal to the expected fair market value of the Demised Premises on such maturity date. All values to be determined under this paragraph (C) shall be determined on a vacant and available basis without, in any instance taking into account the existence of this Lease, or any anticipated amendment(s) thereto or substitute lease(s) to be entered into between Landlord and Tenant with respect to the proposed exchange of properties,"

(d)     The proviso at the end of the first sentence of Section 19.4(a)(ii)(D) is hereby amended to read in its entirety as follows:

"provided, however, Mortgagee's consent shall not be granted in any case where the Exchange Property has an operating history of less than two (2) years, and Landlord and Tenant acknowledge and agree that, in such case, this Lease shall remain in full force and effect."

(e)     Section 19.4(a)(ii)(K) is hereby amended to read in its entirety as follows:

"(K)     An Owners Policy and Mortgagee's Policy of title insurance (1970 ALTA-Form B, or such other form as may be requested by Landlord in its reasonable discretion) for the Exchange Property, containing only those exceptions approved by Landlord and with endorsements reasonably requested by Landlord, with coverage equal to or greater than $14,012,500.00," and

(f)     Section 19.4(a)(iii) is hereby amended to add the words "estoppel certificates and agreements from any guarantors of Tenant's obligations under this Lease confirming and ratifying that all guarantees of Tenant's obligations under this Lease shall continue in full force and effect," between the words "Lease," and "a" on the third line of such Section.

(g)     Section 19.4(d) of the Lease is hereby deleted.

2.23.     Section 20(d) of the Lease is hereby amended to read in its entirety as follows:

"(d)     [Deleted]."

2.24.     Section 20(g) of the Lease and the paragraph immediately following such Section 20(g) are hereby amended to read in their entireties as follows (provided, that this shall not amend the provision which was added at the end of Section 20 of the Lease by the First Amendment, which shall remain as therein provided at the end of said Section 20):

"(g)     if Proffitt's or any other guarantor of Tenant's obligations under this Lease shall avail itself or be subject to any of the events described in paragraphs (e) and (f) above;

then and in any such event Landlord at any time thereafter may: (i) terminate this Lease by giving Tenant ten (10) days written notice of Landlord's election to do so, whereupon the Demised Term of this Lease shall expire and terminate by limitation on the date stated in such notice (subject to the provisions of section 24 relating to the survival of Tenant's obligations) and all rights of Tenant under this Lease shall cease; (ii) terminate the right of Tenant to possession of the Demised Premises without terminating this Lease by giving ten (10) days written notice to Tenant that Tenant's right of possession shall end on the date stated in the notice, whereupon the right of Tenant to possession of the Demised Premises or any part thereof shall cease and terminate on the date stated in such notice; and (iii) pursue such other remedies as are available to Landlord at law or in equity on

-8-

account of such Event of Default. All costs and expenses incurred by or on behalf of Landlord, including, without limitation, reasonable attorneys' fees and expenses, occasioned by any Event of Default shall constitute additional rent hereunder. Anything to the contrary contained in this section 20 notwithstanding, if an Event of Default occurs under subsection (c) hereof which (i) is not a material default, (ii) is not an event which, if not cured, will constitute a default under a Mortgage, (iii) cannot result in Landlord being subject to any civil liability, as to which Tenant has not posted adequate security, or any criminal liability, and (iv) cannot result in the Demised Premises or any rent therefrom or any part thereof or interest therein being in imminent danger of being sold, encumbered, forfeited or lost, then in such event, Landlord shall not be entitled to terminate this Lease or Tenant's right to possession of the Demised Premises, but shall be entitled to pursue any other remedy available hereunder or at law or in equity, including, without limitation, its rights under section 31 hereof and its right to maintain an action for damages."

2.25.   Section 21 of the Lease is hereby amended to read in its entirety as follows:

"21.   <u>Repossession, etc. by Landlord</u>.   At any time after the termination of this Lease or Tenant's right to possession pursuant to section 20 or otherwise, Tenant shall surrender possession of and vacate the Demised Premises immediately and deliver possession thereof to Landlord, and Landlord may enter upon and take complete and peaceful possession of the Demised Premises, with or without process of law, full and complete license to do so being hereby granted to Landlord, and Landlord may remove all persons and any and all property therefrom by force, summary proceedings, ejectment or otherwise. Landlord shall be under no liability for or by reason of any such entry, repossession or removal."

2.26.   The first two lines of Section 22 of the Lease are hereby amended to read in their entirety as follows:

"22.   <u>Reletting</u>. After the termination of this Lease or Tenant's right to possession pursuant to section 20 or otherwise, Landlord shall use"

Section 22 of the Lease is hereby further modified by adding the following paragraph to the end of such existing paragraph:

"In any such case the Landlord may make repairs, alterations and additions in or to the Demised Premises and redecorate with same to the extent deemed by Landlord necessary or desirable and in connection with any such reletting, change the locks to the Demised Premises, and Tenant shall, upon demand, pay the cost thereof together with Landlord's expenses of reletting. Landlord may collect the rents from any such reletting and apply the same first to the payment of the expenses of reentry, the attorneys' fees and costs incurred by Landlord in connection with any Event of Default and in connection with such reletting, the expenses of redecoration, repair and alterations and the expenses of reletting, and second to the payment of Basic Rent, additional rent and other sums herein provided to be paid by Tenant, and any excess or residue shall operate only as an offsetting credit against the amount of Basic Rent, additional rent and other sums as the same thereafter become due and payable hereunder, but the use of such offsetting credit to reduce such amounts due Landlord, if any, shall not be deemed to give Tenant any right, title or interest in or to such excess or residue, and any such excess or residue shall belong to Landlord solely. No such re-entry or repossession, repairs, alterations and additions, or reletting shall be construed as an eviction or ouster of the Tenant

or as an election on Landlord's part to terminate this Lease unless a written notice of such intention be given to Tenant, or shall operate to release the Tenant in whole or in part from any of the Tenant's obligations hereunder, and the Landlord may, at any time and from time to time, sue and recover judgment for any deficiencies from time to time remaining after the application from time to time of the proceeds of any such reletting. Landlord and Tenant agree that Landlord's actions in compliance with the terms of this section 22 shall constitute reasonable measure to mitigate the damages to Landlord resulting from an Event of Default."

2.27.    Section 24 of the Lease is hereby amended to read in its entirety as follows:

"24.    Survival of Tenant's Obligations; Damages.

24.1    Termination of Lease Not to Relieve Tenant of Obligations. No termination of Tenant's right of possession or termination of this Lease pursuant to section 20, and no repossession of the Demised Premises or any part thereof pursuant to section 21 or otherwise shall relieve Tenant of its liability and obligations under this section 24, all of which shall survive any such termination or repossession.

24.2    Damages - Termination of Possession. In the event of the termination of Tenant's right to possession of the Demised Premises without terminating this Lease, Tenant shall pay immediately to Landlord the Basic Rent, and all additional rent and other sums required to be paid by Tenant, including, without limitation, the Impositions, up to the time of such termination, as well as all other additional sums payable by the Tenant, or for which Tenant is liable or in respect of which Tenant has agreed to indemnify Landlord under any of the provisions of this Lease which may be then owing and unpaid for the period up to such termination of possession, and all costs and expenses, including court costs and attorneys' fees incurred by Landlord in the enforcement of its rights and remedies hereunder. Additionally, Landlord shall be entitled to recover as liquidated and final damages for loss of the bargain and not as a penalty the aggregate sum which at the time of such termination represents the excess, if any, of the then present value of the Basic Rent, additional rent and other sums to be paid by Tenant under this Lease for the remainder of the Demised Term, over the then present value of the then aggregate fair rental value of the Demised Premises for the balance of the Demised Term, such present value to be computed in each case on the basis of a per annum discount at seven and sixteen one-hundredths percent (7.16%) from the respective dates upon which such amounts would have been payable hereunder had this Lease not been terminated. If any statute or rule of law shall validly limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount of such damages allowable under such statute or rule of law. In addition, Landlord shall have the right, from time to time, to recover from Tenant, and Tenant shall remain liable for, all additional rent and any other sums thereafter accruing as they become due under this Lease during the period from the date of such notice of termination of possession to the stated end of the Demised Term.

24.3    Damages - Termination of Lease. In the event of the termination of this Lease by Landlord as provided in section 20, Landlord shall be entitled to recover from Tenant all of the Basic Rent, additional rent and other sums to be paid by Tenant under this Lease accrued and unpaid for the period up to such termination date, as well as all other additional

-10-

sums payable by the Tenant, or for which Tenant is liable or in respect of which Tenant has agreed to indemnify Landlord under any of the provisions of this Lease which may be then owing and unpaid for the period up to such termination date, and all costs and expenses, including court costs and attorneys' fees incurred by Landlord in the enforcement of its rights and remedies hereunder, and in addition Landlord shall be entitled to recover as liquidated and final damages for loss of the bargain and not as a penalty the aggregate sum which at the time of such termination represents the excess, if any, of the then present value of the Basic Rent, additional rent and other sums to be paid by Tenant under this Lease for the remainder of the Demised Term (determined as if this Lease had not been terminated), over the then present value of the then aggregate fair rental value of the Demised Premises for the balance of the Demised Term (determined as if this Lease had not been terminated), such present value to be computed in each case on the basis of a per annum discount at seven and sixteen one-hundredths percent (7.16%) from the respective dates upon which such amounts would have been payable hereunder had this Lease not been terminated.

If any statute or rule of law shall validly limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount of such damages allowable under such statute or rule of law."

2.28.   The second sentence of Section 26 of the Lease is hereby amended to read in its entirety as follows:

"No assignment of this Lease solely as security for obligations of Landlord shall release Landlord from any of its obligations under this Lease or constitute an assumption of any such obligations on the part of the assignee.

2.29   Section 29(a) of the Lease is hereby amended to read in its entirety as follows:

(a)     Except as provided in paragraphs (b) and (c) of this section 29, Tenant shall not assign or transfer this Lease or sublet all or any part of the Demised Premises without the prior written consent of Landlord and Mortgagee, such consents not to be unreasonably withheld; provided, however, that the prior written consent of Landlord and Mortgagee shall not be required for any assignment or transfer of this Lease at any time or from time to time, whether by operation of law or voluntary assignment, to another corporation or entity which shall acquire or succeed to all or substantially all of the assets, business and good will of Tenant and CPS.

2.30.   Section 39.1 of the Lease is hereby amended to add a new paragraph at the end of said Section which shall read in its entirety as follows:

"Tenant agrees that, if requested by Landlord, it shall enter into a Subordination, Non-Disturbance and Attornment Agreement reasonably requested by Mortgagee, provided such agreement contains provisions relating to non-disturbance in accordance with the provisions of the foregoing paragraph and Tenant hereby agrees for the benefit of any Mortgagee that Tenant will not, (i) without in each case the prior written consent of Mortgagee, which shall not be unreasonably withheld, conditioned or delayed, amend or modify the Lease (provided, however, Mortgagee in Mortgagee's sole discretion may withhold or condition its consent to any amendment or modification which would or could (A) alter in any way the amount or time for payment of any

-11-

Basic Rent, additional rent or other sum payable hereunder, (B) alter in any way the Tenant's obligations hereunder or materially diminish any such obligations, (C) result in any termination hereof prior to the end of the Demised Term, or (D) otherwise, in Mortgagee's reasonable judgment, affect the rights or obligations of Landlord or Tenant hereunder), or enter into any agreement with Landlord so to do, (ii) without the prior written consent of Mortgagee which may be withheld in Mortgagee's sole discretion, cancel or surrender or seek to cancel or surrender the Demised Term hereof, or enter into any agreement with Landlord to do so, or (iii) pay any installment of Basic Rent more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in this Lease."

2.31.   Section 40 of the Lease is hereby amended to read in its entirety as follows:

"40.   Tenant's Purchase Options.

40.1   General.  Tenant shall have the option to purchase the Demised Premises on the following dates (each referred to herein as an "Effective Date"): (a) on July 31, 2008, (b) on July 31, 2014, (c) at the end of the Fixed Term on January 31, 2024, and (d) at the end of each Additional Extension which is properly exercised and becomes effective hereunder; provided, that all of Tenant's rights and options to purchase the Demised Premises under this section 40 of the Lease shall automatically terminate and be null and void if this Lease is terminated for any reason, regardless of whether or not such rights and options have previously been exercised.  Tenant shall give written notice to Landlord of the exercise of such option not less than twenty-four (24) months and not more than twenty-seven (27) months prior to the respective Effective Date.  Upon the giving of such notice, unless the exercise of the option is canceled pursuant to clause (ii) of the fourth sentence of section 40.2 or clause (f) of section 40.3, Tenant shall be obligated to purchase and Landlord shall be obligated to sell, the Demised Premises subject to the provisions set forth hereinbelow.  The purchase price payable by Tenant under this section 40 (the "Option Purchase Price") shall be determined in accordance with the provisions set forth in section 40.2 and shall be paid to Landlord, less the principal amount of any Permitted Mortgages (as hereinafter defined) which are not released at Closing (as hereinafter defined) under this section 40 and less any other adjustments, all as hereinafter provided, in federal reserve funds deposited in Landlord's account at closing.  Closing ("Closing") shall take place as of the Effective Date through an escrow established at Chicago Title and Trust Company, Chicago, Illinois, the terms and provisions of such escrow to be consistent with the terms and provisions hereof.

40.2   Calculation of Option Purchase Price.  The Option Purchase Price for the Demised Premises pursuant to this section 40 shall be equal to the greater of (a) the amount specified on Exhibit J hereto for the respective Effective Date, or (b) the fair market value of the Demised Premises, without taking into account the existence of this Lease and based on then current appraisal methods.  Tenant's notice to Landlord exercising the option to purchase shall be accompanied by an appraisal, prepared by an appraiser who shall be a member of the American Institute of Real Estate Appraisers of the National Association of Realtors, Chicago, Illinois (the "Institute"), familiar with the areas in which the Demised Premises are located, which shall state the opinion of such appraiser as to the fair market value of the Demised Premises as of a date thirty (30) months prior to the respective Effective Date; provided, that if for any reason the Institute is not in existence and functioning at the time of the exercise of Tenant's purchase option hereunder, then the appraisers referred to in this section 40 shall be members of such other nationally recognized appraiser

-12-

certifying or sanctioning organization as may be agreed upon by Landlord and Tenant or, if they cannot agree, as may be designated by the Senior Judge of the United States District Court for the Northern District of Illinois, which organization shall thereafter be the "Institute" for all purposes hereof. Within thirty (30) days after the receipt of Tenant's notice and such appraisal, Landlord may, by notice to Tenant, either accept the fair market value of the Demised Premises as set forth in such appraisal, and, if such fair market value is in excess of the amount specified on Exhibit J hereto for the respective Effective Date, as the Option Purchase Price for the Demised Premises, or reject such appraisal, in which event Landlord may obtain, no later than eighteen (18) months prior to the respective Effective Date, at Landlord's expense, and submit to Tenant, an appraisal by an appraiser who shall be a member of the Institute, such appraiser having been selected by the President of the Institute, familiar with the area in which the Demised Premises is located, which appraisal shall state the opinion of such appraiser as to the fair market value of the Demised Premises as of the date of the appraisal. Tenant shall then have the option, to be exercised by giving written notice to Landlord within five (5) days following receipt of Landlord's appraisal, to (i) accept, as the Option Purchase Price for the Demised Premises, the greater of the amount specified on Exhibit J hereto for the respective Effective Date or the fair market value of the Demised Premises as determined by the higher of the two appraisals, or (ii) cancel the exercise of its option to purchase the Demised Premises as of the respective Effective Date, or (iii) request a third appraisal. If Tenant requests a third appraisal, then an appraiser who shall be a member of the Institute, mutually acceptable to Landlord and Tenant, and familiar with the area in which the Demised Premises is located, shall promptly make an appraisal of the fair market value of the Demised Premises, at Tenant's expense, and shall state, in his opinion, such fair market value thereof, as of the date of such appraisal in accordance with the provisions of this section 40. If Landlord and Tenant cannot agree on such third appraiser within ten (10) days following Landlord's receipt of a request for a third appraisal, then the third appraiser shall be selected by the President of the Institute at the request of either party. Such appraisal shall be delivered to Landlord and Tenant at least fifteen (15) months prior to the respective Effective Date. Upon receipt of the third appraisal by the parties hereto, the Option Purchase Price of the Demised Premises shall be determined as follows: (1) if the third appraisal provided for hereunder is higher than both of the first two appraisals provided for in this section 40, then the Option Purchase Price for the Demised Premises shall be the greater of the amount specified on Exhibit J hereto for the respective Effective Date or the fair market value of the Demised Premises as determined by the higher of said first two appraisals; or (2) if the third appraisal is lower than both of the first two appraisals provided for in this section 40, then the Option Purchase Price for the Demised Premises shall be the greater of the amount specified on Exhibit J hereto for the respective Effective Date or the fair market value of the Demised Premises as determined by the lower of said first two appraisals; or (3) if the third appraisal is greater than the lower of said first two appraisals and less than the higher of said first two appraisals, then the Option Purchase Price for the Demised Premises shall be the greater of the amount specified on Exhibit J hereto for the respective Effective Date or the fair market value of the Demised Premises as determined by the third appraisal.

40.3    Other Terms and Conditions.   Following exercise of the option by Tenant, the following terms and conditions, in addition to those set forth above, shall apply:

(a)    Landlord agrees to convey to Tenant at Closing by special warranty deed (or local equivalent) the Demised Premises free and clear of all liens and encumbrances other than (i) the Permitted Exceptions, (ii) the Permitted Mortgages (as hereinafter defined) other

-13-

than any Replacement Loan (as hereinafter defined) which shall be released at the Closing as hereinafter provided, (iii) liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to observe or perform any of the terms, covenants or agreements herein provided to be observed and performed by Tenant, (iv) any installments of Impositions then affecting the Demised Premises, and (v) this Lease.

(b)     Any documentary, stamp, transfer, conveyance, transactions or similar taxes levied in connection with the foregoing conveyance of the Demised Premises shall be paid by Tenant.

(c)     At Closing, title to the Demised Premises shall be subject only to (i) the Permitted Exceptions, (ii) Mortgages, Assignments of Leases and Rents and related loan documents (collectively, the "Permitted Mortgages") securing (A) the loan to Landlord from Red Mountain Funding, L.L.C. or its successors and assigns, in the original principal amount of $14,012,500.00 (provided, that so long as Tenant has made all payments of Basic Rent, additional rent and other amounts due under this Lease, the unpaid principal and accrued interest of such loan shall be reduced to an amount not in excess of the Option Purchase Price on the respective Effective Date) which is secured by the Demised Premises (the "Red Mountain Loan") or (B) if the lien securing the Red Mountain Loan has been released, other loans which, so long as Tenant has made all payments of Basic Rent, additional rent and other amounts due under this Lease, shall be in an aggregate amount of unpaid principal and accrued interest not in excess of the Option Purchase Price as of the respective Effective Date (the "Replacement Loan") with respect to which Landlord has delivered to Tenant true and correct copies of the note, mortgage and assignment of leases and rents not less than two (2) years prior to the respective Effective Date and which are prepayable without premium or penalty as of the respective Effective Date, (iii) liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to observe or perform any of the terms, covenants or agreements herein provided to be observed and performed by Tenant, (iv) any installments of Impositions then affecting the Demised Premises, and (v) this Lease. At Closing Landlord shall represent and warrant to Tenant by written instrument delivered to Tenant that Landlord is not in default under any of the Permitted Mortgages and the amount of the unpaid principal and accrued interest thereunder as of Closing.  The Demised Premises shall be conveyed pursuant to this section 40 "AS-IS".  Landlord represents and warrants that true and correct copies of the Note and Mortgage evidencing the Red Mountain Loan have been given to Tenant and that the substantive terms of the Red Mountain Loan shall not be changed without Tenant's prior consent.  Any Replacement Loan shall be paid off out of the Option Purchase Price and the lien thereof released at Closing.

(d)     At Closing, Tenant shall be entitled to obtain, if then available, at its expense an ALTA Owner's Policy, Form B-1992 (or what is at Closing the nearest equivalent thereof if such Form B-1992 is no longer in use) of Chicago Title Insurance Company, or other title insurance company designated by Tenant, dated the date of the Closing, insuring Tenant in the amount of the Option Purchase Price that it owns good and marketable title to the Demised Premises subject only to the Permitted Exceptions, any Permitted Mortgages which are not released at Closing, liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to observe or perform any of the terms, covenants or agreements herein provided to be observed and performed by Tenant, any installments of

-14-

Impositions then affecting the Demised Premises, this Lease, and the standard printed exceptions to the Owner's Policy then in use, including an exception(s) for matters which would be removed by obtaining a current survey, such Owner's Policy to have attached thereto the same endorsements as were furnished Landlord at the time of Landlord's purchase of the Demised Premises.

(e)     At Closing, Landlord shall convey to Tenant by good and sufficient Bill of Sale free and clear of all liens and encumbrances (other than those related to the Permitted Mortgages which are not released at Closing) the personal property conveyed to Landlord at the time of Landlord's purchase of the Demised Premises and any renewals or replacements thereof made by Tenant from time to time during the Demised Term less such parts or portions thereof as shall have been abandoned, lost or destroyed during Tenant's occupation and operation of the Demised Premises.

(f)     In the event that, following the exercise by Tenant of its option to purchase the Demised Premises and prior to Closing, the Demised Premises are destroyed or materially damaged by fire or other casualty, or the whole or any part thereof are taken through the exercise of eminent domain or a petition to so condemn is filed, Tenant shall have the option to either (i) cancel the exercise of its option to purchase the Demised Premises by giving Landlord written notice to that effect not more than fifteen (15) days following the date of such destruction, damage, condemnation or receipt by Tenant of notice as to the filing of such petition to condemn, in which event this Lease shall remain in full force and effect, or (ii) proceed to Closing in which event the Option Purchase Price shall not be reduced but Landlord shall pay to Tenant all insurance proceeds or condemnation awards received by Landlord in connection therewith and assign to Tenant all of its right, title and interest in and to any such awards or proceeds not yet paid.

(g)     At Closing, (i) interest on the Permitted Mortgages shall be prorated, prepaid interest being credited to Landlord and interest accrued but unpaid being credited to Tenant, and (ii) Tenant shall pay to Landlord all accrued but unpaid Basic Rent, additional rent and other amounts payable under the terms of this Lease up to and prorated as of the date of Closing.

(h)     At Closing, the interest of Landlord under the Operating Agreement for the Demised Premises and all insurance policies, certificates, licenses, guaranties, warranties and the like covering the Demised Premises and assigned to Landlord by Tenant shall be reassigned (to the extent assignable) to Tenant by good and sufficient instruments of assignment without representation, warranty or recourse whatsoever, and Tenant will assume and agree to perform, and indemnify Landlord with respect to, all obligations thereunder.

(i)     At or prior to Closing, Landlord and Tenant will cooperate with each other by the filing of such certificates, reports or affidavits (A) as may be required by law to avoid withholding of a part of the Purchase Price to satisfy income or other tax requirements, or (B) as may reasonably be required by the title company or the other party to close the transaction as contemplated by this section 40."

-15-

2.32. The Lease is hereby amended to add an Exhibit J thereto which shall be in the form of Exhibit J attached to this Amendment.

2.33. Section 41 of the Lease is hereby amended to read in its entirety as follows:

"41. Liability of Landlord. If Landlord, or any of its successors or assigns, shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, Tenant's sole recourse shall be against the right, title and interest of Landlord in and to the Demised Premises, and the rents or other income from such property receivable by Landlord, subject, nevertheless, to the rights of any Mortgagee, and neither Landlord nor any successor or assign of Landlord nor any of the beneficiaries, trustees, general partners, limited partners, shareholders, officers or directors of Landlord or of any successor or assign of Landlord, shall be personally liable hereunder.

The term "Landlord" as used in this Lease so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners of the Demised Premises or holder of the Mortgage in possession at the time in question of the Demised Premises and, without limiting the effect of any other provisions of this section 41, in the event of any transfer or transfers of the title of the Demised Premises, the Landlord herein named (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer and conveyance of all liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed."

2.34. The Lease is hereby amended by adding a new Section 45 and a new Section 46 thereto which shall read in their entirety as follows:

"45. Hazardous Substances.

(a) Tenant agrees that it will not on, about, or under the Demised Premises, make, treat or dispose of any "hazardous substances" as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, and the rules and regulations promulgated pursuant thereto, as from time to time amended, 42 U.S.C. § 9601 *et seq*. (the "Act"); but the foregoing shall not prevent the use of any hazardous substances in accordance with applicable laws and regulations. Tenant represents and warrants that it will at all times during the Demised Term comply with the Act and any other federal, state or local laws, rules or regulations governing "Hazardous Materials". "Hazardous Materials" as used herein shall mean all chemicals, petroleum, crude oil or any fraction thereof, hydrocarbons, polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials and/or products, urea formaldehyde, or any substances which are classified as "hazardous" or "toxic" under the Act; hazardous waste as defined under the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901; air pollutants regulated under the Clean Air Act, as amended, 42 U.S.C. § 7401, *et seq*.; pollutants as defined under the Clean Water Act, as amended, 33 U.S.C. § 1251, *et seq*., any pesticide as defined by Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. § 136, *et seq*., any hazardous chemical substance or mixture or imminently hazardous substance or mixture regulated by the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, et Seq., any substance listed in the United States Department

of Transportation Table at 45 CFR 172.101; any chemicals included in regulations promulgated under the above listed statutes; any explosives, radioactive material, and any chemical regulated by state statutes similar to the federal statutes listed above and regulations promulgated under such state statutes.

(b) To the extent required by the Act and/or any federal, state or local laws, rules or regulations governing Hazardous Materials, Tenant shall, during the Demised Term, remove any hazardous substances (as defined in the Act) and Hazardous Materials (as defined above) whether now or hereafter existing on the Demised Premises and whether or not arising out of or in any manner connected with Tenant's occupancy of the Demised Premises during the Demised Term. Tenant shall and hereby does agree to defend, indemnify and hold Mortgagee and Landlord, their beneficiaries, trustees, members, managers, officers, directors, shareholders, partners and employees, harmless from and against any and all causes of actions, suits, demands or judgments of any nature whatsoever, losses, damages, penalties, expenses, fees, claims, costs (including, without limitation, response and remedial costs), and liabilities, including, but not limited to, reasonable attorneys' fees and costs, arising out of or in any manner connected with (i) the violation during the Demised Term of any applicable federal, state or local law, rule or regulation pertaining to health, safety or environmental matters with respect to the Demised Premises; (ii) the "release" or "threatened release" of or failure to remove, as required by this section 45, "hazardous substances" (as defined in the Act) and Hazardous Materials (as defined above) from the Demised Premises or any portion or portions thereof, now of hereafter existing during the Demised Term whether or not arising out of or in any manner connected with Tenant's occupancy of the Demised Premises during the Demised Term. The obligations of Tenant under this section 45(b) relating to matters occurring during the Demised Term of this Lease will survive any termination of this Lease.

(c) The Tenant agrees that it will not install any underground storage tank at the Demised Premises without specific, prior written approval from the Landlord. The Tenant agrees that it will not store combustible or flammable materials on the Demised Premises in violation of the Act or any other federal, state or local laws, rules or regulations governing Hazardous Materials."

"46.  Right of First Refusal.  Except in transactions consummated prior to August 1, 1999, Landlord shall not at any time during the Demised Term sell or convey or agree to sell or convey the Demised Premises to an unaffiliated third party without first having complied with the requirements of this section 46.  If Landlord shall desire to sell or convey all or any portion or portions of the Demised Premises to an unaffiliated third party, Landlord shall obtain from such unaffiliated third party a bona fide arms' length written offer (the "Offer"), which Landlord desires to accept, to purchase all or such portion of the Demised Premises; and Landlord shall submit a written copy of the Offer to Tenant and shall give Tenant twenty (20) days within which to elect to purchase the portion of the Demised Premises which is the subject of the Offer (herein called the "Subject Premises") on the precise terms and conditions of the Offer (except that if the Offer shall be in whole or in part for consideration other than cash, Tenant shall have the right to pay in cash the fair market value of such non-cash consideration). If Tenant elects to so purchase the Subject Premises, Tenant shall give to Landlord written notice thereof ("Acceptance Notice") and closing shall

be held within thirty (30) days after the date of the Acceptance Notice, whereupon Landlord shall convey the Subject Premises to Tenant. At closing Landlord shall deliver to Tenant the Subject Premises in accordance with the terms of the Offer and, in any event, subject to all liens or encumbrances created or suffered by Tenant or arising by reason of the failure of Tenant to have observed or performed any term, covenant or agreement herein provided to be observed or performed by Tenant, the lien of any Impositions then affecting the Demised Premises, and this Lease. This right of first refusal shall continue as to all portions of the Demised Premises until such time as such portions shall have been sold by Landlord to the party making the Offer, provided Landlord has complied with its obligations hereunder. In the event Tenant shall elect not to so purchase the Subject Premises, Landlord may thereafter sell the Subject Premises which are the subject of the Offer only to the party making the Offer or its permitted assigns (as specified in such Offer) and only in accordance with the terms thereof, unless a further Offer is submitted to Tenant in accordance with this section 46. If such sale is not consummated within 365 days after notice of the Offer is given to Tenant, Landlord shall again be obligated to offer the Subject Premises to Tenant pursuant to the terms hereof before any sale to an unaffiliated third party Notwithstanding anything to the contrary herein, the provisions of this section 46 shall not apply to any sale or conveyance of the Leased Premises in foreclosure (or similar proceeding) of a bona fide mortgage or deed of trust or to any conveyance in lieu of foreclosure of such a mortgage or deed of trust.

If Landlord shall obtain an Offer with respect to a sale or conveyance of all or any portion of the Demised Premises, and sells the Demised Premises to Tenant, Tenant hereby acknowledges and consents that if the lien of the Mortgage is not released in connection with such sale of the Demised Premises, no merger of title shall occur and this Lease and any guaranty of this Lease will remain in full force and effect in accordance with their terms.

2.35. All references in the Lease to the "Beneficiary" of the Land Trust described therein shall hereafter be deemed to mean and refer to the Landlord.

2.36. The references to "section 11.2" in the introductory paragraph of Section 19.4(a) and in Section 29(d) of the Lease are hereby amended to read "section 11.1" in both such places.

3. No Further Effect. The Lease as amended and modified by this Amendment is hereby ratified by Landlord and Tenant. Except as expressly set forth in this Amendment, the Lease shall not be amended, modified, or supplemented and shall remain in full force and effect.

4. Consent. Tenant hereby consents to the assignment of the Lease by the Former Landlord to the Landlord and agrees that it shall perform all of its obligations under the Lease, as amended by this Amendment, to and for the benefit of the Landlord as fully as if it were the original Landlord named in the Lease, as amended hereby.

5. Addresses for Notice. Section 42 of the Lease is hereby amended to provide that (a) Landlord's address for notice shall be as follows:

WEC 98C-4 LLC
6750 LBJ Freeway, Suite 1100
Dallas, Texas 75240
Attn: Greg L. England
Facsimile No.: 972/716-6397

With a copy to:    Liechty & McGinnis, P.C.
10440 North Central Expressway, Suite 1100
Dallas, Texas 75231
Attn: Lorne O. Liechty, Esq.
Facsimile No.: 214/265-0615

and (b) Tenant's address for notice shall be as follows:

CPS Department Stores, Inc.
331 W. Wisconsin Avenue
Milwaukee, Wisconsin 53203
Attn: Senior Vice President Real Estate

With copies to:    CPS Department Stores, Inc.
5810 Shelby Oaks Drive
Memphis, Tennessee 38134
Attn: Eric Steven Faires

CPS Department Stores, Inc.
750 Lakeshore Parkway
Birmingham, Alabama 35211
Attn: General Counsel

CPS Department Stores, Inc.
750 Lakeshore Parkway
Birmingham, Alabama 35211
Attn: Lease Administration Manager

The foregoing address of the Landlord shall also be the address to which Basic Rent and all other amounts due to Landlord from Tenant under the Lease shall be paid, unless otherwise designated by Landlord pursuant to Section 3.1 of the Lease.

6.    <u>Representations and Warranties of Tenant</u>. As an inducement to Landlord to enter into this Amendment, Tenant hereby represents and warrants the following to Landlord with respect to the Lease (all references to the Lease in this Section 6 shall mean and refer to the Lease as the same is amended by this Amendment):

(a)    True and correct copies of the Original Lease and the First Amendment are attached to this Amendment. The Lease is in full force and effect; there are no amendments or modifications of any kind to the Original Lease except for the First Amendment and this Amendment; there are no other promises, agreements, understandings or commitments between Landlord and Tenant relating to the Demised Premises

-19-

except as set forth in Section 6(m) below; and Tenant has not given Landlord any notice of termination thereunder. There is currently no exchange under Section 19.4 of the Lease pending or contemplated by Tenant.

(b) Except for subleases or licenses entered into by Tenant in accordance with Section 29(b) of the Lease, there has not been and is now no subletting of the Demised Premises, or any part thereof, or assignment by Tenant of the Lease, or any rights therein, to any party and Tenant continues to be in occupancy of the Demised Premises. Tenant has not assigned, transferred, mortgaged, pledged or otherwise encumbered its interest in the Lease.

(c) No uncured default, Event of Default, or breach by Tenant or, to Tenant's knowledge, by Landlord exists under the Lease, and no facts or circumstances exist that, with notice or the passage of time or both will or could constitute a default, Event of Default, or breach of Tenant or, to Tenant's knowledge, Landlord, under the Lease. Tenant has made no claim against Landlord alleging Landlord's default under the Lease.

(d) Tenant has accepted the Demised Premises, and all common areas of the Demised Premises (including, without limitation, parking areas, sidewalks, access ways and landscaping), if any, are in compliance with the Lease and are satisfactory for Tenant's purposes.

(e) To the best of Tenant's knowledge and belief, there are no rental, lease, or similar commissions payable with respect to the Lease.

(f) Tenant is current with respect to, and is paying the full rent and other charges stipulated in the Lease (including, without limitation, Basic Rent and additional rent) and, to the extent any such rights are expressly provided in the Lease, Tenant has no knowledge of any currently existing rights of abatement, offsets, reductions, deductions, defenses or claims whatsoever; and Tenant has not prepaid any rent or other amounts to Landlord other than rent and other charges due and payable in the calendar month of this Amendment.

(g) The undersigned representative of Tenant is duly authorized and fully qualified to execute this instrument on behalf of Tenant thereby binding Tenant.

(h) Tenant has no outstanding options, rights of first refusal or rights of first offer to purchase the Demised Premises or any part thereof or any property of which the Demised Premises are a part, or any part thereof except as set forth in the Lease.

(i) No voluntary actions or, to Tenant's best knowledge, involuntary actions are pending against Tenant under the bankruptcy laws of the United States or any state thereof.

(j) There are no proceedings pending or, to Tenant's knowledge, threatened against Tenant before or by any court or administrative agency which, if adversely decided, could materially and adversely affect the financial conditions or operations of Tenant or any guarantor of Tenant's obligations under the Lease.

(k) Tenant is the owner and holder of all right, title and interest in the leasehold estate created by the Lease.

(l)    Landlord does not hold a security deposit from Tenant in connection with the Lease.

(m)    That certain Letter Agreement dated April 21, 1993, between Illinois Partners Limited Partnership and CPS Realty Partnership has been incorporated into the First Amendment. Any rights of the Tenant to a setoff under the second paragraph and any other provision of such Letter Agreement are hereby declared to be null and void and of no further force and effect unless expressly included within the First Amendment; provided, however, that without limitation of any other representations and warranties set forth in this Section 6 or any other provisions of this Amendment or any provisions of the Lease, Landlord and Tenant acknowledge that the provisions of Paragraph 6 of said Letter Agreement have not been terminated, and agree that Landlord shall have no obligations or liabilities whatsoever with respect to or arising under said Paragraph 6.

(n)    To Tenant's knowledge, the loans secured by the Existing Mortgages referred to in the Original Lease have been paid in full.

7.    Memorandum of Lease. Landlord and Tenant agree to enter into a revised Memorandum of Lease reflecting the modifications to the terms of the Lease as set forth in this Amendment. The form of the Memorandum of Lease shall be reasonably acceptable to both Landlord and Tenant.

8.    Counterparts. To facilitate execution, this Amendment may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature or acknowledgment of, or on behalf of, each party, or that the signature of all persons required to bind any party, or the acknowledgment of such party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Amendment to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, and the respective acknowledgments of, each of the parties hereto. Any signature or acknowledgment page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures or acknowledgments thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature or acknowledgment pages.

IN WITNESS WHEREOF, the undersigned have executed this Amendment effective as of the date first set forth above.

> WEC 98C-4 LLC,
> a Texas limited liability company
>
> By:    Wolverine 98C-4, Inc., a Texas corporation,
>        its sole manager
>
> By: _____
> Its: _____

CPS DEPARTMENT STORES, INC.,
**a** Delaware corporation

By:_____

Its:_____

D:\WOLVERIN\CARSON\RIVERSID\LSEAMD2.2ND

**EXHIBIT B-1**

**Annual Basic Rent**

| Period | Annual Basic Rent Amount | |
|---|---|---|
| 8/ _1_ /98 - 7/31/99 | $1,069,586.00 | |
| 8/1/99 - 7/31/08 | $1,132,502.00 | |
| (8/1/08 - 1/31/24) | $1,179,690.00 | /12 = 98,307.50 |
| First Extension (2/1/24 - 1/31/29) | $1,215,081.00 | |
| Second Extension (2/1/29 - 1/31/34) | $1,250,471.00 | |
| Third Extension (2/1/34 - 1/31/39) | $1,285,862.00 | |
| Fourth Extension (2/1/39 - 1/31/44) | $1,321,253.00 | |
| Fifth Extension (2/1/44 - 1/31/49) | $1,356,644.00 | |

**EXHIBIT I**

<u>Condemnation Purchase Price Schedule</u>

[attached hereto]

| original loan | $ 14,012,500 | **EXHIBIT I** | **RIVERSIDE** |

**Purchase Price Schedule**

| Month | | Purchase Price | Month | | Purchase Price |
|---|---|---|---|---|---|
| 1 | 9/1/1998 | $ 14,012,500 | 47 | 7/1/2002 | $ 13,586,125 |
| 2 | 10/1/1998 | $ 14,007,242 | 48 | 8/1/2002 | $ 13,575,798 |
| 3 | 11/1/1998 | $ 14,004,739 | 49 | 9/1/2002 | $ 13,565,408 |
| 4 | 12/1/1998 | $ 13,999,435 | 50 | 10/1/2002 | $ 13,552,255 |
| 5 | 1/1/1999 | $ 13,996,884 | 51 | 11/1/2002 | $ 13,541,719 |
| 6 | 2/1/1999 | $ 13,994,317 | 52 | 12/1/2002 | $ 13,528,425 |
| 7 | 3/1/1999 | $ 13,983,384 | 53 | 1/1/2003 | $ 13,517,743 |
| 8 | 4/1/1999 | $ 13,980,734 | 54 | 2/1/2003 | $ 13,506,994 |
| 9 | 5/1/1999 | $ 13,975,287 | 55 | 3/1/2003 | $ 13,488,120 |
| 10 | 6/1/1999 | $ 13,972,587 | 56 | 4/1/2003 | $ 13,477,189 |
| 11 | 7/1/1999 | $ 13,967,091 | 57 | 5/1/2003 | $ 13,463,510 |
| 12 | 8/1/1999 | $ 13,959,113 | 58 | 6/1/2003 | $ 13,452,427 |
| 13 | 9/1/1999 | $ 13,951,086 | 59 | 7/1/2003 | $ 13,438,600 |
| 14 | 10/1/1999 | $ 13,940,234 | 60 | 8/1/2003 | $ 13,427,364 |
| 15 | 11/1/1999 | $ 13,932,091 | 61 | 9/1/2003 | $ 13,416,058 |
| 16 | 12/1/1999 | $ 13,921,126 | 62 | 10/1/2003 | $ 13,402,014 |
| 17 | 1/1/2000 | $ 13,912,865 | 63 | 11/1/2003 | $ 13,390,552 |
| 18 | 2/1/2000 | $ 13,904,552 | 64 | 12/1/2003 | $ 13,376,356 |
| 19 | 3/1/2000 | $ 13,890,658 | 65 | 1/1/2004 | $ 13,364,736 |
| 20 | 4/1/2000 | $ 13,882,208 | 66 | 2/1/2004 | $ 13,353,044 |
| 21 | 5/1/2000 | $ 13,870,946 | 67 | 3/1/2004 | $ 13,335,969 |
| 22 | 6/1/2000 | $ 13,862,375 | 68 | 4/1/2004 | $ 13,324,099 |
| 23 | 7/1/2000 | $ 13,850,994 | 69 | 5/1/2004 | $ 13,309,507 |
| 24 | 8/1/2000 | $ 13,842,300 | 70 | 6/1/2004 | $ 13,297,475 |
| 25 | 9/1/2000 | $ 13,833,553 | 71 | 7/1/2004 | $ 13,282,723 |
| 26 | 10/1/2000 | $ 13,822,000 | 72 | 8/1/2004 | $ 13,270,526 |
| 27 | 11/1/2000 | $ 13,813,128 | 73 | 9/1/2004 | $ 13,258,253 |
| 28 | 12/1/2000 | $ 13,801,453 | 74 | 10/1/2004 | $ 13,243,268 |
| 29 | 1/1/2001 | $ 13,792,454 | 75 | 11/1/2004 | $ 13,230,827 |
| 30 | 2/1/2001 | $ 13,783,399 | 76 | 12/1/2004 | $ 13,215,678 |
| 31 | 3/1/2001 | $ 13,766,064 | 77 | 1/1/2005 | $ 13,203,067 |
| 32 | 4/1/2001 | $ 13,756,847 | 78 | 2/1/2005 | $ 13,190,378 |
| 33 | 5/1/2001 | $ 13,744,836 | 79 | 3/1/2005 | $ 13,169,741 |
| 34 | 6/1/2001 | $ 13,735,488 | 80 | 4/1/2005 | $ 13,156,847 |
| 35 | 7/1/2001 | $ 13,723,350 | 81 | 5/1/2005 | $ 13,141,256 |
| 36 | 8/1/2001 | $ 13,713,869 | 82 | 6/1/2005 | $ 13,128,187 |
| 37 | 9/1/2001 | $ 13,704,330 | 83 | 7/1/2005 | $ 13,112,425 |
| 38 | 10/1/2001 | $ 13,692,006 | 84 | 8/1/2005 | $ 13,099,178 |
| 39 | 11/1/2001 | $ 13,682,332 | 85 | 9/1/2005 | $ 13,085,848 |
| 40 | 12/1/2001 | $ 13,669,877 | 86 | 10/1/2005 | $ 13,069,834 |
| 41 | 1/1/2002 | $ 13,660,067 | 87 | 11/1/2005 | $ 13,056,324 |
| 42 | 2/1/2002 | $ 13,650,196 | 88 | 12/1/2005 | $ 13,040,134 |
| 43 | 3/1/2002 | $ 13,632,119 | 89 | 1/1/2006 | $ 13,026,441 |
| 44 | 4/1/2002 | $ 13,622,076 | 90 | 2/1/2006 | $ 13,012,663 |
| 45 | 5/1/2002 | $ 13,609,261 | 91 | 3/1/2006 | $ 12,991,036 |
| 46 | 6/1/2002 | $ 13,599,077 | 92 | 4/1/2006 | $ 12,977,040 |

## EXHIBIT I          RIVERSIDE
### Purchase Price Schedule

| Month | | Purchase Price | Month | | Purchase Price |
|---|---|---|---|---|---|
| 93 | 5/1/2006 | $ 12,960,377 | 142 | 6/1/2010 | $ 11,977,492 |
| 94 | 6/1/2006 | $ 12,946,192 | 143 | 7/1/2010 | $ 11,950,944 |
| 95 | 7/1/2006 | $ 12,929,345 | 144 | 8/1/2010 | $ 11,926,615 |
| 96 | 8/1/2006 | $ 12,914,969 | 145 | 9/1/2010 | $ 11,902,136 |
| 97 | 9/1/2006 | $ 12,900,504 | 146 | 10/1/2010 | $ 11,875,138 |
| 98 | 10/1/2006 | $ 12,883,384 | 147 | 11/1/2010 | $ 11,850,342 |
| 99 | 11/1/2006 | $ 12,868,724 | 148 | 12/1/2010 | $ 11,823,035 |
| 100 | 12/1/2006 | $ 12,851,414 | 149 | 1/1/2011 | $ 11,797,917 |
| 101 | 1/1/2007 | $ 12,836,558 | 150 | 2/1/2011 | $ 11,772,645 |
| 102 | 2/1/2007 | $ 12,821,609 | 151 | 3/1/2011 | $ 11,740,192 |
| 103 | 3/1/2007 | $ 12,798,918 | 152 | 4/1/2011 | $ 11,714,563 |
| 104 | 4/1/2007 | $ 12,783,738 | 153 | 5/1/2011 | $ 11,686,446 |
| 105 | 5/1/2007 | $ 12,765,921 | 154 | 6/1/2011 | $ 11,660,486 |
| 106 | 6/1/2007 | $ 12,750,512 | 155 | 7/1/2011 | $ 11,632,047 |
| 107 | 7/1/2007 | $ 12,732,523 | 156 | 8/1/2011 | $ 11,605,752 |
| 108 | 8/1/2007 | $ 12,716,933 | 157 | 9/1/2011 | $ 11,579,294 |
| 109 | 9/1/2007 | $ 12,701,247 | 158 | 10/1/2011 | $ 11,550,371 |
| 110 | 10/1/2007 | $ 12,682,938 | 159 | 11/1/2011 | $ 11,523,572 |
| 111 | 11/1/2007 | $ 12,667,042 | 160 | 12/1/2011 | $ 11,494,315 |
| 112 | 12/1/2007 | $ 12,648,530 | 161 | 1/1/2012 | $ 11,467,171 |
| 113 | 1/1/2008 | $ 12,632,422 | 162 | 2/1/2012 | $ 11,439,859 |
| 114 | 2/1/2008 | $ 12,616,215 | 163 | 3/1/2012 | $ 11,407,828 |
| 115 | 3/1/2008 | $ 12,594,889 | 164 | 4/1/2012 | $ 11,380,150 |
| 116 | 4/1/2008 | $ 12,578,451 | 165 | 5/1/2012 | $ 11,350,038 |
| 117 | 5/1/2008 | $ 12,559,409 | 166 | 6/1/2012 | $ 11,322,004 |
| 118 | 6/1/2008 | $ 12,542,752 | 167 | 7/1/2012 | $ 11,291,545 |
| 119 | 7/1/2008 | $ 12,523,498 | 168 | 8/1/2012 | $ 11,263,150 |
| 120 | 8/1/2008 | $ 12,502,699 | 169 | 9/1/2012 | $ 11,234,580 |
| 121 | 9/1/2008 | $ 12,481,771 | 170 | 10/1/2012 | $ 11,203,600 |
| 122 | 10/1/2008 | $ 12,458,232 | 171 | 11/1/2012 | $ 11,174,663 |
| 123 | 11/1/2008 | $ 12,437,031 | 172 | 12/1/2012 | $ 11,143,325 |
| 124 | 12/1/2008 | $ 12,413,225 | 173 | 1/1/2013 | $ 11,114,016 |
| 125 | 1/1/2009 | $ 12,391,746 | 174 | 2/1/2013 | $ 11,084,527 |
| 126 | 2/1/2009 | $ 12,370,135 | 175 | 3/1/2013 | $ 11,048,242 |
| 127 | 3/1/2009 | $ 12,341,009 | 176 | 4/1/2013 | $ 11,018,347 |
| 128 | 4/1/2009 | $ 12,319,085 | 177 | 5/1/2013 | $ 10,986,076 |
| 129 | 5/1/2009 | $ 12,294,575 | 178 | 6/1/2013 | $ 10,955,798 |
| 130 | 6/1/2009 | $ 12,272,365 | 179 | 7/1/2013 | $ 10,923,154 |
| 131 | 7/1/2009 | $ 12,247,576 | 180 | 8/1/2013 | $ 10,892,488 |
| 132 | 8/1/2009 | $ 12,225,076 | 181 | 9/1/2013 | $ 10,861,633 |
| 133 | 9/1/2009 | $ 12,202,437 | 182 | 10/1/2013 | $ 10,828,427 |
| 134 | 10/1/2009 | $ 12,177,231 | 183 | 11/1/2013 | $ 10,797,177 |
| 135 | 11/1/2009 | $ 12,154,297 | 184 | 12/1/2013 | $ 10,763,587 |
| 136 | 12/1/2009 | $ 12,128,804 | 185 | 1/1/2014 | $ 10,731,937 |
| 137 | 1/1/2010 | $ 12,105,572 | 186 | 2/1/2014 | $ 10,700,092 |
| 138 | 2/1/2010 | $ 12,082,196 | 187 | 3/1/2014 | $ 10,661,666 |
| 139 | 3/1/2010 | $ 12,051,467 | 188 | 4/1/2014 | $ 10,629,387 |
| 140 | 4/1/2010 | $ 12,027,757 | 189 | 5/1/2014 | $ 10,594,796 |
| 141 | 5/1/2010 | $ 12,001,509 | 190 | 6/1/2014 | $ 10,562,105 |

EXHIBIT I          RIVERSIDE

## Purchase Price Schedule

| Month | | Purchase Price | Month | | Purchase Price |
|---|---|---|---|---|---|
| 191 | 7/1/2014 | $ 10,527,112 | 240 | 8/1/2018 | $ 8,579,999 |
| 192 | 8/1/2014 | $ 10,494,004 | 241 | 9/1/2018 | $ 8,534,886 |
| 193 | 9/1/2014 | $ 10,460,692 | 242 | 10/1/2018 | $ 8,487,797 |
| 194 | 10/1/2014 | $ 10,425,094 | 243 | 11/1/2018 | $ 8,442,116 |
| 195 | 11/1/2014 | $ 10,391,357 | 244 | 12/1/2018 | $ 8,394,474 |
| 196 | 12/1/2014 | $ 10,355,346 | 245 | 1/1/2019 | $ 8,348,217 |
| 197 | 1/1/2015 | $ 10,321,179 | 246 | 2/1/2019 | $ 8,301,675 |
| 198 | 2/1/2015 | $ 10,286,801 | 247 | 3/1/2019 | $ 8,249,892 |
| 199 | 3/1/2015 | $ 10,246,074 | 248 | 4/1/2019 | $ 8,202,744 |
| 200 | 4/1/2015 | $ 10,211,233 | 249 | 5/1/2019 | $ 8,153,674 |
| 201 | 5/1/2015 | $ 10,174,147 | 250 | 6/1/2019 | $ 8,105,932 |
| 202 | 6/1/2015 | $ 10,138,862 | 251 | 7/1/2019 | $ 8,056,284 |
| 203 | 7/1/2015 | $ 10,101,344 | 252 | 8/1/2019 | $ 8,007,942 |
| 204 | 8/1/2015 | $ 10,065,611 | 253 | 9/1/2019 | $ 7,959,302 |
| 205 | 9/1/2015 | $ 10,029,658 | 254 | 10/1/2019 | $ 7,908,779 |
| 206 | 10/1/2015 | $ 9,991,488 | 255 | 11/1/2019 | $ 7,859,527 |
| 207 | 11/1/2015 | $ 9,955,077 | 256 | 12/1/2019 | $ 7,808,409 |
| 208 | 12/1/2015 | $ 9,916,463 | 257 | 1/1/2020 | $ 7,758,539 |
| 209 | 1/1/2016 | $ 9,879,590 | 258 | 2/1/2020 | $ 7,708,361 |
| 210 | 2/1/2016 | $ 9,842,489 | 259 | 3/1/2020 | $ 7,654,808 |
| 211 | 3/1/2016 | $ 9,801,245 | 260 | 4/1/2020 | $ 7,603,990 |
| 212 | 4/1/2016 | $ 9,763,662 | 261 | 5/1/2020 | $ 7,551,348 |
| 213 | 5/1/2016 | $ 9,723,905 | 262 | 6/1/2020 | $ 7,499,892 |
| 214 | 6/1/2016 | $ 9,685,845 | 263 | 7/1/2020 | $ 7,446,628 |
| 215 | 7/1/2016 | $ 9,645,623 | 264 | 8/1/2020 | $ 7,394,527 |
| 216 | 8/1/2016 | $ 9,607,081 | 265 | 9/1/2020 | $ 7,342,105 |
| 217 | 9/1/2016 | $ 9,568,300 | 266 | 10/1/2020 | $ 7,287,900 |
| 218 | 10/1/2016 | $ 9,527,378 | 267 | 11/1/2020 | $ 7,234,820 |
| 219 | 11/1/2016 | $ 9,488,106 | 268 | 12/1/2020 | $ 7,179,974 |
| 220 | 12/1/2016 | $ 9,446,705 | 269 | 1/1/2021 | $ 7,126,230 |
| 221 | 1/1/2017 | $ 9,406,935 | 270 | 2/1/2021 | $ 7,072,153 |
| 222 | 2/1/2017 | $ 9,366,921 | 271 | 3/1/2021 | $ 7,013,524 |
| 223 | 3/1/2017 | $ 9,321,071 | 272 | 4/1/2021 | $ 6,958,753 |
| 224 | 4/1/2017 | $ 9,280,527 | 273 | 5/1/2021 | $ 6,902,260 |
| 225 | 5/1/2017 | $ 9,237,887 | 274 | 6/1/2021 | $ 6,846,803 |
| 226 | 6/1/2017 | $ 9,196,830 | 275 | 7/1/2021 | $ 6,789,642 |
| 227 | 7/1/2017 | $ 9,153,691 | 276 | 8/1/2021 | $ 6,733,490 |
| 228 | 8/1/2017 | $ 9,112,116 | 277 | 9/1/2021 | $ 6,676,992 |
| 229 | 9/1/2017 | $ 9,070,283 | 278 | 10/1/2021 | $ 6,618,818 |
| 230 | 10/1/2017 | $ 9,026,389 | 279 | 11/1/2021 | $ 6,561,614 |
| 231 | 11/1/2017 | $ 8,984,028 | 280 | 12/1/2021 | $ 6,502,751 |
| 232 | 12/1/2017 | $ 8,939,620 | 281 | 1/1/2022 | $ 6,444,831 |
| 233 | 1/1/2018 | $ 8,896,724 | 282 | 2/1/2022 | $ 6,386,553 |
| 234 | 2/1/2018 | $ 8,853,564 | 283 | 3/1/2022 | $ 6,324,106 |
| 235 | 3/1/2018 | $ 8,804,855 | 284 | 4/1/2022 | $ 6,265,084 |
| 236 | 4/1/2018 | $ 8,761,128 | 285 | 5/1/2022 | $ 6,204,452 |
| 237 | 5/1/2018 | $ 8,715,389 | 286 | 6/1/2022 | $ 6,144,692 |
| 238 | 6/1/2018 | $ 8,671,111 | 287 | 7/1/2022 | $ 6,083,342 |
| 239 | 7/1/2018 | $ 8,624,835 | 288 | 8/1/2022 | $ 6,022,836 |

## EXHIBIT I     RIVERSIDE
### Purchase Price Schedule

| Month | | Purchase Price |
|---|---|---|
| 289 | 9/1/2022 | $ 5,961,957 |
| 290 | 10/1/2022 | $ 5,899,516 |
| 291 | 11/1/2022 | $ 5,837,877 |
| 292 | 12/1/2022 | $ 5,774,696 |
| 293 | 1/1/2023 | $ 5,712,287 |
| 294 | 2/1/2023 | $ 5,649,493 |
| 295 | 3/1/2023 | $ 5,582,941 |
| 296 | 4/1/2023 | $ 5,519,349 |
| 297 | 5/1/2023 | $ 5,454,268 |
| 298 | 6/1/2023 | $ 5,389,883 |
| 299 | 7/1/2023 | $ 5,324,029 |
| 300 | 8/1/2023 | $ 5,258,841 |
| 301 | 9/1/2023 | $ 5,193,251 |
| 302 | 10/1/2023 | $ 5,126,224 |
| 303 | 11/1/2023 | $ 5,059,817 |
| 304 | 12/1/2023 | $ 4,991,994 |
| 305 | 1/1/2024 | $ 4,924,759 |

## EXHIBIT J

### Minimum Option Purchase Price

The amount specified in subpart (a) of the first sentence of section 40.2 of the Lease shall be the following respective amounts for the respective Effective Dates:

| | | |
|---|---|---|
| 1. | For the Effective Date of July 31, 2008: | $13,669,917.00; |
| 2. | For the Effective Date of July 31, 2014: | $11,656,091.00; and |
| 3. | For the Effective Date of January 31, 2024, and any Effective Date thereafter: | $6,300,590.00. |

## EXHIBIT K

### Permitted Exceptions

1. Taxes for 1997 and 1998 and subsequent years.

2. Amended and Restated Short Form of Lease and of Option to Purchase by and between WEC 98C-4 LLC, a Texas limited liability company, as Landlord, and CPS Department Stores, as Tenant, evidencing that certain unrecorded lease between Chicago Title and Trust Company, as Trustee under a Trust Agreement dated June 15, 1985 (as amended, modified or assigned, the "Lease"), and known as Trust No. 1085900 ("Trust") and Six Anchors Limited Partnership, a Maryland limited partnership, collectively as Landlord, and CPS Realty Partnership an Illinois general partnership ("CPS Realty Partnership"), as Tenant, as amended by (i) Amendment of Lease dated effective as of August 1, 1993, but executed on February 1, 1994, between Trust and Illinois Partners Limited Partnership (formerly named Six Anchors Limited Partnership), a Maryland limited partnership ("Illinois Partners"), as Landlord, and CPS Department Stores, Inc., a Delaware corporation ("CPS Department Stores"), as successor to CPS Realty Partnership, as Tenant, and (ii) Second Amendment to Lease dated as of July __, 1998, by and between WEC 98C-4 LLC, a Texas limited liability company, as successor to Trust and Illinois Partners, as Landlord, and CPS Department Stores, as Tenant; the transfer of interest from CPS Realty Partnership to CPS Holding Co. and to CPS Department Stores being evidenced by Assignments and Assumptions of Leases, Ground Leases and Agreements being recorded in Document Nos. 03013980 and 03013983, Cook County, Illinois.

3. Easement dated June 11, 1971 and recorded March 9, 1973 as Document 22245779 granted by the Lutheran Church-Missouri Synod to the Village of North Riverside, a Municipal corporation of Illinois, a perpetual non-exclusive easement to construct, install, establish, operate, repair and replace a water pipeline under the North 20 feet of Parcels 1 and 2 which is the 20 feet South and adjoining the South line of West Cermak Road.

4. Easements and agreements set forth in the Reciprocal Operation and Easement Agreement dated December 6, 1973, and recorded January 2, 1974 as Document 22584954.

   First Amendment recorded January 7, 1976 as Document 23346268.

   Second Amendment recorded November 23, 1976 as Document 23721362.

   Third Amendment recorded January 5, 1993 as Document 93005191.

   Fourth Amendment recorded October 22, 1996 as Document 96803440.

   Assigned by Carson Pirie Scott & Company and Lathrop Avenue Corporation to Chicago Title and Trust Company, as Trustee under Trust No. 1085900 by Document 85261577.

   Reassigned from Chicago Title and Trust Company, as Trustee under Trust No. 1085900 to Carson Pirie Scott & Company and CPS Realty Partnership by Document 85261578.

5. Terms, agreements, provisions conditions and limitations contained in the Lease dated February 9, 1973 and recorded January 2, 1974 as Document No. 22584954, and all rights thereunder of said Lessors, their heirs, executors, administrators, and assigns, including rents and all other charges reserved.

# Exhibit B

2198-13789-nbu-slc

98700246

9217/0118 03 001 Page 1 of 10
1998-08-10 10:11:04
Cook County Recorder          75.00

# ASSIGNMENT OF LEASE AND RENTS

**WEC 98C-4, LLC,**

(Assignor)

to

**RED MOUNTAIN FUNDING, L.L.C.,**

(Assignee)

Dated: August 5th, 1998

**This instrument prepared by and upon
recordation should be returned to:**

Burr & Forman LLP
One Georgia Center, Suite 1200
600 W. Peachtree Street
Atlanta, Georgia  30308
Attention:  Gary W. Farris, Esq.

Location: Cermak Road/26th Street, North Riverside, Illinois

Tax Parcel Number: 15-25-200-004

# BOX 333-CTI

26912.3

This **ASSIGNMENT OF LEASE AND RENTS** (herein, together with all modifications, supplements and amendments hereto, called this "Assignment"), dated as of August 5th, 1998 made by **WEC 98C-4 LLC**, a Texas limited liability company having an office at 6750 LBJ Freeway, Suite 1100, Dallas, Texas 75240 ("Borrower") to **RED MOUNTAIN FUNDING, L.L.C.**, a Delaware limited liability company having an address at 420 North 20th Street, 9th Floor, Birmingham, Alabama 35203 ("Lender").

W I T N E S S E T H:

**WHEREAS**, CPS Department Stores, Inc., a Delaware corporation ("Lessee"), is the current lessee under a Lease Agreement dated October 31, 1985 (hereinafter, as heretofore amended by an Amendment of Lease dated as of August 1, 1993, and as further amended and extended by Second Amendment to Lease of even date herewith, and as it may hereafter from time to time be modified, supplemented or amended, called the "Lease") covering the lot(s) or parcel(s) of land described in **Exhibit A** annexed hereto and made a part hereof, together with the easements, rights and appurtenances appertaining thereto (the "Land"), all buildings and other improvements now or hereafter located thereon (the "Improvements") and the machinery and equipment which is owned by Borrower and attached to the Improvements (the "Equipment"), all as more particularly described in the Security Instrument (as hereinafter defined) the Land, the Improvements and the Equipment are hereinafter referred to collectively as (the "Mortgaged Property");

**WHEREAS**, Borrower has purchased the Mortgaged Property subject to the Lease, and in connection therewith the existing lessor under the Lease has transferred and assigned to Borrower, and Borrower has assumed, all of the lessor's right, title, and interest in and to the Lease;

**WHEREAS**, contemporaneously with Borrower's purchase of the Mortgaged Property, Proffitt's, Inc., a Delaware corporation ("Lease Guarantor") has executed and delivered to Borrower a Corporate Guaranty of even date herewith (the "Lease Guaranty") pursuant to which Lease Guarantor guarantees the prompt payment and performance of all obligations of Lessee under the Lease;

**WHEREAS,** contemporaneously with the execution of this Assignment, Lender is making a mortgage loan to Borrower in the principal amount of $14,012,500.00 (the "Loan") as evidenced by a Promissory Note dated as of the date hereof by Borrower to Lender (the "Note") and secured by a Mortgage, Security Agreement and Assignment of Leases and Rents of even date herewith by Borrower for the benefit of Lender, covering the Mortgaged Property (the "Security Instrument"); and

**WHEREAS**, Borrower has agreed to execute and deliver this Assignment for the purpose of securing the payment of the principal of, interest on, premium (if any) and all other amounts payable in respect of the Note and the Security Instrument and the performance of the covenants and agreements contained herein and in the Note and the Security Instrument (collectively, the "Obligations");

**NOW, THEREFORE**, in consideration of the foregoing, and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. Borrower, as security for the Obligations, has assigned, transferred, conveyed and set over, and by these presents does hereby presently, unconditionally and irrevocably assign, transfer, convey and set over to Lender, all of Borrower's estate, right, title and interest in, to and under the Lease and the Lease Guaranty, together with all rights, powers, privileges, options and

other benefits of Borrower, as the lessor under the Lease and as beneficiary of the Lease Guaranty, and together with any and all other leases, subleases, if and to the extent that Borrower has an interest therein pursuant to the Lease, licenses, rental agreements and occupancy agreements of whatever form now or hereafter affecting all or any part of the Mortgaged Property, including, without limitation, the immediate and continuing right:

      (a)    to make claim for, receive and collect (and to apply the same to the payment of the Obligations) all rents (including all basic rent and additional rent), income, revenues, issues, profits, insurance proceeds, condemnation proceeds, moneys, demolition deposits, security deposits, demands, and damages payable to or receivable by Borrower under the Lease or pursuant to any of the provisions thereof (such rents, income, revenues, issues, profits, proceeds, moneys, security deposits or damages, collectively, the "Rents");

      (b)    to accept (i) any offer by Lessee pursuant to the Lease to purchase the Mortgaged Property or any part thereof or (ii) any condemnation proceeds or insurance proceeds payable in connection with a loss or destruction thereof as provided in and subject to the Lease;

      (c)    to make all waivers and agreements of any kind; and

      (d)    to give all notices, consents, rejections, approvals, disapprovals, releases and other instruments.

      2.    Borrower agrees that it shall not (a) declare a default or an event of default or exercise any claims, rights, or remedies under the Lease or the Lease Guaranty, except in respect of any Excepted Rights and Payments, as hereinafter defined (but with respect thereto only upon the terms and conditions expressly permitted in the definition thereof), or terminate, modify, amend, waive or accept a surrender of, or offer or agree to any termination, modification, consent, amendment, waiver or surrender of, or give or withhold any consent with respect to, exercise any right or option or take any other action required or contemplated by, the Lease or the Lease Guaranty or any term or provision thereof, except as otherwise provided in the Security Instrument, made by the Lessee pursuant to the Lease, or (b) receive or collect, or permit the receipt or collection of any payment, of Rents (excepting only such amounts as shall be within the definition of Excepted Rights and Payments), purchase proceeds or avails, insurance proceeds (excepting only such amounts as shall be within the definition of Excepted Rights and Payments) or condemnation awards, prior to the date for the payment thereof provided for by the Lease, or assign, transfer or hypothecate (other than to Lender) any payment of Rents, purchase proceeds or avails, insurance proceeds or condemnation awards, then due or to accrue in the future under the Lease. As used herein, "Excepted Rights and Payments" means the following described properties, payments, amounts, rights, interests and privileges:

      (i)    all payments by Lessee pursuant to any indemnity or guaranty under the Lease which by the terms thereof are payable to Borrower or its successors, permitted assigns, employees, officers, directors, shareholders, members, servants, agents and affiliates thereof;

      (ii)    any insurance proceeds to the extent payable under general public liability policies maintained by Lessee pursuant to Section 18 of the Lease, which, by the terms of such policies, are payable directly to Borrower or its successors,

permitted assigns, employees, officers, directors, shareholders, members, servants, agents and affiliates thereof, in each such case for their own respective accounts;

(iii)    the right of the Borrower, but not to the exclusion of Lender, (A) to receive from Lessee certificates and other documents and information that Lessee is required to give or furnish to Borrower pursuant to the Lease, (B) to inspect the premises demised under the Lease and all records relating thereto and (C) to sue for damages or to enforce performance or observance by Lessee of the applicable covenants and terms of the Lease as allowed by law, equity, or the Lease, but subject to any prohibitions against same as specifically set forth in the Security Instrument; and

(iv)    the right of Borrower, on its behalf only, to consent or approve or refuse to consent or approve the matters set forth in Sections 19.4, 40, and 46 of the Lease.

Notwithstanding the foregoing, Borrower shall not be entitled to exercise, enforce, or collect any Excepted Rights and Payments if an Event of Default (as defined in the Security Instrument) has occurred.

3.    This Assignment is executed as collateral security and the execution and delivery hereof shall not in any way impair or diminish the obligations of Borrower under the Lease, nor shall any of the obligations contained in the Lease be imposed upon Lender (unless and until fee title to the Mortgaged Property is transferred to Lender pursuant to a foreclosure of the Security Instrument or other exercise by Lender of its remedies under the Security Instrument). Upon the payment of the Obligations, this Assignment and all rights herein assigned to Lender shall automatically cease and terminate and all estate, right, title and interest of Borrower in and to the Lease shall revert to Borrower, and Lender shall, at the request and at the expense of Borrower, deliver to Borrower an instrument in recordable form canceling this Assignment and reassigning the Lease without recourse, representation or warranty, to Borrower.

4.    Borrower hereby presently, unconditionally and irrevocably designates Lender to receive, and directs Lessee to pay to Lender or its designated servicer, all payments payable or receivable under both the Lease, including, without limitation, all payments of basic rent and additional rent, and other sums payable to the lessor under the Lease, and no such payment by Lessee under the Lease shall be effective to discharge the obligation of Lessee under the Lease to make such payment unless made to Lender in accordance with such designation and direction. Borrower agrees that any Rents received by Borrower shall be held in trust by Borrower for the sole and exclusive benefit of Lender and shall be delivered by Borrower to Lender within five (5) business days after receipt of the same. Borrower hereby designates Lender to receive duplicate original copies of all notices, undertakings, demands, statements, offers, documents and other instruments and communications which Lessee is or may be required or permitted to give, make, deliver to or serve upon Borrower under the Lease. Borrower hereby directs Lessee to deliver to Lender, at its address set forth below or at such other address as Lender shall designate to Borrower, duplicate original copies of all such notices, undertakings, demands, statements, documents and other communications. No delivery thereof by Lessee shall be of any force or effect unless made to Lender and Borrower.

5.    Borrower represents and warrants to Lender that, as of the date hereof, (a) the Lease and the Lease Guaranty are in full force and effect and no default exists thereunder; (b) Borrower is the sole owner of the entire lessor's interest in the Lease; (c) Borrower has delivered to Lender

a true, correct and complete copy of the Lease, as amended to the date hereof, and the Lease Guaranty; (d) Borrower has full power and authority to execute and deliver this Assignment; (e) Borrower has not executed any other assignment of the subject matter of this Assignment; (f) none of the Rents reserved in the Lease have been assigned or otherwise pledged or hypothecated; (g) none of the Rents have been collected for more than one (1) month in advance; and (h) there exist no offsets or defenses to the payment of any portion of the Rents.

6.        Borrower shall not take any action as the lessor under the Lease or otherwise which is inconsistent with this Assignment or the Security Instrument, or make any other assignment, designation or direction inconsistent herewith or therewith, and any assignment, designation or direction inconsistent herewith or therewith shall be void.  Borrower shall, from time to time upon the request of Lender, execute all reasonable instruments of further assurance and all such supplemental instruments with respect to the transactions contemplated hereby as Lender may specify.

7.        Borrower further agrees with Lender that Borrower (a) shall observe and perform all the obligations imposed upon the lessor under the Lease and shall not do or permit to be done anything to impair the value of the Lease and the Lease Guaranty as security for the Obligations; (b) except as otherwise provided in the Security Instrument, shall not execute any other assignment of lessor's interest in the Lease; (c) shall not alter, modify or change the terms of the Lease or the Lease Guaranty, or cancel or terminate the Lease or the Lease Guaranty or accept a surrender thereof or convey or transfer or suffer or permit a conveyance or transfer of the Mortgaged Property or of any interest therein so as to effect a merger of the estates and rights of, or termination or diminution of the obligations of Lessee thereunder; (d) shall not consent to any assignment of or subletting under the Lease not in accordance with the Lease terms without the prior written consent of Lender; and (e) except as provided for in the Excepted Rights and Payments, shall not pursue any remedies under the Lease or the Lease Guaranty, without the prior written agreement of Lender, which will not be unreasonably withheld, conditioned or delayed.

8.        Upon and during the continuance of an Event of Default (as defined in the Security Instrument), Lender may, at its option, without waiving such Event of Default, without notice and without regard to the adequacy of the security for the Obligations, either in person or by agent or servicer, with or without bringing any action or proceeding, or by a receiver appointed by a court, enforce its interest in the Lease and Rents and take possession of the Mortgaged Property and have, hold, manage, lease and operate the Mortgaged Property on such terms and for such period of time as Lender may deem proper and either with or without taking possession of the Mortgaged Property in its own name, demand, sue for or otherwise collect and receive all Rents which are currently due or past due and unpaid with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as may be permitted under the Lease and as may seem proper to Lender and shall apply the Rents to the payment of the following in such order and proportion as Lender in its sole discretion may determine, any law, custom or use to the contrary notwithstanding:

(i)        all reasonable and necessary expenses of managing and securing the Mortgaged Property, including, without being limited thereto, the salaries, fees and wages of a managing agent and such other employees or agents as Lender may deem necessary or desirable and all expenses of operating and maintaining the Mortgaged Property, including, without being limited thereto, all taxes, charges, claims, assessments, water charges, sewer rents and any other liens, and premiums for all insurance which Lender may deem necessary or desirable, and the cost of all

alterations, renovations, repairs or replacements permitted under the Lease, and all expenses incident to taking and retaining possession of the Mortgaged Property; and

(ii)    the Obligations, together with all costs and reasonable attorneys' fees and disbursements.

In addition to the rights which Lender may have herein, upon the occurrence and during the continuation of an Event of Default, Lender, at its option, may either require Borrower to pay monthly in advance to Lender or the designee of Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Mortgaged Property as may be in possession of Borrower or may require Borrower to vacate and surrender possession of the Mortgaged Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise. For purposes of this paragraph, Borrower grants to Lender and the designee of Lender its irrevocable power of attorney, coupled with an interest, to take any and all of the aforementioned actions and any or all other actions designated by Lender for the proper management and preservation of the Mortgaged Property, which power of attorney Lender agrees not to exercise unless and until the occurrence and during the continuation of an Event of Default. The exercise by Lender of the option granted it in this paragraph and the collection of the Rents and the application thereof as herein provided shall not be considered a waiver of any default by Borrower under the Note, the Security Instrument, the Lease, this Assignment or any of the Other Security Documents (as defined in the Security Instrument).

9.    Lender shall not be liable for any loss sustained by Borrower resulting from Lender's failure to let the Mortgaged Property after an Event of Default or from any other act or omission of Lender in managing the Mortgaged Property after any Event of Default unless such loss is caused by the willful misconduct, gross negligence, and bad faith of Lender. Lender shall not be obligated to perform or discharge any obligation, duty or liability under the Lease or under or by reason of this Assignment (unless and until fee title to the Mortgaged Property is transferred to Lender pursuant to a foreclosure of the Security Instrument or other exercise by Lender of its remedies under the Security Instrument) and Borrower shall, and hereby agrees, to indemnify Lender for, and to hold Lender harmless from, any and all liability, loss or damage which is incurred under the Lease or under or by reason of this Assignment and from any and all claims and demands whatsoever, including the defense of any such claims or demands which may be asserted against Lender by reason of any alleged obligations and undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Lease. Should Lender incur any such liability, the amount thereof, including costs, expenses and reasonable attorneys' fees and disbursements, shall be secured hereby and by the Security Instrument and the other Loan Documents and Borrower shall reimburse Lender therefor immediately upon demand and upon the failure of Borrower so to do Lender may, at its option, declare all sums secured hereby and by the Note, the Security Instrument and the other Loan Documents immediately due and payable. This Assignment shall not operate to place any obligation or liability for the control, care, management or repair of the Mortgaged Property upon Lender, nor for the carrying out of any of the terms and conditions of the Lease, nor shall it operate to make Lender responsible or liable for any waste committed on the Mortgaged Property by Lessee or any other parties (except to the extent caused by the gross negligence or willful misconduct of Lender), or for any dangerous or defective condition of the Mortgaged Property, including without limitation the presence of any Hazardous Substances (as defined in the Security Instrument) (except to the extent caused by the gross negligence or willful misconduct of Lender), or for any negligence in the management, upkeep, repair or control of the Mortgaged Property resulting in loss or injury or death to any lessee, licensee, employee or stranger.

10.     Lender may take or release other security for the payment of the Debt, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the reduction or satisfaction of the Debt without prejudice to any of its rights under this Assignment.

11.     Nothing contained in this Assignment and no act done or omitted by Lender pursuant to the power and rights granted to Lender hereunder shall be deemed to be a waiver by Lender of its rights and remedies under the Note, the Security Instrument, or the other Loan Documents and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Lender under the terms thereof.  The right of Lender to collect the Debt and to enforce any other security therefor held by it may be exercised by Lender either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

12.     Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession" in the absence of the taking of actual possession of the Mortgaged Property by Lender. In the exercise of the powers herein granted Lender, no liability shall be asserted or enforced against Lender, all such liability being expressly waived and released by Borrower.

13.     Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Assignment may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Mortgaged Property or any part thereof or any interest therein, (unless such party has been released by Lender from its obligations)" the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by the Security Instrument," the word "person" shall include an individual, corporation, partnership, trust, unincorporated association, government, governmental authority, and any other entity, the words "Mortgaged Property" shall include any portion of the Mortgaged Property and any interest therein, and the word "Debt" shall mean the principal balance of the Note with interest thereon as provided in the Note and the Security Instrument and all other sums due pursuant to the Note, the Security Instrument, this Assignment and the other Loan Documents; whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

14.     The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Assignment.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) failure of Lender to comply with any request of Borrower or any other party to take any action to enforce any of the provisions hereof or of the Security Instrument, the Note or the Other Security Documents, (ii) the release from the Security Instrument, regardless of consideration, of any part of the Mortgaged Property, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of this Assignment, the Note, the Security Instrument or the Other Security Documents. Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect.  Lender may take any action to recover the Debt, or any portion thereof or to enforce any covenant hereof without prejudice to the right of Lender thereafter to enforce its rights under this Assignment.  The rights of Lender under this Assignment shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

26912.3

15.     If any term or provision of this Assignment or any application hereof shall be invalid or unenforceable, the remainder of this Assignment and any other application of such term or provision shall not be affected thereby.

16.     All notices or other communications required or permitted to be given pursuant hereto shall be given in the manner specified in the Security Instrument directed to the parties at their respective addresses as provided therein.

17.     This Assignment cannot be modified, changed or discharged except by an agreement in writing, duly acknowledged in form for recording, signed by the party against whom enforcement of such modification, change or discharge is sought.

18.     This Assignment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns and shall run with the Mortgaged Property.

19.     This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.

20.     This Assignment shall be governed by and construed in accordance with the laws of the State in which the Mortgaged Property is located.

21.     The limitation of liability as against the Borrower (and its managers or members) contained within the Security Instrument are hereby incorporated into this Assignment.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]

98700246

**IN WITNESS WHEREOF,** Borrower has executed this Assignment of Lease and Rents under seal as of the day and year first above written.

<div style="text-align: right">

**WEC 98C-4 LLC,** a Texas limited liability company

By:     **Wolverine 98C-4, Inc.,** a Texas corporation
        Its Manager

By: _Kristin S. Markham_ _____
Name:       Kristin S. Markham
Title:      Vice President

[Affix corporate seal]

</div>

STATE OF _Texas_ )
                 ) SS
COUNTY OF _Dallas_ )


     I, _Carole Peavey_ , a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that Kristin S. Markham, the Vice President of Wolverine 98C-4, Inc., a  Texas corporation, which is the Manager of WEC 98C-4 LLC, a Texas limited liability company, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed and delivered said instrument as such officer of such corporation, as her own free and voluntary act and as the free and voluntary act of such corporation for the uses and purposes therein set forth.

     GIVEN under my hand and Notarial Seal this _31st_ day of _July_ , 1998.


_Carole Peavey_
NOTARY PUBLIC

My Commission Expires:

<div style="text-align: center; border: 1px solid">

★ **CAROLE PEAVEY**
My Commission Expires
January 15, 2001

</div>

Exhibit A

PARCEL 1:

THAT PART OF THE NORTHEAST 1/4 OF SECTION 25, TOWNSHIP 39 NORTH, RANGE 12, EAST
OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS; BOUNDED AND DESCRIBED
AS FOLLOWS:

BEGINNING AT A POINT 50 FEET SOUTH AND 33 FEET EAST OF THE NORTHWEST CORNER OF
THE NORTHEAST 1/4 OF SAID SECTION; THENCE SOUTH 0 DEGREES 10 MINUTES 52 SECONDS
EAST ALONG A STRAIGHT LINE 33 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF
SAID NORTHEAST 1/4 A DISTANCE OF 1,589.31 FEET TO A POINT; THENCE NORTH 89
DEGREES 58 MINUTES 52 SECONDS WEST ALONG A STRAIGHT LINE A DISTANCE OF 33.0 FEET
TO A POINT IN THE WEST LINE OF THE SAID NORTHEAST 1/4; THENCE SOUTH 0 DEGREES 10
MINUTES 52 SECONDS EAST ALONG SAID WEST LINE OF SAID NORTHEAST 1/4 A DISTANCE OF
149.15 FEET TO A POINT IN THE NORTHERLY RIGHT OF WAY OF THE ILLINOIS CENTRAL
RAILROAD; THENCE SOUTH 67 DEGREES 12 MINUTES 02 SECONDS EAST ALONG SAID NORTHERLY
LINE OF THE ILLINOIS CENTRAL RAILROAD A DISTANCE OF 438.79 FEET; THENCE DUE NORTH
ALONG A STRAIGHT LINE A DISTANCE OF 450.53 FEET TO A POINT; THENCE DUE EAST ALONG
A STRAIGHT LINE                   A DISTANCE OF 55.00 FEET TO A POINT; THENCE DUE
NORTH ALONG A STRAIGHT LINE A DISTANCE OF 238.5 FEET TO A POINT; THENCE DUE EAST
ALONG A STRAIGHT LINE A DISTANCE OF 120.00 FEET TO A POINT; THENCE DUE NORTH
ALONG A STRAIGHT LINE A DISTANCE OF 303.00 FEET TO A POINT; THENCE DUE WEST ALONG
A STRAIGHT LINE A DISTANCE OF 136.38 FEET TO A POINT; THENCE DUE NORTH ALONG A
STRAIGHT LINE A DISTANCE OF 88.5 FEET TO A POINT; THENCE DUE WEST ALONG A
STRAIGHT LINE A DISTANCE OF 358.00 FEET TO A POINT; THENCE NORTH 0 DEGREES 10
MINUTES 52 SECONDS WEST ALONG A STRAIGHT LINE A DISTANCE OF 648.00 FEET TO A
POINT; THENCE DUE WEST ALONG A STRAIGHT LINE A DISTANCE OF 20.00 FEET TO A POINT;
THENCE NORTH 0 DEGREES 10 MINUTES 52 SECONDS WEST ALONG A STRAIGHT LINE A
DISTANCE OF 115.00 FEET TO A POINT; THENCE NORTH 44 DEGREES 54 MINUTES 34 SECONDS
EAST ALONG A STRAIGHT LINE A DISTANCE OF 56.48 FEET TO A POINT; THENCE DUE EAST
ALONG A STRAIGHT LINE A DISTANCE OF 218.00 FEET TO A POINT; THENCE SOUTH 80
DEGREES 32 MINUTES 33 SECONDS EAST ALONG A STRAIGHT LINE A DISTANCE OF 152.15
FEET TO A POINT; THENCE NORTH 0 DEGREES 10 MINUTES 52 SECONDS WEST ALONG A
STRAIGHT LINE A DISTANCE OF 50.00 FEET TO A POINT; THENCE DUE WEST ALONG A
STRAIGHT LINE A DISTANCE OF 443.00 FEET TO THE POINT OF BEGINNING.

PARCEL 2:

EASEMENTS CONTAINED IN RECIPROCAL OPERATION AND EASEMENT AGREEMENT DATED DECEMBER
6, 1973, AND RECORDED AS DOCUMENT NO. 22584954, AS AMENDED BY AMENDMENT TO
RECIPROCAL OPERATION AND EASEMENT AGREEMENT DATED NOVEMBER 14, 1975, AND RECORDED
AS DOCUMENT NO. 23346268, AND BY SECOND AMENDMENT TO RECIPROCAL OPERATION AND
EASEMENT AGREEMENT DATED NOVEMBER 1, 1976, AND RECORDED AS DOCUMENT 23721362, AND
BY THIRD AMENDMENT TO RECIPROCAL OPERATION AND EASEMENT AGREEMENT DATED MARCH 31,
1992, AND RECORDED AS DOCUMENT 93005191, AND BY FOURTH AMENDMENT TO RECIPROCAL
OPERATION AND EASEMENT AGREEMENT DATED AUGUST 10, 1995, AND RECORDED AS DOCUMENT
NO. 96803440, ALL IN COOK COUNTY, ILLINOIS.

WEC 98C-4-North Riverside:

Location: Cermak Road/26th Street, North Riverside, Illinois
Tax Parcel Number: 15-25-200-004

# Exhibit C

## CORPORATE GUARANTY
### (North Riverside Shopping Center; North Riverside, Illinois Property)

THIS CORPORATE GUARANTY (this "Guaranty") is executed to be effective as of August 5, 1998, by PROFFITT'S, INC., a Tennessee corporation (the "Guarantor").

WITNESSETH:

WHEREAS, Chicago Title & Trust Company, as Trustee ("Land Trustee") under a Trust Agreement dated June 15, 1985, and known as Trust No. 1085900 and Six Anchors Limited Partnership, a Maryland limited partnership currently known as Illinois Partners Limited Partnership, as beneficiary under the Trust, collectively as Landlord (the "Former Landlord"), and CPS Realty Partnership, an Illinois general partnership ("CPS Partnership"), as the Tenant, entered into a Lease dated October 31, 1985, relating to certain premises constituting a portion of the North Riverside Shopping Center in North Riverside, Illinois, as such premises are more fully described in said Lease (the "Original Lease");

WHEREAS, CPS Department Stores, Inc., a Delaware corporation ("Tenant"), is successor-in-interest to CPS Partnership as Tenant under the Original Lease;

WHEREAS, Tenant and Former Landlord have previously entered into an Amendment of Lease executed on February 1, 1994, to be effective as of August 1, 1993 (the "First Amendment");

WHEREAS, WEC 98C-4 LLC, a Texas limited liability company ("Landlord"), has purchased the property constituting the Demised Premises from the Former Landlord effective as of the date of this Guaranty and, in connection with the Landlord's purchase of such property, Landlord and Tenant have agreed to amend certain terms and provisions of the Lease as more fully set forth in that certain Second Amendment to Lease entered into as of even date herewith between Landlord and Tenant (the "Second Amendment"); and

WHEREAS, as a condition to Landlord's agreement to amend the Lease in accordance with the Second Amendment, the Guarantor has agreed to enter into this Guaranty.

NOW, THEREFORE, in consideration of and as an inducement for the Landlord's purchase of the Demised Premises and the granting, execution and delivery of the Second Amendment (the Original Lease, as amended by the First Amendment and the Second Amendment, is hereinafter called the "Lease"), and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by the undersigned, Guarantor, intending to be legally bound, hereby guarantees to Landlord the full and prompt payment when due of all Basic Rent, additional rent and any and all other sums and charges payable by Tenant under the Lease, and the full, faithful and prompt performance and observance of all the covenants, terms, conditions, and agreements therein provided to be performed and observed by Tenant (collectively, the "Obligations"); and Guarantor does hereby become surety to Landlord for and with respect to all of the Obligations.

Guarantor hereby covenants and agrees to and with Landlord that if default shall at any time be made by Tenant in the payment of any such rent or other sums or charges payable by Tenant

under the Lease or in the performance of any of the covenants, terms, conditions or agreements contained in the Lease, Guarantor will forthwith pay such rent or other sums or charges to Landlord, and any arrears thereof, and will forthwith faithfully perform and fulfill all of such covenants, terms, conditions and agreements, and will forthwith pay to Landlord all damages and all costs and expenses that may arise in consequence of any default by Guarantor hereunder (including, without limitation, all reasonable attorneys' fees incurred by Landlord or caused by any such default and/or by the enforcement of this Guaranty).

This Guaranty is an absolute and unconditional guaranty of payment (and not of collection) and of performance and is a surety agreement. Guarantor's liability hereunder is direct and may be enforced without Landlord being required to resort to any other right, remedy or security and this Guaranty shall be enforceable against Guarantor, without the necessity for any suit or proceedings on Landlord's part of any kind or nature whatsoever against Tenant, and without the necessity of any notice of non-payment, non-performance or non-observance or the continuance of any such default or of any notice of acceptance of this Guaranty or of Landlord's intention to act in reliance hereon or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives; and Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in nowise be terminated, affected or impaired by reason of the assertion or the failure to assert by Landlord against Tenant, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease.

This Guaranty shall be a continuing Guaranty, and (whether or not Guarantor shall have notice or knowledge of any of the following) the liability and obligation of Guarantor hereunder shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, discharged or in any way impaired by, and shall not be subject to any reduction, limitation, termination, defense, offset, counterclaim or recoupment as a result of (a) any amendment or modification of, or supplement to, or extension or renewal of, the Lease or any assignment or transfer thereof; (b) any exercise or non-exercise of any right, power, remedy or privilege under or in respect of the Lease or this Guaranty or any waiver, consent or approval by Landlord with respect to any of the covenants, terms, conditions or agreements contained in the Lease or this Guaranty or any indulgences, forbearances or extensions of time for performance or observance allowed to Tenant or Guarantor from time to time and for any length of time; (c) any increase in, addition to, exchange or release of, or non-perfection of any lien on or security interest in, any collateral or any release or amendment or waiver of or consent to any departure from or failure to enforce any other guarantee, for all or any of the Obligations; (d) any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation, dissolution or similar proceeding relating to Tenant, or its properties, or Guarantor including, without limitation, rejection of the Lease or guaranteed Obligations in such bankruptcy; (e) any limitation on the liability or obligation of Tenant under the Lease or its estate in bankruptcy or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the federal bankruptcy law; (f) any sublease or transfer by Tenant or any assignment, mortgage or pledge of its interest under the Lease (except to the extent, and only to the extent, otherwise expressly hereinafter provided with respect to an assignment or transfer of the Lease under Section 29(c) thereof which

-2-

operates to release and discharge Tenant from its liability under the Lease); (g) any termination of the Lease as a result of Tenant's default thereunder prior to the expiration of its Term; (h) any agreement entered into between the Landlord and an assignee or subtenant of Tenant; (i) any exchange of the Demised Premises for Exchange Property as contemplated by Section 19.4 (or any other provision) of the Lease; or (j) any lack of validity of enforceability of the Lease or any agreement or instrument relating thereto. Notwithstanding the provisions of clause (f) above, in the event that the Lease is assigned or transferred to another entity (the "Transferee") pursuant to the provisions of Section 29(c) of the Lease, Landlord and Mortgagee shall release Guarantor from its obligations under this Guaranty concurrently with such assignment or transfer (a "Transfer") provided that all the conditions set forth in Section 29(c) of the Lease are satisfied and provided further that all of the following conditions precedent are satisfied:

(i)     Mortgagee and Landlord shall have received, not less than sixty (60) days prior to the proposed Transfer, audited annual financial statements of Guarantor and Transferee for each of the two (2) fiscal years of Guarantor and Transferee next preceding the proposed Transfer (the "Applicable Fiscal Years"), prepared by a nationally recognized certified public accounting firm in accordance with generally accepted accounting principles consistently applied ("GAAP"), together with all Section 10(k) and 10(q) quarterly and annual filings made by Guarantor and Transferee, if any, with the Securities Exchange Commission with respect to the Applicable Fiscal Years;

(ii)     Mortgagee and Landlord shall have received, not less than sixty (60) days prior to the proposed Transfer, a certificate executed by the respective chief financial officers of Guarantor and Transferee demonstrating that each of the Financial Criteria (defined below) for Transferee is equal to or better than each of the corresponding Financial Criteria for Guarantor as of the end of the fiscal year next preceding the proposed Transfer. As used herein, the term "Financial Criteria" means collectively (AA) the Tangible Net Worth and Ratio of Debt to Tangible Net Worth of Guarantor and Transferee determined in accordance with GAAP, and (BB) the rating assigned to one or more classes of outstanding public debt issued by Guarantor and Transferee by Moody's Investors Services, Inc., or Standard & Poor's Corporation, or successor to any of them;

(iii)     Mortgagee shall have received written confirmation from the Rating Agencies that the Transfer shall not result in a downgrade, withdrawal or qualification of any kind with respect to any security collateralized by or related to the loan secured by the Mortgage;

(iv)     Mortgagee and Landlord shall have received such legal opinions to the effect that the documents creating the Transferee's liability are duly authorized, executed and delivered and are binding and enforceable in accordance with their terms; and

(v)     Guarantor reimburses Mortgagee and Landlord for their reasonable legal and out-of-pocket expenses incurred in connection with the Transfer.

In the event Transferee does not satisfy one or more of the requirements and conditions set forth above, Transferee or Guarantor may provide one or more substitute guarantors of the Lease (a "Substitute Guarantor"), whereupon Guarantor shall be released from this Guaranty provided that (a) all the conditions and requirements described above are satisfied with respect to Substitute Guarantor as fully as if it were the Transferee, and (b) the Substitute Guarantor executes, without any cost or expense to Lender, a new guaranty agreement in the form of this Guaranty.

All of Landlord's rights and remedies under the Lease and under this Guaranty are intended to be distinct, separate and cumulative and no such right and remedy therein or herein mentioned is intended to be in exclusion of or a waiver of any of the others. No termination of the Lease or taking or recovering of the premises demised thereby shall deprive Landlord of any of its rights and remedies against Guarantor under this Guaranty. This Guaranty shall apply to the Obligations arising on or before January 31, 2024, and shall be null and void and of no force or effect as to any Obligations thereafter arising.

The Guarantor hereby waives any requirement that the Landlord protect, secure, perfect or insure any security interest or lien or any property subject thereto or exhaust any right to take any action against any person or any collateral (including any rights relating to marshaling of assets).

Guarantor further agrees that, to the extent that the Tenant or the Guarantor makes a payment or payments to the Landlord, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to the Tenant or the Guarantor or their respective estate, trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, this Guaranty and the advances or part thereof which have been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the date such initial payment, reduction or satisfaction occurred.

Guarantor shall have no rights (direct or indirect) of subrogation, contribution, reimbursement, indemnification or other rights of payment or recovery from the Tenant, or any other guarantor of the Tenant's obligations under the Lease, for any payments made by the Guarantor hereunder, and Guarantor hereby waives and releases absolutely and unconditionally, any such rights of subrogation, contribution, reimbursement, indemnification and other rights of recovery which it may now or hereafter acquire.

Guarantor represents and warrants to Landlord that (a) the execution and delivery of this Guaranty has been duly authorized by the Board of Directors of Guarantor and (b) on the date of this Guaranty, Guarantor is the owner, through one or more wholly-owned subsidiaries, of all of the issued and outstanding capital stock of the Tenant, and Guarantor will, directly or indirectly, benefit from the Lease and the transaction which is the subject of the Second Amendment.

This Guaranty shall be legally binding upon Guarantor and its successors and assigns and shall inure to the benefit of Landlord and its successors and assigns. Reference herein to Tenant

shall be deemed to include Tenant and its successors and assigns. The terms and provisions of this Guaranty shall be governed by the laws of the State of Illinois.

Guarantor will not enter into any amendment to this Guaranty, and no such amendment will be effective in any event, without the prior written consent thereto by Landlord and the Mortgagee. Guarantor will from time to time during the Demised Term, promptly following request of Landlord or Mortgagee, confirm in writing to Landlord and to Mortgagee that this Guaranty remains in full force and effect in accordance with its terms and such other matters as may be reasonably requested by Landlord or Guarantor.

All terms used in this Guaranty with their initial letters capitalized which are specially defined in the Lease shall have the same meaning herein as given to such terms in the Lease, unless otherwise defined herein or the context otherwise clearly requires.

IN WITNESS WHEREOF, Guarantor, intending to be legally bound hereby, has caused this Guaranty to be executed by its duly authorized officer on this _5_ day of August, 1998.

PROFFITT'S, INC.,
a Tennessee corporation

By:_____

Its:_____

D:\WOLVERIN\CARSONP\RIVERSID\CORPGUAR.1

-5-

# Exhibit D

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

TOCU II LLC,

                Plaintiff,

    v.

WEC 98C-4 LLC, UNKNOWN OWNERS and
NON-RECORD CLAIMANTS,

                Defendants.

Case No. 2018 CH 11656

Address:   7501 W. Cermak Road
              North Riverside, IL 60546

## JUDGMENT OF FORECLOSURE AND SALE

On this day came TOCU II LLC, a Delaware limited liability company ("TOCU II" or "Plaintiff"), by and through Midland Loan Services, a division of PNC Bank, National Association ("Midland"), solely in its capacity as servicer, by and through their attorneys, Akerman LLP, and on their Motion for Summary Judgment and Judgment of Foreclosure and Sale as to Counts I - II of the Verified Complaint to Foreclose Mortgage and for Other Relief (the "Verified Complaint") against WEC 98C-4 LLC ("Defendant" or "Borrower"), this Court FINDS:

## COUNT I
## JURISDICTION

1.     The following Defendants have been properly served with a summons and a copy of the complaint: WEC 98C-4 LLC, and North Riverside Park Associates LLC ("Mall Owner"). Borrower filed its answer and affirmative defenses on January 17, 2019 and Mall Owner filed its answer and affirmative defenses on January 16, 2019.

2.     The following Defendants, UNKNOWN OWNERS and NON-RECORD CLAIMANTS were duly served by publication of a notice in the Chicago Daily Law Bulletin, a secular daily newspaper of general circulation in Cook County, Chicago, Illinois, on September 23, October 1 and 8, 2018, and said Defendants have failed to answer the complaint or otherwise enter any appearance herein although more than thirty days have passed since the first said publication, and the default date published as aforesaid has passed, and said Defendants, UNKNOWN OWNERS and NON-RECORD CLAIMANTS are ordered defaulted.

3.     The court specifically finds service of process in each instance was properly made in accordance with the Code of Civil Procedure.

4.     This court has jurisdiction over all the parties hereto and the subject matter presented herein.

## EVIDENTIARY FINDINGS

5.      Plaintiff filed its Verified Complaint for Foreclosure and Other Relief (the "Verified Complaint") herein to foreclose the Mortgage[1] hereinafter described and joined the following persons as Defendants: WEC 98C-4 LLC, UNKNOWN OWNERS, and NON-RECORD CLAIMANTS.

6.      Exhibit "A" - Mortgage dated August 5, 1998, Exhibit "B" - Promissory Note A dated July 18, 2004, Exhibit "C" – Promissory Note B dated July 18, 2004, Exhibit "D" – Assignments of Mortgage, and Exhibit "E" – Assignment of Lease and Rents, are admitted into evidence, and any originals presented may be withdrawn.

7.      Information concerning mortgage on property located at 7501 W. Cermak Road, North Riverside, Illinois 60546:

    a.  <u>Nature of Instrument</u>: Mortgage, Security Agreement and Assignment of Leases and Rents.

    b.  <u>Date of Mortgage</u>: August 5, 1998.

    c.  <u>Name of Mortgagor</u>: WEC 98C-4 LLC.

    d.  <u>Name of Mortgagee</u>: Red Mountain Funding, L.L.C., the original mortgagee, assigned all right, title and interest in the Mortgage to TOCU II.

    e.  <u>Date and Place of Recording</u>: The Mortgage was recorded on August 10, 1998 with the Recorder of Deeds in Cook County, Illinois.

    f.  <u>Identification of Recording</u>: The Mortgage is recorded as Document Number 98700245.

    g.  <u>Interest Subject to the Mortgage</u>: fee simple.

    h.  <u>Amount of Original Indebtedness, Including Subsequent Advances Made under the Mortgage</u>: $14,012,500.00, excluding advances.

    i.  <u>Legal Description and Common Address of the Mortgaged Premises (the "mortgaged real estate" or "Premises")</u>:

PARCEL 1:

THAT PART OF THE NORTHEAST 1/4 OF SECTION 25, TOWNSHIP 39 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS; BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT 50 FEET SOUTH AND 33 FEET EAST OF THE NORTHWEST CORNER OF THE NORTHEAST 1/4 OF SAID SECTION; THENCE SOUTH 0 DEGREES 10

---

[1] All capitalized but undefined terms shall take the meaning as defined in the Verified Complaint.

50716382;1

MINUTES 52 SECONDS EAST ALONG A STRAIGHT LINE 33 FEET EAST OF AND PARALLEL WITH THE WEST LINE OF SAID NORTHEAST 1/4 A DISTANCE OF 1,589.31 FEET TO A POINT; THENCE NORTH 89 DEGREES 58 MINUTES 52 SECONDS WEST ALONG A STRAIGHT LINE A DISTANCE OF 33.0 FEET TO A POINT IN THE WEST LINE OF THE SAID NORTHEAST 1/4; THENCE SOUTH 0 DEGREES 10 MINUTES 52 SECONDS EAST ALONG SAID WEST LINE OF SAID NORTHEAST 1/4 A DISTANCE OF 149.15 FEET TO A POINT IN THE NORTHERLY RIGHT OF WAY OF THE ILLINOIS CENTRAL RAILROAD; THENCE SOUTH 67 DEGREES 12 MINUTES 02 SECONDS EAST ALONG SAID NORTHERLY LINE OF THE ILLINOIS CENTRAL RAILROAD A DISTANCE OF 438.79 FEET; THENCE DUE NORTH ALONG A STRAIGHT LINE A DISTANCE OF 450.53 FEET OT A POINT; THENCE DUE EAST ALONG A STRAIGHT LINE, A DISTANCE OF 55.0 FEET TO A POINT; THENCE DUE NORTH ALONG A STRAIGHT LINE A DISTANCE OF 238.5 FEET TO A POINT; THENCE DUE EAST ALONG A STRAIGHT LINE A DISTANCE OF 120.00 FEET TO A POINT; THENCE DUE NORTH ALONG A STRAIGHT LINE OF 303.00 FEET TO A POINT; THENCE DUE WEST ALONG A STRAIGHT LINE A DISTANCE OF 136.38 FEET TO A POINT; THENCE DUE NORTH ALONG A STRAIGHT LINE A DISTANCE OF 88.5 FEET TO A POINT; THENCE DUE WEST ALONG A STRAIGHT LINE A DISTANCE OF 358.00 FEET TO A POINT; THENCE NORTH 0 DEGREES 10 MINUTES 52 SECONDS WEST ALONG A STRAIGHT LINE A DISTANCE OF 648.00 FEET TO A POINT; THENCE DUE WEST ALONG A STRAIGHT LINE A DISTANCE OF 20.00 FEET TO A POINT; THENCE NORTH 0 DEGREES 10 MINUTES 52 SECONDS WEST ALONG A STRAIGHT LINE A DISTANCE OF 115.00 FEET TO A POINT; THENCE NORTH 44 DEGREES 54 MINUTES 34 SECONDS EAST ALONG A STRAIGHT LINE A DISTANCE OF 56.48 FEET TO A POINT; THENCE DUE EAST ALONG A STRAIGHT LINE A DISTANCE OF 218.00 FEET TO A POINT; THENCE SOUTH 80 DEGREES 32 MINUTES 33 SECONDS EAST ALONG A STRAIGHT LINE A DISTANCE OF 152.15 FEET TO A POINT; THENCE NORTH 0 DEGREES 10 MINUTES 52 SECONDS WEST ALONG A STRAIGHT LINE A DISTANCE OF 50.00 FEET TO A POINT; THENCE DUE WEST ALONG A STRAIGHT LINE A DISTANCE OF 443.00 FEET TO THE POINT OF BEGINNING.

PARCEL 2:

EASEMENTS CONTAINED IN RECIPROCAL OPERATION AND EASEMENT AGREEMENT DATED DECEMBER 6, 1973, AND RECORDED AS DOCUMENT NO. 22584954, AS AMENDED BY AMENDMENT TO RECIPROCAL OPERATION AND EASEMENT AGREEMENT DATED NOVEMBER 14, 1975, AND RECORDED AS DOCUMENT NO. 23346268, AND BY SECOND AMENDMENT TO RECIPROCAL OPERATION AND EASEMENT AGREEMENT DATED NOVEMBER 1, 1976, AND RECORDED AS DOCUMENT NO. 23721362, AND BY THIRD AMENDMENT TO RECIPROCAL OPERATION AND EASEMENT AGREEMENT DATED MARCH 31, 1992, AND RECORDED AS DOCUMENT NO. 93005191, AND BY FOURTH AMENDMENT TO RECIPROCAL OPERATION AND EASEMENT AGREEMENT DATED AUGUST 10, 1995, AND RECORDED AS DOCUMENT NO. 96803440, ALL IN COOK COUNTY, ILLINOIS.

P.I.N.: 15-25-200-004-0000.

Common Address: 7501 W. Cermak Road, North Riverside, Illinois 60546

      j.    <u>Statement as to Defaults:</u> Monthly installment payments due under Exhibits "B" through "C" are in default and arrears since February 2018.

| | |
|---|---|
| Note A Unpaid Principal Balance: | $3,569,648.31 |
| Note A Unpaid Accrued Interest: | $144,729.00 |
| Note A Unpaid Default Interest: | $401,639.74 |
| Note B Unpaid Principal Balance: | $4,924,759.00 |
| Note B Unpaid Accrued Interest: | $384,935.64 |
| Note B Unpaid Default Interest: | $548,569.94 |
| **Total principal and interest due as of March 1, 2019**: | **$9,974,281.63** |

plus

| | |
|---|---|
| Protective Advance – Force-placed Insurance | $587.10 |
| Protective Advance – Operating Expenses | $492,067.14 |
| Attorneys' Fees | $78,204.30 |
| Reconveyance, Payoff, & Setup Fee | $750.00 |
| Title | $500.00 |
| Filing Fees | $945.09 |
| Recorder | $14.50 |
| Publication | $825.00 |
| Service | $246.50 |
| Copies, Postage & Westlaw | $280.60 |
| **Subtotal as of March 1, 2019**: | **$574,420.23** |

**TOTAL AMOUNT DUE:**                                               **$10,548,701.86**

*Interest accrues on the unpaid balance of the indebtedness at a per diem rate through the date of entry of judgment as set forth in paragraph 34(J)(iv) – (v) of the Verified Complaint.

      k.    <u>Name of Present Owners of the Real Estate</u>: WEC 98C-4 LLC.

      l.    <u>Names of Other Persons who are Joined as Defendants and Whose Interest in or Lien on the Mortgaged Real Estate is Sought to be Terminated</u>: all Unknown Owners and Non-Record Claimants.

      m.    <u>Names of Defendants Claimed to be Personally Liable for Deficiency, if Any</u>: None at present.

      n.    <u>Capacity in which Plaintiff brings this Foreclosure</u>: Plaintiff brings this foreclosure, by and through Midland as servicer, in its capacity as the mortgagee, the owner and legal holder of the Mortgage, the holder of the A Note, and by agreement with and consent of the holder of the B Note under that certain Agreement Among Noteholders dated June 28, 2004.

## ALLEGATIONS DEEMED PROVED

8.     On the date indicated in the Verified Complaint, the obligor of the indebtedness or other obligations secured by the mortgage was justly indebted in the amount of the indicated original indebtedness to the original mortgagee or payee of the mortgage note.

9.     The exhibits to the Verified Complaint are true and correct copies of the Mortgage, Note, Assignments of Mortgage, Assignment of Lease and Rents, and Lease Guaranty.

10.     The mortgagor was, at the date indicated in the complaint, owner of the interest in the real estate described in the complaint and as of that date made, executed, and delivered the Mortgage as security for the note or other obligations.

11.     The Mortgage was recorded in the county in which the mortgaged real estate is located, on the date indicated, in the book and page or as the document number indicated.

12.     Defaults occurred as indicated in the Verified Complaint and in evidence or affidavits presented to the Court.

13.     The persons named as present owners are the owners of the indicated interests in and to the real estate described.

14.     The Mortgage constitutes a valid, prior and paramount lien upon the indicated interest in the mortgaged real estate, which lien is prior and superior to the right, title, interest, claim or lien of all parties and non-record claimants whose interests in the mortgaged real estate are terminated by this foreclosure.

15.     By reason of the defaults alleged and proved, if the indebtedness had not matured by its terms, the same became due by the exercise, by the Plaintiff or other persons having such power, of a right or power to declare immediately due and payable the whole of all indebtedness secured by the Mortgage.

16.     Any and all notices of default or election to declare the indebtedness due and payable or other notices required to be given have been given.

17.     Any and all periods of grace or other period of time allowed for the performance of the covenants or conditions claimed to be breached or for the curing of any breaches have expired.

18.     The amount indicated to be due is broken down in the statement in the Verified Complaint or in the evidence or affidavits presented to the court into various items; the same are correctly stated and if such break down indicated any advances made or to be made by the Plaintiff or owner of the mortgage indebtedness, such advances were, in fact, made or will be required to be made, and under and by virtue of the mortgage the same constitute additional indebtedness secured by the mortgage.

## FEES AND COSTS

19.     Plaintiff has been compelled to employ and retain attorneys to prepare and file the Verified Complaint and to represent and advise the Plaintiff in the foreclosure of the Mortgage, and the Plaintiff has and will thereby become liable for the usual, reasonable and customary fees of the attorneys in that behalf.

20.     The Plaintiff has been compelled to advance or will be compelled to advance, various sums of money in payment of costs, fees, expenses and disbursements incurred in connection with the foreclosure, including, without limiting the generality of the foregoing, filing fees, stenographer's fees, witness fees, costs of publication, costs of procuring abstracts of title, Torrens certificates, foreclosure minutes and a title insurance policy.

21.     Under the terms of the Mortgage, all such advances, costs, attorneys' fees and other fees, expenses and disbursements are made a lien upon the mortgaged real estate and the Plaintiff is entitled to recover all such advances, costs, attorneys' fees, expenses and disbursements, together with interest on all advances at the rate provided in the mortgage, or, if no rate is provided therein, at the statutory judgment rate, from the date on which such advances are made.

22.     In order to protect the lien of the Mortgage, it may or has become necessary for Plaintiff to pay taxes and assessments which have been or may be levied upon the mortgaged real estate.

23.     In order to protect and preserve the mortgaged real estate, it has or may also become necessary for the Plaintiff to pay fire and other hazard insurance premiums on the real estate or to make such repairs to the real estate as may reasonably be deemed necessary for the proper preservation thereof.

24.     Under the terms of the Mortgage, any money so paid or expended has or will become an additional indebtedness secured by the Mortgage and will bear interest from the date such monies are advances at the rate provided in the Mortgage, or, if no rate is provided, at the statutory judgment rate.

## ULTIMATE FINDINGS

25.     The factual allegations of Plaintiff's Verified Complaint are true substantially as set forth, the equities in the cause are with Plaintiff, and Plaintiff is entitled to the relief set forth below including foreclosure of said mortgage upon the real estate described in the Verified Complaint in the amount of the Total Amount Due, as found in Paragraph 7(j) above, together with interest thereon at the statutory rate after entry of the final judgment and additional court costs, including publication costs and expenses of sale.

26.     All lien or mortgage claimants defaulted are found and declared to have no interest in the real estate foreclosed, as they have offered no evidence of said interest.

27.     Said real estate is free and clear of all liens and encumbrances except:

50716382;1

a.  General real estate taxes for the year 2018 and thereafter and special assessments, if any.

b.  Said Mortgage given to Plaintiff.

28.  Plaintiff's said Mortgage is prior and superior to all other mortgages, claims of interests and liens upon said real estate except for real estate taxes and special assessments, if any, and except for any mortgages, liens, or other interests found herein to be prior and superior to Plaintiff's mortgage or prior liens of non-parties.

29.  Nothing in this Judgment shall affect the easements contained in that certain Reciprocal Operation and Easement Agreement dated December 6, 1973 and recorded January 2, 1974 with the Cook County Recorder of Deeds, Document No. 22584954, as amended, which are not subject to foreclosure in the present action and are not foreclosed by this Judgment.

30.  The sum of attorneys' fees allowed herein as stated above is the fair, reasonable and proper fee to be allowed to Plaintiff as attorneys' fees in this proceeding in accordance with the terms of the note and mortgage given to Plaintiff by said Defendants, which should be added to and become a part of the indebtedness due to Plaintiff.

**IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED:**

**ORDER UPON DEEMED REQUEST FOR FORECLOSURE**

31.  An accounting has been taken under the direction of the court of the amounts due and owing to the Plaintiff as declared herein.

32.  The Defendants are ordered to pay to the Plaintiff before expiration of any redemption period (or, if no redemption period, within seven days after the date of this judgment) whatever sums may appear to be due upon the taking of such account, together with attorney's fees and costs of the proceedings (to the extent provided in the mortgage or by law.)

33.  In default of such payment in accordance with this judgment, the mortgaged real estate shall be sold as directed by the court, to satisfy the amount due to the Plaintiff as set forth in this judgment, together with the interest thereon at the statutory judgment rate from the date of the judgment.

34.  In the event the Plaintiff is a purchaser of the mortgaged real estate at such sale, the Plaintiff may offset against the purchase price of such real estate the amounts due under the judgment for foreclosure and order confirming the sale.

35.  In the event of such sale and the failure of the person entitled thereto to redeem prior to such sale pursuant to statutory provisions, the Defendants made parties to the foreclosure in accordance with statutory provisions, and all non-record claimants given notice of the foreclosure in accordance with statutory provisions, and all persons claiming by, through or under them, and each and any and all of them, shall be forever barred and foreclosed of any right, title interest, claim, lien or right to redeem in and to the mortgaged real estate.

50716382;1

36.     If no redemption is made prior to such sale, a deed shall be issued to the purchaser thereat according to law and such purchaser shall be let into possession of the mortgaged real estate in accordance with statutory provisions.

## ORDER UPON SPECIAL MATTERS

37.     The sale shall be by public auction.

38.     The sale shall be by open verbal bid.

39.     The sale shall be conducted by any authorized representative of this Court.

40.     Exceptions to which title in the real estate shall be subject at the sale shall include general real estate taxes for the current year and for the preceding year which have not become due and payable as of the date of this judgment and any special assessments upon the real estate and covenants, conditions, easements and restrictions of record.

41.     In the event any party to this foreclosure is a successful bidder at the sale, such party may offset against the purchase price to be paid for such real estate of amounts due such party under this judgment of foreclosure or the order confirming the sale.

## ORDER FOR JUDICIAL SALE

42.     The real estate is ordered sold in accordance with statutory provisions.

43.     <u>Notice of Sale</u>.  The mortgagee, or such other party designated by the Court, shall give public notice of the sale as follows:

    a.     The notice of sale shall include the following information, but an immaterial error in the information shall not validate the legal effect of the notice:

        (i)     The name, address and telephone number of the person to contact for information regarding the real estate;

        (ii)     The common address and other common description (other than legal description), if any, of the real estate;

        (iii)     A legal description of the real estate sufficient to identify it with reasonable certainty;

        (iv)     A description of the improvements on the real estate;

        (v)     The real estate will not be available for inspection;

        (vi)     The time and place of the sale;

        (vii)     The terms of the sale; and

        (viii)     The case title, case number and court which foreclosure was filed.

b.    The notice of sale shall be published at least three (3) consecutive calendar weeks, once in each week, the first such notice to be published not more than five (5) weeks prior to the sale, the last such notice to be published not less than seven (7) days prior to the sale, by:

(i)    an advertisement in a newspaper circulated to the general public in the county in which the real estate is located, in the section of that newspaper where legal notices are commonly placed and (b) a separate advertisement in the section of such newspaper, which may be the same newspaper, in which real estate other than real estate being sold as part of legal proceedings is commonly advertised to the general public; provided, that where both advertisements could be published in the same newspaper and that newspaper does not have separate legal notices and real estate advertisement sections, a single advertisement shall be sufficient; and

(ii)    No other publication shall be required.

c.    The party who gives notice of public sale shall also give notice to all parties in the action who have appeared and have not heretofore been found by the court to be in default for failure to plead. Such notice shall be given in the manner provided in the applicable rules of court for service of papers other than process and complaint, not more than forty-five (45) days nor less than seven (7) days prior to the day of sale. After notice is given as required in this Section, a copy thereof shall be filed in the office of the clerk of this Court together with a certificate of counsel of other proof that notice has been served in compliance with this Section.

d.    The party who gives notice of public sale shall again give notice of any adjourned sale; provided however, that if the adjourned sale is to occur less than sixty (60) days after the last scheduled sale, notice must be given in accordance with the provisions above.

Upon purchase of the Premises, the person conducting the sale shall give a certificate of sale to the Purchaser which certificate of sale may be recorded.

44.    <u>Transfer of Title</u>. Upon or after confirmation of sale, the person who conducted the sale or the Court shall execute a deed to the holder of the certificate of sale sufficient to convey title to the Premises, which deed shall identify the Court and the caption of the case in which judgment was entered authorizing issuance of the deed. Signature and the recital in the deed of the title or authority of the person signing the deed as grantor, of authority pursuant to this Judgment of Foreclosure and of the giving of the notices required by statute shall be sufficient proof of the facts recited and of such authority to execute the deed, but such deed shall not be construed to contain any covenant on the part of the person executing it.

Delivery of the deed executed on the sale of the Premises, even if the purchaser or holder of the certificate of sale is a party to the foreclosure, shall be sufficient to pass title thereto. Except

50716382;1

as otherwise provided herein, such conveyance shall be an entire bar of all claims of parties to this foreclosure action.

45. <u>Application of Proceeds</u>. The proceeds resulting from the sale ordered herein shall be applied in the following order:

  a. The reasonable expenses of sale;

  b. Plaintiff's and the court-appointed receiver's reasonable expenses of securing possession before sale, holding, maintaining, and preparing the Premises for sale, including payment of taxes and other governmental charges, premiums on hazard and liability insurance, and, to the extent provided for in the Mortgage, reasonable attorneys' fees, payments made pursuant to 735 ILCS 5/15-1505, and other legal expenses incurred by Plaintiff;

  c. Satisfaction of the claims of the A Note Holder and B Note Holder as adjudicated in this Judgment of Foreclosure and Sale, including *per diem* interest at the default rates set forth in the Verified Complaint at paragraph 34(J)(iv)-(v) after March 1, 2019, plus its attorneys' fees and costs, including attorneys' fees and costs after judgment is entered, any advances made by Plaintiff after the date of this Judgment, and any additional amounts found due and owing to Plaintiff pursuant to any further order of this Court, and if any surplus remains thereafter, it shall be deposited with the Clerk of the Court and held there subject to distribution pursuant to further order of this Court.

46. Satisfaction of claims in the order of priority adjudicated in this judgment of foreclosure; and

47. Remittance of any surplus to the mortgagor or as otherwise directed by the court.

## REDEMPTION - NON-RESIDENTIAL

48. The mortgaged real estate is not residential property as defined in § 15-1219 of the Illinois Mortgage Foreclosure Law, 735 ILCS 5/15-1219. The right of redemption and the right of reinstatement have been waived in writing by the owner of record.

## OTHER MATTERS

49. <u>Report of Sale</u>. The person conducting the sale shall file a report of sale with the Clerk of this Court specifying the amount of proceeds of sale realized and the disposition thereof.

50. <u>Possession</u>. Plaintiff is authorized to take possession of said real estate upon and after default by the terms of the mortgage foreclosed; Plaintiff has prevailed on a final hearing of this cause; Plaintiff has requested to be placed in possession of said real estate, and Defendant-mortgagor has not objected and shown good cause for having possession of said Premises hereafter. After the entry of this judgment, Plaintiff and/or the court-appointed receiver, in

50716382;1

Plaintiff's sole discretion, shall have exclusive possession of said real estate and after the sale ordered herein, the holder of the certificate of sale shall have Plaintiff's right to be placed in possession of said real estate. After issuance of the Judicial Deed to the said real estate, the Grantee shall be entitled to immediate possession of the said real estate without further Order of the Court.

51.　　<u>Homestead Waiver</u>.　Defendant-mortgagor waived its right to homestead or other exemptions in said real estate in the body of said mortgage, which was duly signed and acknowledged, and said Defendant-mortgagor is therefore barred from claiming any right to homestead or other exemptions in said real estate.

52.　　<u>Deficiency</u>.　If the money arising from said sale shall be insufficient to pay the amounts due to Plaintiff with interest and the costs and expenses of sale, the person conducting the sale shall specify the amount of such deficiency in the report of sale, and a judgment shall be entered therefor, if appropriate and authorized by the Mortgage.

53.　　Selling Officer.　Pursuant to 735 ILCS 5/15-1506(f)(3), Intercounty Judicial Sales Corporation is appointed as Sales Officer to conduct the judicial sale in this matter in accordance with statutory provisions.

## **COUNT II**

53.　　Summary judgment is entered in favor of Plaintiff on Count II (Foreclosure of Liens and Security Interests).　The Personal Property may be sold in conjunction with the judicial sale in this cause.

Judge Gerald Cleary

NOV 12 2019

Circuit Court - 2147

ENTER: _____

Judge

_____

Prepared by:
*/s/ Thomas B. Fullerton*
Thomas B. Fullerton
Akerman LLP
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
Tel. 312.634.5700
Fax: 312.424.1926
thomas.fullerton@akerman.com
*Attorneys for Plaintiff TOCU II LLC,*
*a Delaware limited liability company*

11

50716382;1

Copies to:
John J. Tully, Jr.
33 N. Dearborn St., Ste. 2450
Chicago, IL 60602
(312) 917-2411
jtully@tullyassoc.com
*Attorney for Defendant WEC 98C-4 LLC*

Chelsea McCarthy
Holland & Knight LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
chelsea.mccarthy@hklaw.com
*Attorney for North Riverside Park Associates, LLC*

50716382;1